1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,      : 17-CR-48 (JBW)
                               :
          Plaintiff,           :
                               : United States Courthouse
     -against-                 : Brooklyn, New York
                               :
JANE DOE,                      :
                               : Thursday, July 19, 2018
          Defendant.           : 3:00 p.m.
- - - - - - - - - - - - - - - -X


TRANSCRIPT OF CRIMINAL CAUSE FOR BOND REVOCATION HEARING
BEFORE THE HONORABLE ROBERT LEVY
UNITED STATES MAGISTRATE JUDGE


A P P E A R A N C E S:


For the Government:       RICHARD P. DONOGHUE, ESQ.
                          UNITED STATES ATTORNEY
                          Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201
                          BY:  TIANA DEMAS, ESQ.
                               Assistant United States Attorney


For the Defendant:        FEDERAL DEFENDERS OF NY, INC.
                          One Pierrepont Plaza
                          16th Floor
                          Brooklyn, New York 11201
                          BY:  SAMUEL JACOBSON, ESQ.
                               DEIRDRE VON DORNUM, ESQ.


Court Reporter:       DAVID R. ROY, RPR
                      225 Cadman Plaza East
                      Brooklyn, New York 11201
                      drroyofcr@gmail.com

Proceedings recorded by Stenographic machine shorthand,
transcript produced by Computer-Assisted Transcription.

```
                        Proceedings                    2
```

 1            (In open court.)

 2            THE COURT:  Good afternoon.  Please have a seat

 3    everyone.

 4            So are we ready to start or do we need to wait a

 5    few minutes?

 6            MR. JACOBSON:  We're ready, Judge.

 7            THE COURT:  All right.  So we're here in USA

 8    versus Jane Doe, 17-CR-48.

 9            Counsel, please state their appearances for the

10    record.

11            MS. DEMAS:  Good afternoon, Your Honor.  For the

12    Government, Tiana Demas, and with me is Bianca Carter,

13    Pretrial Services.

14            MR. JACOBSON:  Good afternoon.

15            MS. CARTER:  Good afternoon.

16            MR. JACOBSON:  Good afternoon, Your Honor.  Sam

17    Jacobson, Federal Defenders, on behalf of Ms. Doe who is

18    present next to me.  We're joined today by Vivianne Guevara,

19    social worker; and Karina Buruca, paralegal in our office;

20    and Ms. Von Dornum, who should be here shortly.

21            THE COURT:  Okay.  Thank you.

22            All right.  Should we start with

23    Pretrial Services, or has everyone seen the

24    Pretrial Services services report?

25            MR. JACOBSON:  Yes, we have, Judge.

```
                        Proceedings                    3
```

1          MS. DEMAS:  Yes.

2          THE COURT:  Okay.  Is there anything you want to

3    add to the report?

4          MS. CARTER:  Your Honor, we still haven't heard

5    back from Patrick McFarland for the BOP, the halfway house

6    contractor.

7          THE COURT:  Okay.

8          MS. CARTER:  So there's no update to the

9    memorandum regarding the transitional housing.

10         THE COURT:  Okay.  Is he not answering his phone

11   or he just doesn't --

12         MS. CARTER:  He's just not answering.  We've had

13   both of the halfway houses also reach out to him after we

14   spoke to him, and we haven't heard anything back.

15         THE COURT:  So presumably if he gives a yes

16   answer, there would be several places for her, presumably

17   two places for her?

18         MS. CARTER:  Correct.

19         THE COURT:  Okay.

20         Does anyone have a comment on that at this point

21   or should we just wait until we hear?

22         MS. DEMAS:  Your Honor, the Government's position

23   remains the same with respect to what location best

24   maintains the safety of the community and maintains the risk

25   of flight and that is at the MDC where the defendant

Proceedings                                              4

1    currently is now.  I still don't know what the answer, that

2    Ms. Carter explained to me at least one of these halfway

3    houses, I think, takes all the phones away from the

4    residents so that would certainly be a step in the right

5    direction.  I understand that there is a computer, and I

6    believe this is the place in New Jersey; however, it's quite

7    far out in New Jersey, I think close to Camden, which is

8    pretty close to Pennsylvania.

9              THE COURT:  Right.

10             MS. DEMAS:  So I don't know how that would affect

11   Pretrial's ability to even continue supervising the

12   defendant.  I think they would have to transfer that

13   supervision to the District of New Jersey, and I don't know

14   if the District of New Jersey is willing to take that on.

15   So, in fact, that probably needs to be answered before the

16   viability of the New Jersey halfway house is addressed.

17             THE COURT:  It would also make it difficult for

18   her to meet with counsel.

19             MS. DEMAS:  Yes.

20             Although I do think that maybe -- and maybe I'm

21   just conflating all places in New Jersey, but I thought that

22   this may have been the location that defense counsel

23   suggested.

24             MR. JACOBSON:  Well, we hadn't initially proposed

25   a halfway house, but it's close to the family member that we

1    were trying to find suitable housing there.

2              MS. DEMAS:  Correct.

3              MR. JACOBSON:  And I think our proposal is

4    essentially that any of these re-entry facilities would be

5    suitable for Ms. Doe.  I understand that Pretrial might have

6    a preference for the New Jersey facility because of the

7    phone restrictions.  Certainly the Brooklyn or the Bronx

8    halfway house would enable her to be closer to her doctors

9    at Bronx Lebanon Hospital and her counsel.  I know there

10   were logistical and monetary issues based on who would make

11   the referral and who would actually pick up the tab.

12             I did look into a little bit of the costs of

13   incarceration versus a halfway house and on the whole, the

14   halfway house -- the daily rate is generally cheaper than

15   what BOP pays in costs for its own facilities.  So I think

16   MDC is upwards of a hundred dollars a day and a halfway

17   house is usually in the 80s or 90s.  I think there's a BOP

18   report that suggests that nationwide, and again, there are a

19   lot of rural prisons, but it's about $80 per day for the

20   average prison and $72 for the average halfway house.  So I

21   know there is an issue of whether it's fungible in terms of

22   BOP paying versus Pretrial.  But it is cheaper than the cost

23   of holding her at MDC or MCC.

24             MS. CARTER:  Just to point out, Your Honor, in

25   relation to the halfway house, we agree with Counsel if that

Proceedings                                    6

1    was the Court's route.  Being closer to us would be best

2    because all of our doctors' appointments are here and the

3    social workers, so that's why we are reaching out to them

4    locally definitely to see if we could get her a place there,

5    and as you noted, we're still waiting to hear back.

6              THE COURT:  Okay.

7              Has the Government found out any additional

8    information through its investigators as to what was on the

9    Facebook account or postings?

10             MS. DEMAS:  As I mentioned to the Court, the only

11   way for the Government to be able to figure that out on our

12   own would be to get a search warrant, which would take time

13   to get that from Facebook.  The first step that we discussed

14   at the status -- or I'm sorry, the bail hearing -- or the

15   revocation hearing, excuse me, on Tuesday, with the

16   Federal Defenders we're going to go into the defendant's

17   Facebook account and see if they can download it.

18             THE COURT:  Okay.

19             MS. DEMAS:  I understand from Mr. Jacobson that he

20   today went into the account, has not looked through it

21   completely, and that he has somebody at Federal Defenders of

22   New York looking into how they can download it, and I gave

23   them direction on that point.  But I don't understand

24   Mr. Jacobson to have made an offer that he would necessarily

25   turn it over to us because it doesn't sound like he's done

Proceedings                                                      7

1  his review.  If the result of that review is that they do

2  not want to turn it over to the Government, then we

3  obviously will need the search warrant and obtain it from

4  Facebook.  And then I would anticipate, just based on half

5  the response time, usually by the time the warrant is served

6  on Facebook, we receive a response usually in approximately

7  two weeks but sometimes longer.

8           THE COURT:  Okay.

9           MR. JACOBSON:  And I can add a little bit to that,

10  Judge, just based on my kind of cursory review of the social

11  media platforms.  I did review the Google Plus account.  We

12  had some discussion about whether that was social media

13  having conceded that you are able to post things to a

14  Google Plus account.  So I reviewed the entirety of

15  Ms. Doe's Google Plus account.  There are about 10 or 15

16  posts.  I would characterize them -- and the Government can

17  jump in if I'm missing anything -- but there are dietary

18  posts.  There are a number of posts about eating more

19  vegetables and less meat.  There's a post about her counsel

20  and her feelings about her counsel.  There are some general

21  Islamic quotes, for example, eating at the end of Ramadan.

22  There are some cooking recipes, and there are posts about

23  her medical situation and the pain that she's in.  My

24  extremely brief review of the Facebook profile, and I was

25  strictly looking at the posts that were made to her account,

Proceedings                                              8

1    is that it was similarly innocuous.  There were posts,

2    general Islamic quotes, post about fashion, posts about

3    diet, cooking recipes, photos of cats.

4          MS. DEMAS:  Just to put a somewhat finer point on

5    it.  However, Your Honor, the things that the Government

6    would be most concerned about, and that was clearly a

7    violation -- all of it was a violation of the terms of her

8    pretrial release, but the specific communications that are

9    most concerning are the ones with people on whom the

10   defendant had previously recorded.  Those would not be in

11   the general host section of Facebook.  Those would be in the

12   Facebook direct messaging section, and it doesn't sound like

13   Mr. Jacobson has reviewed those.

14         MR. JACOBSON:  I have not, Judge, and we will.  I

15   do think I can add a little bit of color to what some of

16   these communications were that are mentioned in the Pretrial

17   report, both from my review of the account and from the

18   investigation that I've done about the nature of the

19   communications.  I think I would -- we hadn't discussed in

20   full Paragraph 5 of the Facebook contacts that were made,

21   and that was with Umm Oyiam.  That was an individual that

22   Ms. Doe had previously known.

23         There's a full section of that paragraph of the

24   pretrial memorandum that says that Ms. Doe contacted the

25   individual via telephone.  I would just add that she never

1    actually made contact.  It was just a voicemail.  There is a

2    suggestion that there were a number of messages.  I can say,

3    and I know this from having spoken to an Islamic

4    organization that I was in contact with, the nature of those

5    communications was Ms. Doe trying to find support within the

6    Muslim community for herself, and she absolutely went about

7    it in the wrong way.  She should have worked through

8    Pretrial who is there to support her and Hope House and her

9    counsel.  But I do know, because I spoke to the

10   organization, that it was to find a charitable Muslim

11   organization that could provide housing.

12            I think that one of the issues in the Bronx was

13   that there were no other Muslims in the residence, so there

14   were issues with having halal and being able to do group

15   prayer sessions.  So she very much wanted to be in a place

16   where there were other Muslims, understandably.  And so she

17   was reaching out wrongly to organizations that she felt

18   could provide that help.  But as I said last time, this had

19   nothing to do with ISIS or any foreign organizations.  It

20   was simply an attempt to find herself a better and more

21   suitable situation.  And then I think a number of other

22   individuals saw that she had connected on Facebook to this

23   individual, and perhaps sent her Facebook requests.  But I

24   don't think she -- there was no contact with the majority of

25   the people in the top section of this memorandum.

Proceedings                                      10

1              As to the suggestion, and I don't think I

2     mentioned this at our previous appearance, but the bottom

3     section, Paragraphs 1 through 4 of the searches that were

4     conducted, I do think it's important that really these were

5     just Google searches.  And, yes, they were Google searchs

6     about people she had previously provided information about,

7     and that was the wrong way for her to go about it, but I

8     truly believe that that was curiosity.  It was nothing

9     malicious.  She was not trying to obstruct justice or tamper

10    with witnesses or try to provide information about her

11    cooperation.  She was merely searching on Google to find out

12    what had happened to these individuals.

13             For example, Paragraph 3, Abu Isa Al Amriki is

14    deceased and was killed by American forces.  And I think the

15    attempt was being made to figure out exactly what had

16    happened.  But these were not individuals, for the most

17    part, that she could have contacted with the exception of

18    the individual enumerated in Paragraphs 1 and 2.  As to

19    Paragraph 1, that was also an individual that she knew in

20    her previous life and was curious about -- I think she was

21    primarily curious about whether he had been arrested and

22    never was able to reach that phone number but was merely

23    trying to find out if he was still on the map, so to speak,

24    and available at that number.  But she was not in any way

25    trying to have a substantive conversation with any of these

1   people.  And, again, for most of these individuals, it was

2   just a Google search.  It was not any sort of communications

3   with them.  And the same applies to Numbers 1 through 7 for

4   the Facebook account.

5           So when she did -- when there's evidence that she

6   did reach out, most of these instances, there was never a

7   connection that was made or a connection to a voicemail or

8   nothing was actually left.

9           MS. DEMAS:  Your Honor, I feel like the record has

10  now become somewhat muddled because, first of all, in the

11  violation report there was never any indication for the

12  second half of the page, individuals 1 through 4 that the

13  defendant had actually contacted them.  Giving Number 3 as

14  an example, Abu Isa Al Amriki, he was an extremely well

15  known and prolific ISIS recruiter who was based oversees,

16  whose wife the defendant communicated with before both

17  Abu Isa Al Amriki and his wife were killed.  They were

18  killed during the time that the defendant was communicating

19  with them before she was arrested.  She knew before she was

20  arrested that they had been killed.  There was speculation

21  that they had been killed by drones.  So the idea to the

22  extent that it was suggested that Ms. Doe was Google

23  searching that person to figure out what had happened to

24  him, she knew full well what had happened to him, and she

25  knew that as of the spring of May of 2015 because she had

1   made plenty of Facebook posts about it and it was about that

2   point in time when the defendant then began communicating

3   with other ISIS facilitators in an effort to help people

4   wanting to make -- to travel to ISIS-controlled territory

5   from the United States, you know, to travel abroad.  So I

6   think that that point needs to be clarified.

7           Secondly, to the extent that Mr. Jacobson has

8   suggested that the defendant did not actually make contact

9   with the individuals listed in 1 through 7 on Facebook, as

10  Mr. Jacobson previously indicated, he never reviewed the

11  defendant's direct messages.  I understand he reviewed her

12  Facebook posts.  The Facebook posts would not indicate

13  whether or not she had made contact with the individuals and

14  sent messages to them.  Certainly the pen register results

15  which the Government has and on which this violation report

16  was based on, shows that the defendant was indeed exchanging

17  direct messages with these individuals.  Sometimes received,

18  but also she sent.  So without knowing the content of those

19  messages, I think it's very difficult to accept.  I would

20  caution anybody to accept Mr. Jacobson's representation that

21  the defendant did not actually communicate with these

22  people.

23          With respect to Hassan Yahya, Number 1, on the

24  second part of Page 2, the defendant called his place of

25  work, and it was only by happenstance that that number

Proceedings                                    13

1   happened to have been disconnected.  But if it hadn't been

2   disconnected, someone, presumably him, would have answered.

3   So the idea that because it was disconnected that these

4   actions are somehow less concerning, I don't think that

5   that's true at all.

6          The defendant's actions show that she fully

7   intended to communicate with people.  Otherwise, you don't

8   make a phone call.  So the concerns that the Government

9   previously raised about the defendant reaching out to

10  individuals whom she had reason to believe are under

11  Government investigation and corresponding with them and

12  potentially warning them, that that remains just as strong

13  as it was a few days ago.  And I have not heard anything

14  that that would suggest that that concern has been

15  alleviated.

16         MR. JACOBSON:  And, Judge, if I could just

17  clarify?  I'm not suggesting that she didn't have

18  communications with any of these individuals.  She did have

19  communications with the individual in Number 5.  But again,

20  I have spoken to the fruits of that communication because it

21  was an Islamic organization that provides charitable

22  services.  So it was not a conversation -- and again, it was

23  absolutely not the right way to go about obtaining these

24  services, but that's what she was trying to do.  And she

25  did -- also the individual in Paragraph 5 there was a phone

1   call that didn't connect.  And I, of course, agree that

2   there's this phone call that Pretrial and the Government

3   believe was placed, a number that was previously associated

4   with the individual in Number 1 and it didn't connect.  And

5   I don't think that she had an intent to have any substantive

6   conversation with the individual.  I think that she was just

7   trying to see if he picked up the phone or if someone -- if

8   he was still at -- if he was still on the street or had been

9   arrested, and that's understandable.  And that is certainly

10  not the way to approach this, but it's understandable that

11  someone who had entered into a cooperation agreement would

12  want to know if some of those individuals had been arrested,

13  totally separately from a malicious intent of trying to

14  obstruct justice or tamper with witnesses.  There's a much

15  more innocent and much more -- much more obvious explanation

16  of just trying to see, which is consistent with the contacts

17  that she made trying to search people -- Google other

18  individuals that she had no way of contacting.

19          And I think there's a suggestion on the next page

20  of contacts that were made with two individuals in Morocco.

21  Those are people who have no affiliation whatsoever with

22  radical groups and were people she had known when she was

23  living in Morocco.

24          And there's also the mention of the Arabian Travel

25  Trans Corporation, which sounds like it would be an Arabian

Proceedings                                      15

1    travel agency, but it's actually the car service here in

2    New York that --

3                 THE COURT:  Is that right?

4                 MR. JACOBSON:  It's a car service -- if you Google

5    it, it's a car service here in New York City.

6                 THE COURT:  Even though it's self-described as a

7    travel agency?

8                 MR. JACOBSON:  Right.

9                 THE COURT:  Because that's what we read.

10                MR. JACOBSON:  That's a trumped-up title, I would

11   say.  They provide --

12                MS. VON DORNUM:  Travel from here to the Bronx.

13                MR. JACOBSON:  Right.

14                And I can say this, too, because I have done this

15   for Ms. Doe, and you will see that the phone number matches

16   as well.  I can say that I have done this previously for

17   Ms. Doe as has my co-counsel and social workers and

18   paralegals.  But she's been hospitalized many times since

19   she's been out on bail, and when she gets discharged from

20   the hospital in the middle of the night, she has no way of

21   getting home.  And so on several occasions, if we're still

22   awake at that hour, we will order an Uber for her or try to

23   make sure that her MetroCard is filled.  But for travel from

24   Bronx Lebanon Hospital back to Hope House, I think she was

25   looking for cars.  That really -- so that is the

1    explanation.

2           I can see that the Court's clerks have found the

3    website and that is, in fact, what it is.

4           THE COURT:  Yes.

5           MR. JACOBSON:  So I know that a lot of these

6    things sounds scary and look scary on their face, but I

7    think there was really -- there was no intent to reach out

8    to ISIS, to recruit for ISIS, to do anything with ISIS other

9    than curiosity, which was manifested in an extremely

10   misguided way and manifested in a way that you would hope it

11   wouldn't, but you would understand for someone who was

12   suffering from very severe mental health issues, very severe

13   physical issues.

14          She is also an extremist and went about satisfying

15   her curiosity and satisfying her desire for Islamic services

16   in the wrong way.  But I just want to be very clear that

17   none of this had anything to do with ISIS.  It had to do

18   with someone who was suffering and wanted the services and

19   people who could alleviated that suffering.

20          THE COURT:  Okay.  When I Google Arabian Travel

21   Trans Corp., there is a drop-down which says preregister for

22   Hajj 2018.

23          MR. JACOBSON:  There's several organizations with

24   the same name.  If you look at the Arabian Travel Trans

25   Corp. with the (877) number, it's the black car.

```
                        Proceedings                    17
```

1          THE COURT:  Oh, it's the black one?

2          MR. JACOBSON:  Yes.

3          THE COURT:  Okay.

4          MR. JACOBSON:  I agree, Judge.  There are several

5     organizations with the same name, but the one that she

6     called is the car service.

7          THE COURT:  That's fine.  Well, Google doesn't

8     list the car services prominently.

9          MR. JACOBSON:  That's the one she called.

10          THE COURT:  The (877) number?

11          MR. JACOBSON:  Right.

12          THE COURT:  Okay.

13          MR. JACOBSON:  And so I have not reviewed every

14     Facebook message, but I think what we have from her profile

15     posts from her Google Plus is consistent with -- and, again,

16     the posts she made is eat less meat, more veggies.  Stuff

17     about Eid and general Islamic quotes, cooking recipes, stuff

18     about her health, and how she was looking for people who

19     could help her with her health issues.  I think that is all

20     consistent with what we're saying, which is that she was

21     just trying to reach out and she reached out to people she

22     shouldn't have and she violated the conditions of her bail.

23     But she didn't do that because she wanted to help ISIS.  She

24     did it because she wanted to help herself.

25          THE COURT:  Okay.  Well, I think the situation we

```
                    Proceedings                18
```

1  are in now is that we do not have an alternative that is

2  available at this point.  As I understand it, we are still

3  waiting for BOP to give the okay on the Brooklyn or Bronx

4  halfway houses, and then we will determine whether they are

5  acceptable.

6          And for the New Jersey halfway house, it appears

7  there is not a bed; is that right, and we also need to worry

8  about -- or is there is a bed?

9          MS. CARTER:  There's one in Bridgeton.

10          THE COURT:  Well, Bridgeton is one that is six

11  hours --

12          MS. CARTER:  That's six hours by public

13  transportation.

14          THE COURT:  Okay.

15          MS. CARTER:  The other one is located in Newark,

16  which is about an hour or so --

17          THE COURT:  Yes.

18          MS. CARTER:  -- by public transportation.  It

19  doesn't have a bed available at the time.

20          THE COURT:  Okay.

21          MS. CARTER:  And they don't know when one will be

22  available.

23          THE COURT:  And will we have transfer supervision

24  to --

25          MS. CARTER:  For Newark?  No, we would keep it.

1    For Bridgeton, more than likely yes, because Camden -- I

2    can't drive to Camden, Your Honor.

3            THE COURT:  Okay.

4            MS. CARTER:  So that's our only option, because

5    Camden is still about maybe 45 minutes from the facility, so

6    they would be the nearest office that works with us.

7            THE COURT:  Okay.  So it does not seen that we

8    really have a lot of options right now.

9            MR. JACOBSON:  Well, I wonder, Judge, and this is

10   a question for Pretrial, whether she could temporarily be

11   placed at the Brooklyn halfway house until an option comes

12   available in New Jersey that has all of the strict

13   restrictions that --

14           MS. CARTER:  (Indicating.)

15           MR. JACOBSON:  I'm sorry.  Go ahead.

16           MS. CARTER:  We can't place anyone in New York.

17   That's our first option.

18           THE COURT:  Right.

19           MS. CARTER:  We can't place them without BOP

20   giving us the okay because they have to do the referral

21   because it's their -- the place they use to house people.

22   So they have to give a referral for them to say yes to us.

23   Even though we're going to pay, they have to make the

24   referral to Brooklyn house or the Bronx halfway house.

25           MR. JACOBSON:  I see.

Proceedings                    20

1          THE COURT:  McFarland, is that the person who can

2    give the okay, and he is strenuously avoiding your emails,

3    apparently?

4          MS. VON DORNUM:  I can vouch for on that,

5    Ms. Carrera.  He tends to.

6          MS. CARRERA:  But do we have a sense of how long

7    that would take, assuming he responds; is that a one-day

8    process; is it a two-week process?

9          MS. CARTER:  All he has to do is -- if he responds

10   and he says yes, all we have to do is give them the 129,

11   which we already have ready to send him.  He has to just let

12   the Brooklyn house or GO say, Yes, you can take her.  It's

13   just about them just saying yes.

14         MS. VON DORNUM:  Right.

15         MR. JACOBSON:  And I don't know --

16         THE COURT:  And then if we were to do that, even

17   temporarily, what measures could be taken to enforce the

18   nonaccess to phones and computers?

19         MS. CARTER:  So it's my understanding that

20   whatever the Court orders, they have to follow.

21         THE COURT:  Okay.

22         MS. CARTER:  And that's how it goes from there.

23   Brooklyn house is right here.  I have spoken to the director

24   about this case, not in detail, but just explain the

25   concerns that the Court has, and they indicated that they

1   would abide by that.  They have someone there that's

2   currently under Probation on GPS, so she could be there with

3   an ankle monitor, so...  And they do have beds available

4   right here at Brooklyn house.  It's just about the mere

5   presence.

6           THE COURT:  Okay.

7           MR. JACOBSON:  There's a possibility, Judge, that

8   it be done through Probation's contract with the halfway

9   house, because in a lot of districts, Probation and Pretrial

10  share contracts with these facilities.

11          MS. CARTER:  So at the end of the day even though

12  it's done with their contract, they don't -- BOP's issue is

13  that she's not sentenced, so she will not have a judgment or

14  conviction, and their rules -- unless Mr. McFarland says

15  okay to, they can't commingle.

16          THE COURT:  What about a Court order?  Would they

17  listen to a Court order or would they not?

18          MS. CARTER:  I'm not sure, Your Honor.  Does the

19  Bureau of Prisons listen to any Court orders really?  No

20  offense, but...

21          THE COURT:  Nothing personal.

22          So there is nothing that the Court can do at this

23  point to speed things up?

24          MS. VON DORNUM:  I mean, a Court order may aid us

25  with Mr. McFarland.

Proceedings                          22

1          THE COURT:  Okay.

2          MS. VON DORNUM:  Even if it's not the final word,

3     I think it could help move him along.

4          MS. CARTER:  I mean, even a person has to go to a

5     local facility, it's the judge's suggestion.

6          THE COURT:  Right, I know.

7          MS. CARTER:  So, I mean, by all means, if

8     Your Honor wants to write something, we can get it to

9     Mr. McFarland.  I can give you his contact information.  If

10    you want to make that phone call, by all means.  But it is

11    not Pretrial's lack of trying.

12         THE COURT:  No, I understand that.

13         No, but I would like to get this resolved, and I

14    would like to make sure that we have conditions in place and

15    that, you know, both the community and the defendant are

16    safe at this point.

17         Does the Government have anything to add at this

18    point if we get the conditions implemented there?

19         MS. DEMAS:  I would just like to be able to

20    confirm with the halfway house director myself what the cell

21    phone use policy is and what the availability of computers

22    are and whether it is something that we can actually

23    enforce.  I only say this because in the past when we looked

24    at the three-quarter house and, you know, the probation

25    officer along had serious concerns about that three-quarter

Proceedings                                              23

1    house's ability to, you know, actually implement these

2    restrictions.  So I would just like to speak to either the

3    director or someone in a position of power to know exactly

4    what their people are doing.  Because if it's just a matter

5    of we trust people not to use the phones and not to bring

6    them in, but they don't do anything to actually see if

7    that's being adhered to, then I would, you know, have

8    serious concerns.

9            MS. VON DORNUM:  Your Honor, Ms. Carter can speak

10   to it as well, and, obviously, Ms. Demas can speak to the

11   director of the halfway house, but I have had several

12   clients who received violations and were discharged from the

13   halfway house because of possession of cell phones.  So I

14   can tell you what happens when they come into the halfway

15   house.  They have to show their purse; show their bag; have

16   their pockets looked at if they have pockets that could hold

17   it; and there are also, if you manage to make it past that,

18   random room searches fairly frequently.

19           THE COURT:  Okay.

20           MS. VON DORNUM:  So I'm not saying that -- you

21   know, I believe there's also a metal detector at the

22   Brooklyn house.  I don't think there is at the Bronx, but

23   there is one at the Brooklyn house.  And you are not allowed

24   to have a cell phone unless you have a specific contract

25   saying that you may have a device, and they monitor

1  carefully who has that and who doesn't.  And they won't

2  place residents who are allowed to have one with residents

3  who are not allowed to have one for the reasons they don't

4  want them to be shared if you're not supposed to have one.

5  So they segregate the residents by room and they do random

6  room searches.

7       THE COURT:  So those would be the kinds of

8  conditions that would give the Court some comfort.  I don't

9  know if there's anything else.

10      MS. DEMAS:  Well, beyond cell phone, the computers

11  I would want to have more information about because it's

12  very rare to find anyplace today that does not have a

13  computer, and those computers are not under lock and key.

14  So I would just want to gain a better understanding at the

15  halfway house.

16      THE COURT:  Has anyone been to the Gold Street

17  house to see where the computers are?

18      MS. GUEVARA:  I don't know where they are, but I

19  do know that people can't just go in and use them freely.

20  My last knowledge of them there, you have a certain time

21  where you can use the computer and there's a log-in.  You

22  can't just open them and be available for use.  So she would

23  be restricted, I think, by not having a log-in.  I guess

24  they could give her the log-in, but it's a separate room

25  where she could go there.  Somebody would notice.  There's

Proceedings                                    25

1    staff always around watching.

2              THE COURT:  Okay.

3              MS. VON DORNUM:  And there are other people there

4    who have no computer-use conditions.  I have several child

5    pornography there who have specific no-computer-use

6    restrictions.

7              THE COURT:  Okay.  Well, and there would be a

8    zero-tolerance policy on this, so, you know...

9              So no mistakes.

10             THE DEFENDANT:  Yes, sir, Your Honor.

11             THE COURT:  So that means if you have one

12   violation, you're become in the MDC.

13             THE DEFENDANT:  Yes.

14             THE COURT:  So let's hope.

15             I think the way to leave this, it is the Court's

16   ruling subject to the confirmation by the Bureau of Prisons

17   that the halfway houses that are closer to court in this

18   district would be the most appropriate at this time, rather

19   than New Jersey, unless Pretrial Services believes

20   otherwise.

21             And, secondly, that the Court would under the

22   conditions that were just discussed, including the strict

23   monitoring of and searches for cell phones and other

24   computer-like devices, as well as GPS monitoring with an

25   ankle bracelet, that that would be sufficient to protect the

Proceedings                                              26

1    community and the defendant in this situation.

2           If the Government finds information to the

3    contrary or believes that there is something the Court is

4    either unaware of or has overlooked, of course, the

5    Government should come back at any moment and advise me.

6    But I do not want us to have to wait to have another

7    proceeding in order to implement this if a bed becomes

8    available and is authorized.

9           MS. DEMAS:  So, Your Honor, practically speaking

10   concerning no place for the defendant to go now, how -- I

11   just want to understand what the trigger will be when the

12   bed is available.  What is the thing that needs to happen to

13   get the defendant to that point because the marshals will

14   need an order?

15          THE COURT:  Right.  So I think I would go back to

16   Pretrial Services then and ask them what do you need from me

17   to make this happen?

18          MS. CARTER:  Do we need an expedited or just in

19   general?

20          THE COURT:  Well, I can have an order that says

21   the Court directs on the Bureau of Prisons to use every

22   effort to approve a bed for Ms. Doe.

23          MS. CARTER:  So what I can do is upon -- if

24   Your Honor gives that letter and I give it to Mr. McFarland,

25   I can notify the Court as soon as something is yes or a no,

Proceedings                                        27

1   however it goes.  And if it's a yes, then does Your Honor

2   want to see the defendant to release her, or how does that

3   go?

4              THE COURT:  No, I think this is fine.  I do not

5   think we need to --

6              Ms. Doe, do you have any questions about what you

7   can and can't do?

8              THE DEFENDANT:  As long as I have legal visits and

9   I can go to my medical appointments --

10             THE COURT:  Right.

11             THE DEFENDANT:  -- am I approved for that?

12             THE COURT:  You are approved for legal visits and

13  medical visits upon approval of -- you know, you have to

14  have an okay from the halfway house and Pretrial Services.

15             MS. VON DORNUM:  You have to get permission each

16  time.

17             THE DEFENDANT:  Each time.

18             THE COURT:  You cannot just go out and say, I'm

19  going to see my lawyer.

20             THE DEFENDANT:  I see.

21             THE COURT:  Okay.

22             MS. DEMAS:  Your Honor, the only other thing is

23  that I think the special conditions are now actually being

24  modified as to where they previously had been, and there's

25  no document right now that contains any special

Proceedings                                    28

1    conditions --

2         THE COURT:  Oh, you mean as to Hope House as

3    opposed to --

4         MS. DEMAS:  Well, Hope House, and also, you know,

5    prior -- my understanding of the Court's -- maybe ruling is

6    not quite the right word, but the conditions that would be

7    imposed should the defendant be released to a halfway house

8    are going to be stricter than the conditions that had been

9    imposed when she was released to Hope House.  So, for

10   example, Condition 1, which is only being able to use a

11   computer approved by Pretrial Services and the

12   U.S. Attorney's Office is now no computer use, rather than

13   it being limited.

14        THE COURT:  Okay.

15        MS. DEMAS:  And I think the telephone condition

16   remains the same.

17        Number 3 remains the same.

18        But I just would like it to be very clear to the

19   defendant what she can and cannot do, and that there be a

20   document that reflects that.

21        THE COURT:  Well, I do, too.  I am just looking on

22   the docket sheet to see if we have an order that can be

23   modified.

24        MR. JACOBSON:  Oh, I have a copy of it here,

25   Judge.  I think it's just a matter of modifying Paragraph 4,

```
                     Proceedings                    29
```

1     Attachment A.

2              THE COURT:  Okay.  Do you know what docket number

3     that is?

4              MR. JACOBSON:  I don't.

5              THE COURT:  Okay.

6              MS. DEMAS:  The problem, Your Honor, is it's a

7     sealed docket, so we can't -- unless I go through the Clerk

8     of the Court, I can't --

9              THE COURT:  Oh, really?  Neither one of you

10    could --

11             MS. DEMAS:  No.

12             THE COURT:  I am surprised there is not access to

13    the parties.  I thought that that is what we --

14             MS. DEMAS:  There's supposed to be, but in effect,

15    I've been told that it depends on when the case is sealed.

16    So even know when I theoretically have access, I still need

17    to get it from the Clerk of Court --

18             THE COURT:  Okay.

19             MS. DEMAS:  -- rather than...

20             THE COURT:  Okay.

21             Okay.  I think it is Attachment 80 on

22    Docket Number 38.  I think we can modify that.

23             Do you have a copy?  I can print out another copy.

24             Does the Government have a copy as well?

25             MS. DEMAS:  I don't have it in front of me,

Proceedings                                30

1    Your Honor.  I have other documents.

2            THE COURT:  Irrelevant documents.

3            Okay.  And so what I was going to suggest is that

4    if both sides could get together and right now just redact

5    that so that it is something that both sides agree to and

6    are on notice of.

7            MR. JACOBSON:  We'll do that, Judge.

8            THE COURT:  And I have got a extra copy if you

9    need it.  I can make a copy of that if you want.

10           Do you need another clean copy?

11           MR. JACOBSON:  I think we're able to use this,

12   Your Honor.

13           THE COURT:  Okay.  So it is only Number 4 that we

14   are changing?

15           MR. JACOBSON:  We also have a proposed change to

16   Paragraph 6 which I'm handing up to Your Honor.

17           THE COURT:  Okay.  Thank you.

18           All right.  I am going to read the changes that

19   are proposed.  This is Attachment A to Docket 38 in the

20   sealed docket of 17-CR-48.  Paragraph 4 of Attachment A is

21   completely redacted.  All previous lines are redacted now

22   and the following is substituted:  "The defendant may not

23   use a computer or any mobile device capable of connecting to

24   the Internet."  Period.

25           And Paragraph 6 contains an additional sentence at

Proceedings                                          31

1    the end of that paragraph.  There are no redactions.  It

2    states, "Nor may the defendant contact any individual whose

3    criminal activity she has previously reported to the

4    Government."

5               Okay.  Are these conditions now satisfactory to

6    the defense?

7               MR. JACOBSON:  They are.

8               THE COURT:  To the Government?

9               MS. DEMAS:  Yes, Your Honor.

10              MS. CARTER:  Your Honor, I just forwarded you a

11   document sent to me by Mr. McFarland.  He advised that the

12   defendant would need to sign this document prior to being

13   placed.  And I've sent him this docket with her 129, and he

14   is going to review it for approval for placement.

15              Did you get the docket, Your Honor?

16              THE COURT:  Okay.  I have not gotten it yet.

17              (Pause in proceedings.)

18              THE COURT:  Is there anything else we need the

19   Government for, because I think you need to leave?

20              MS. DEMAS:  No, Your Honor.  Thank you.

21              (Ms. Demas exits the courtroom.)

22              THE COURT:  Do we need to be on the record for

23   this?

24              MS. CARTER:  I don't think so, Your Honor.

25              THE COURT:  I do not think without the Government

Proceedings                                          32

1    here, we want to continue on the record.

2              MR. JACOBSON:  No.

3              THE COURT:  All right.

4              (Matter on the record concluded.)

5                        --ooOoo--

6

7

8

9

10    I (we) certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.

11

12        /s/ David R. Roy              September 21, 2018
            DAVID R. ROY                      Date

13

14

15

16

17

18

19

20

21

22

23

24

25