

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RMT:JGH/ICR
F. #2016R00532

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 17, 2019

## TO BE FILED UNDER SEAL

By ECF & Hand Delivery

The Honorable Jack B. Weinstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re: United States v. Jane Doe
> Criminal Docket No. 17-48 (JBW)
> Criminal Docket No. 19-117 (JBW)

Dear Judge Weinstein:

The government submits this letter under seal[1] in advance of defendant Sinmyah Amera Ceasar's sentencing in the above-captioned cases, which is scheduled for June 24, 2019, at 10:30 a.m.[2] The defendant has pleaded guilty to two separate crimes: conspiring to

---

[1] On March 13, 2019, the government filed a motion under seal in case Docket No. 17-CR-48 seeking the following relief: (1) that the defendant's true name Sinmyah Amera Ceasar be substituted in place of "Jane Doe" on the Court's public docket; (2) that the criminal complaint and information be unsealed; and (3) that the defendant be held by the Bureau of Prisons under her true name. The Court has indicated that it will address these issues at the time of sentencing. Should the Court grant the government's motion, the government will file a redacted version of this sentencing letter on the public docket that protects the sensitive information in this memorandum regarding the defendant's cooperation with the government and other sensitive personal and health related matters.

[2] At sentencing, the government expects to call two witnesses to provide expert testimony relevant to the Court's sentencing determination. Dr. Lorenzo Vidino will testify as an expert on international terrorism and provide background to the Court on ISIS, the role of U.S.-based ISIS recruiters and facilitators, the significance of certain language used by the defendant in her commission of both offenses, and some of the central factors that experts in

provide material support to the Islamic State of Iraq and al-Sham ("ISIS") and then, while on release pending sentencing, obstructing justice by deleting numerous electronic communications she had with other individuals, including ISIS supporters, in order to prevent their detection by the government and the Court.

As this Court rightly observed when sentencing a different defendant in a terrorism case several years ago, among the many sentencing factors the Court must weigh in such cases, "[a]bove all, the court must consider how best to protect the public."[3] For all the reasons set forth herein, and in particular the need to protect the community from further criminal conduct by the defendant – who to this day remains unrepentant for her actions – the government respectfully requests a sentence within the advisory Sentencing Guidelines range of 360 to 600 months' imprisonment.

## I.    **Introduction**

It is important to begin with who the defendant is *not*. She is not a so-called "ISIS Bride," several of whom recently received significant media attention for leaving – or attempting to leave – the United States or other Western countries to join ISIS abroad, only to have a change of heart and seek to return to their home countries.[4] Moreover, the defendant was not convicted of a "cybercrime" or for talking to the wrong people, as she has repeatedly claimed. Nor, finally, is the defendant a victim of religious persecution, prosecuted for standing up for her religious beliefs or her First Amendment rights, claims she continues to make despite having pleaded guilty to two felony offenses.

On the contrary, from at least January 2016 until her November 2016 arrest, the defendant provided material support to ISIS. She did so as a committed recruiter and self-described "assistant" to the terrorist group, connecting ISIS supporters in the United States to ISIS facilitators and operatives abroad. Specifically, the defendant repeatedly used numerous social media accounts and other electronic communication platforms to proclaim her support for ISIS and violent jihad, to recruit for ISIS and to attempt to help others join and fight for the group. During this same period, the defendant also expressed her own desire to travel to ISIS-

---

the field use to assess an individual's disengagement from a terrorist organization/extremist ideology. A copy of Dr. Vidino's expert report and his C/V are attached hereto as Exhibits 1 and 1A, respectively.

The government will also call forensic psychologist Dr. Kostas Katsavdakis to testify about his examination of the defendant and his clinical assessment of her. A copy of Dr. Katsavdakis's expert report and C/V are attached hereto as Exhibits 2 and 2A, respectively.

[3]    United States v. John Doe, Crim. No. 14-612, 323 F. Supp. 3d 368, 371 (E.D.N.Y. 2018) (JBW).

[4]    See, e.g., https://www.cnn.com/2019/02/26/opinions/isis-bride-hoda-muthana-citizenship-callan/index.html.

controlled territory and join the group and die as a martyr. She also created and disseminated on social media her own ISIS propaganda, including the ISIS logo next to a photo of then-President Obama with an exploding gun next to his temple. And the defendant did all of this knowing – indeed while openly celebrating – the fact that ISIS and its followers brutally murder people in the United States and around the world. The defendant pleaded guilty to all of this conduct in February 2017, after agreeing to cooperate with the government which, for a certain period, she did.

Then, in 2018, when released on bail prior to sentencing, despite explicit orders from the Court not to do so, the defendant violated the terms of her release and her cooperation agreement by covertly re-connecting and attempting to re-connect with numerous people she herself had identified as supporters of ISIS and other extremist groups, and by seeking out the same pro-ISIS propaganda that she relied on and spread when recruiting for ISIS. The defendant also committed a new crime by attempting to cover up her conduct by deleting her electronic communications to avoid detection by the government and this Court. Finally, when given the opportunity to explain her conduct, the defendant repeatedly lied to the government. For these actions, the defendant was charged with and pleaded guilty to the obstruction of justice offense on March 7, 2019.

And yet, the defendant persists in denying the gravity of her crimes and her responsibility for committing them. Instead, she blames the government, her lawyers, "spies," and "dar al kufr"[5] for her predicament. For example, in December 2018 the defendant said the following about her case:

> I didn't know it was a conspiracy if you just know the information and talking to officials. It just basically, just how do you say, your first amendment is being violated basically and just because I'm Muslim they even charged me with it because they was saying that I can't talk to those officials or whatever, but my friends on Facebook and us we was all, like, you know, you know what I mean like we all was supporting whatever because like there was a lot of stuff going on with Islam now these days so they charged me with conspiracy, but I'm fighting it and my lawyers trying to tell the Judge and stuff like that, but they made

---

[5]     The term "dar al kufr" refers to all lands not governed by what jihadists deem to be the correct interpretation of the sharia, a "land of disbelief." See Vidino Rpt. at 25. The word "kuffar" or "kufr" is a deeply pejorative term frequently used by the defendant to attack others. The term is commonly translated as meaning infidel, rejecter or disbeliever and refers to people "who do not believe in Allah and reject Muhammad's prophecy." Id.

me take a plea so I could get out on bail, but I violated so I'm
back here now...[6]

Indeed, as recently as February 24, 2019, the defendant wrote an email to an associate stating: "I did not do anything wrong as a Muslim but a cyber crime in social media which is a violation in USA to support certain shari'ah islaamia so al maghreb tul horriya." See Exhibit 3.[7]

## II.    Procedural and Factual Background

On November 15, 2016, the defendant was arrested at John F. Kennedy International Airport and charged in a criminal complaint with attempting and conspiring to provide material support and resources to a foreign terrorist organization, to wit, ISIS, in violation of 18 U.S.C. § 2339B(a).  From November 18, 2016, forward, the defendant was detained at the Metropolitan Detention Center in Brooklyn, New York ("MDC").

On February 13, 2017, pursuant to a cooperation agreement with the government, the defendant pleaded guilty to one count of conspiracy to provide material support to a foreign terrorist organization (the "Material Support Offense").  In April 2018, based on the claim that her health was deteriorating at the MDC, the defendant sought release on bail pending sentencing, which this Court granted, subject to stringent conditions.  Within months, the defendant violated numerous terms of her release and materially breached her cooperation agreement by, among other things, committing a new crime and making multiple false and misleading statements to the government about her conduct while on release.  As a result, the government was released from its obligations under the cooperation agreement and will not file a motion seeking any sentence reduction pursuant to U.S.S.G. § 5K1.1, all of which was previously noticed to the defendant.

On March 7, 2019, the defendant pleaded guilty to one count of obstruction of an official proceeding (the "Obstruction of Justice Offense"), in violation of 18 U.S.C. § 1512(c)(1), a crime which, as noted above, the defendant committed while on release pending sentencing on the Material Support Offense.

The defendant now faces sentencing before this Court for both the Material Support Offense and the Obstruction of Justice Offense.  Additionally, because the defendant committed the Obstruction of Justice Offense while on bail, she faces an additional mandatory punishment pursuant to 18 U.S.C. § 3147.

---

[6]     The defendant made these statements during a recorded jail call to an associate on December 14, 2018.

[7]     This exhibit, along with several others referenced herein, are provided as illustrative and non-exhaustive examples of the defendant's conduct and her denial of responsibility for her crimes.  Copies of the exhibits will be provided in hard copy to the Court and defense counsel under separate cover.

A.     The Material Support Offense

The Court is well-versed in the facts of the defendant's Material Support Offense, which are set forth in detail in the Presentence Investigation Report (PSR) prepared by the United States Probation Department (Probation).  See PSR ¶¶ 5-40.  It is nevertheless important to focus on the critical aspects of the defendant's criminal conduct.

The record – including her own allocution at her 2017 guilty plea hearing – is unambiguous; the defendant did not limit herself to merely expressing support for ISIS or its violence, or associating with "her friends" who happen to support ISIS.  Rather, for at least 11 months until her arrest in November 2016, the defendant actively sought to support and assist ISIS and conspired with others to do so.  Here is how the defendant described her conduct in her 2017 allocution:

> The Court:     Okay. All right. So, can you tell me, in your own words, what you did that makes your guilty of the charge?
>
> Defendant:     Yes, I will.  From January 2016 to November 15 - - 2016, I knowingly and intentionally agreed with others to provide material support to foreign terrorist organization, that I know is run by Dawla or Islamic State.
>
> This is the same organization that the U.S. Government calls "ISIS" or "ISIL."  At the time, I agreed with others to provide material support to Dawla.  I was aware that they're engaged in terrorist activity and that the U.S. government had this (inaudible) as a terrorist organization.
>
> Specifically, I was aware that ISIL had claimed responsibility for the attacks in Paris and in Brussels that happened in 2015 of November and March 2016.  I am aware that these attacks involved the use of firearms and explosives, and that they were intending, and, did endanger the safety of one or more individuals.  I worked as an assistant to the other members more than once.  I put U.S. based individuals who wanted to make [Hijrah] or migration to the Dawla in touch with the other members who were based overseas.  I did this by passing the [T]elegram contact information of the other members to these U.S. based individuals, telegram is sent encrypted messaging application.  I put these U.S. based individuals in

> touch with all the members on [T]elegram[] so that
> they would have contacts in Dawla, who could
> help them travel overseas to the territory controlled
> by Dawla.
>
> I believed that if these individuals made it to
> Dawla, they would join the group and work under
> its directions and control. I personally spoke on a
> [T]elegram and other social network applications
> to Dawla members whose contact information I
> passed to these individuals. When I passed the
> information on [T]elegram to contact the Dawla
> members, I was in the United States, Brooklyn, at
> the time. I also intended to make [Hijrah] to Dawla
> to join the group. First, I was going to -- to move
> to Swede to get married to a Dawla supporter, and
> after that we agreed to get married in -- to go to
> make [Hijrah] to Dawla to control the territory.

Feb. 2017 Plea Tr. at 25:16 – 27:7.

It is crucial to understand the meaning of the Arabic word "hijrah" or "hijra" as used by the defendant. She repeatedly used the term during her work for ISIS in 2016. As explained by Dr. Vidino:

> *Hijrah* in the Qur'an refers to the prophet Muhammad's (and his
> followers') migration from Mecca—his place of birth and
> upbringing—to Medina in 622 CE to flee persecution. Those
> who followed Muhammad were the first converts and followers
> of Islam and demonstrated their faith by fleeing with Muhammad
> before fighting alongside him and helping establish the first
> Islamic society.
>
> For jihadists, hijrah is a term used predominantly for
> supporters/followers in countries outside the operational zones of
> the jihadist group to travel to those zones and join the group. To
> make hijrah is to travel from a "land of disbelief" (see later) to a
> territory where a jihadist group has created or seeks to create what
> it deems a perfect Islamic society.

Vidino Rpt. at 23.

There is no ambiguity about which meaning of "hijrah" the defendant intended while providing material support to ISIS. It was not the innocuous version. She and her associates, including those with whom she conspired to provide material support, repeatedly

used the term in conjunction with joining ISIS, waging jihad and committing violence.  For example, on February 21, 2016, the defendant posted on Facebook, in Arabic, "Let's go . . . let's go like the soldiers."  This post was accompanied by emoticons of a knife, a gun and a bomb.  Moreover, in a series of Facebook posts in around June 2016, in which the defendant was discussing her search for a husband and her desire to get out of "dar ul kufr," the defendant wrote, "I want to complete everything before I die in jihad" and then, regarding the type of husband she was searching for ". . . I want a mujahid who wants jihad and hijra."  See Exhibit 4.

In another Facebook post from the same period, the defendant wrote ". . . y'all need to wake up ummah fear Allah and do hijrah and jihaad our ummah is dying and we will establish tawheed. . . .  Allahu Akbar."

In yet another Facebook post, the defendant wrote, "If a brother says he want to do hijrah but don't want fight or kill kufar . . . hmmm is he a coconut[8]??"  In other words, in the defendant's warped view, a man who wanted to make "hijrah" without wanting to kill "kufar" – unbelievers –  is not a true Muslim.

These – and the many other similar posts written by the defendant – did not occur in a vacuum.  On the contrary, she wrote in support of making hijrah to join ISIS and killing non-believers and dying as a martyr while ISIS and its followers were committing acts of brutal violence around the world, and while she herself was providing material support to the group by recruiting and facilitating for it.

Moreover, in lengthy Mirandized interviews following her November 2016 arrest, the defendant described her conduct in detail, making clear that she considered herself an important person in helping people to join ISIS.  At one point, when explaining why someone who wanted to make hijrah and join ISIS would come to her for help, the defendant explained that she is "a good router" who could ask one of her contacts in ISIS "what gates are open and what gates are closed,"[9] referring to access points into ISIS-controlled territory.

At another point in her interview, the defendant was asked how law enforcement could know that she was telling the truth about her work for ISIS.  The defendant immediately

---

[8]     "Coconut" is a derogatory term used by jihadists to describe a Muslim who is not truly dedicated to Islam; a Muslim is a "coconut" if they are "brown (true in faith) on the outside, white (disbeliever) on the inside."  Vidino Rpt. at 27.

[9]     The defendant made this statement during a video-recorded interview by the FBI on November 16, 2016.

responded, "Give me a phone, let me sign up, let me sign back in on Facebook and on Telegram . . . I'll show ya'll proof."[10]

By her own account – as well as a wealth of corroborating evidence – the defendant sought to aid at least five people join ISIS abroad; each is discussed in turn.

1. Facebook User 1

In February 2016, the defendant used one of her many Facebook accounts to post the following quotation attributed to now-deceased al-Qaeda in the Arabian Peninsula ("AQAP") leader Anwar al-Awlaki: "Running away from Jihad will not save you from death, You can die as a coward or you can die as a Martyr!"[11] Another Facebook user who expressed extremist pro-ISIS views online ("Facebook User 1") commented in response to this post: "True I would love to die as a shaheed it a big honor."[12] If there were any question as to the defendant's use of the word hijrah and her intent to help ISIS commit violence, even if she herself did not commit it, she answered it when she responded, "Then do hijrah." See Exhibit 5.

The defendant then helped Facebook User 1 try to join ISIS. She posted a screenshot of an ISIS operative ("ISIS Operative 1") and instructed Facebook User 1 to "Add him he will guide you," meaning guide Facebook User 1 to join ISIS. See id. This response was followed by an emoticon of an airplane, further demonstrating the defendant's intent to facilitate Facebook User 1's travel to ISIS-controlled territory to join ISIS. The defendant also admitted in her post arrest statements to law enforcement that she was attempting to connect Facebook User 1 to ISIS Operative 1 so that Facebook User 1 could join ISIS.[13]

---

[10] The defendant made this statement during a video-recorded interview by the FBI on November 17, 2016.

[11] Before his death, al-Awlaki was an influential American-born Islamic lecturer who and leader of AQAP, a designated foreign terrorist organization, who espoused violent jihad against Westerners and encouraged the emigration of foreign fighters to lands around the world where Muslims were perceived to be under attack. He died on or about September 30, 2011.

[12] "Shuhada" is the concept of martyrdom (death by fighting in jihad), encompassing an act of testimony of one's belief through martyrdom. A "Shaheed" is a person who has achieved martyrdom. While the term conceptually is not specific to jihadist groups, jihadists have seized shuhada as a term reserved for their fighters. In particular, someone who engages in a suicide operation, or an attack operation where the outcome is near-certain death, is a shaheed. Vidino Rpt. at 23.

[13] The defendant made this statement during her November 30, 2016 proffer with the government.

There is no mystery here; the defendant was talking to Facebook User 1 about violent jihad, and encouraging him to engage in it. Then, the defendant put action behind her words by providing to Facebook User 1 the contact information for ISIS Operative 1. After her 2016 arrest, the defendant identified ISIS Operative 1 as an individual she believed to be in Libya who wanted to help people travel to join ISIS. As context, prior to her arrest in 2016, after the defendant used Facebook to post a news article about a new automatic weapon being sold, ISIS Operative 1 wrote in response, "I love it I wish I can have 3 of it for the future use on the taghout head."[14]

The defendant also admitted that after ISIS Operative 1 changed his Facebook user name to a new name, she provided the new name to Facebook User 1. The defendant also told the government that she eventually stopped talking to ISIS Operative 1 because she believed he was going to war.

Disturbingly, in June 2018, while on release pending sentencing the defendant attempted to re-establish contact with ISIS Operative 1 but was unable to reach him.[15]

## 2. "Abu Talib"

In April 2016, unbeknownst to the defendant, a confidential source working at the direction and under the supervision of the FBI contacted the defendant posing as a U.S.-based male with the persona "Abu Talib" seeking to travel overseas to join ISIS. In a series of text exchanges in April 2016, the defendant instructed Abu Talib on the best routes for making hijrah to ISIS-controlled territory. The defendant then provided Abu Talib with the contact information for Abu Sa'ad al-Sudani, also known as "Abu Isa Al Amriki," ("Abu Isa") on an Internet messaging application used by the defendant for ISIS-related communications throughout 2016. The defendant described Abu Isa to Talib as the "head master for the mujahideen" and "head master For t brothers in Libya or turkey etc" who was in charge of "Khalifah News."[16] The defendant then told Abu Talib "No you need to listen to me unless you want to go to jail" and then "U need routes and good route and trust nobody." After

---

[14]     "Taghout" is an Arabic word often denoting idols, Satan and "jinn," a bad or evil spirit.

[15]     The defendant admitted this during her January 2, 2019 interview with the government at which her defense attorneys were also present.

[16]     "Khilafah" means "Caliphate," and the term is commonly used by ISIS supporters to refer to areas under ISIS's control. "Khilafah News" is the name of both a website and an internal private messaging group on OCS, which the defendant previously used to communicate with ISIS supporters and which she described in detail as a significant source of news about the group, including links to jihadist material and information about ISIS links to terrorist attacks. The defendant has used several alternative spellings of the term, including "Khalifah" and "Khilafa."

passing on Abu Isa's contact information to Abu Talib, the defendant told Abu Talib, "He will lead you." See Exhibit 6.

As context, Abu Isa was an ISIS operative and external attack planner based in Syria who, along with his wife, Shadi Jabar Khalil Mohammad, also known as "Umm Isa al-Amriki" ("Umm Isa"), actively recruited and communicated with potential ISIS recruits. In May 2016, the United States Department of Defense (the "DOD") announced that Abu Isa and Umm Isa were killed by coalition airstrikes near Al-Bab, Syria.[17] The DOD identified Abu Isa and Umm Isa as "involved in planning attacks against the United States, Canada and the United Kingdom" and "active in recruiting foreign fighters in efforts to inspire attacks against Western interests."[18] In 2016, the defendant exchanged hundreds of electronic communications with Umm Isa.

To cite just one example of Abu Isa's work for ISIS, on January 17, 2017, Emanuel Luchtman was sentenced in federal court in the Northern District of New York to 20 years' imprisonment and 50 years' supervised release for conspiring with Abu Isa to provide material support to ISIS by conducting a terrorist attack in Rochester, New York.[19] Luchtman admitted to conspiring with Abu Isa and planning to "conduct an attack against civilians using knives and a machete on New Year's Eve in 2015." Id. Luchtman "intended to conduct an attack that could be claimed by [ISIS] and that could also help him gain membership into [ISIS] when he thereafter traveled overseas to join the terrorist organization." Id.

Abu Isa also played a pivotal role in radicalizing Abdulrahman El Bahnasawy, a Canadian citizen who in 2018 was convicted of terrorism offenses in the United States. Abu Isa encouraged El Bahnasawy to participate in an attack for ISIS in the United States that Abu Isa was coordinating, and in May 2016, El Bahnasawy was arrested while traveling to New York City to conduct an attack there. Specifically, El Bahnasawy had planned to detonate bombs in Times Square and the New York City subway system and to shoot civilians at concert venues. El Bahnasawy subsequently pleaded guilty in the Southern District of New York to multiple terrorism offenses and, on December 18, 2018, was sentenced to 40 years' imprisonment and a lifetime of supervised release.[20]

---

[17]    See https://dod.defense.gov/News/Transcripts/Transcript-View/Article/752789/department-of-defense-press-briefing-by-pentagon-press-secretary-peter-cook-in/.

[18]    Id.

[19]    See https://www.justice.gov/opa/pr/new-york-man-sentenced-20-years-conspiring-provide-material-support-isil-connection-planned.

[20]    See https://www.justice.gov/opa/pr/abdulrahman-el-bahnasawy-sentenced-40-years-prison-plotting-carry-out-terrorist-attacks-new.

Once the defendant connected them in April 2016, Abu Isa and Abu Talib began communicating via an Internet messaging application. Abu Isa ultimately connected Abu Talib to El Bahnasawy,[21] who was residing in Canada at the time. After exchanging a series of communications over an Internet messaging service, El Bahnasawy sent Abu Talib bomb making instructions and encouraged Abu Talib to conduct an attack on the New York City subway system.

The defendant was no passive bystander to all this; she actively attempted to facilitate Abu Talib's travel to ISIS-controlled territory in order to join ISIS and connected Abu Talib to Abu Isa, a bona fide ISIS operative who, before he was killed in coalition airstrikes, issued directives to individuals to carry out attacks in the United States. After providing Abu Isa's contact information to Abu Talib, the defendant further advised Abu Talib on how to connect with the operatives. This included the defendant instructing Abu Talib on what to say when ISIS operatives asked him questions to test him. The defendant also sought to help Abu Talib avoid detection by law enforcement, warning him to "encrypt ur phone now because our devices record by kuffar."[22] Indeed, the defendant carried enough weight with ISIS that Abu Talib successfully used the defendant's name to vouch for him when questioned about how he had received Abu Isa's contact information. See PSR ¶¶ 19-24.

And the defendant went further still. In July 2016, after several months without contact, she proactively contacted Abu Talib via Facebook. At this point, the "Abu Talib" persona, previously played by a source working under FBI supervision, was now played by an undercover FBI agent. The defendant told Abu Talib, "I can get you visa for shams . . . My visa approve for shams to make hijrah . . . . so they told me to tell you . . . you don't have to send no money just get visa application and I send you invitation letter." See Exhibit 7. In other words, the defendant sought out a man whom she believed wanted to travel abroad to join ISIS and promised to help him obtain a visa to do so.

The defendant also told Abu Talib that Abu Isa and Umm Isa had been killed in airstrikes. She then gave Abu Talib the contact information on an Internet messaging application for an individual with the display and user names "Manager" and "Eastern Standard" (hereinafter "Manager"). The defendant told Abu Talib that Manager and another ISIS facilitator abroad using the name "Centre"[23] on the Internet messaging service had taken over for Abu Isa and Umm Isa after their deaths. PSR ¶ 27. The defendant told Abu Talib,

---

[21]    El Bahnasawy is referred to as "ISIS Supporter 1" in both the filed criminal complaint and the PSR in this case.

[22]    "Kuffar" or "kufr," a term frequently used by the defendant, refers to people "who do not believe in Allah and reject Muhammad's prophecy. Some jihadists declare other Muslims, who disagree with their interpretation of the religion, as 'Kuffar' in a practice known as a 'takfir.'" Vidino Rpt. at 25. The defendant sometimes spells this "kafir."

[23]    The name "Centre" on the Internet messaging service is spelled several different ways, including "Senter" and "Center," but is spelled "Centre" herein.

referring to her own role under Manager and Centre, "they put me as assistant to help them out because all gates are closed except for Afghanistan so we needs Muslimin." See Exhibit 7. This exchange alone makes clear the defendant viewed herself as an "assistant" to ISIS facilitators abroad whose role was to help recruit people inside the U.S. travel to join the group. It is also exactly how the defendant described her role to the FBI after her 2016 arrest.

Indeed, as the defendant explained in detail in her post-arrest statements to the government, and as confirmed by the FBI, Manager was an ISIS facilitator operating in Pakistan, and Centre was an ISIS facilitator operating in Afghanistan. ████████████████ ████████████████████████████████████████████████████████ ████████████████

The FBI has also confirmed that a telephone recovered from Centre contained the defendant's name, address, and telephone number.[25]

### 3. "Safiyya Mu"

In early 2016, a second confidential source working under the supervision of the FBI and using the female persona "Safiyya Mu" ("Mu") initiated contact with the defendant via Facebook. The defendant and Mu discussed Mu's desire to travel abroad to join ISIS. The defendant then provided Umm Isa's contact information on an Internet messaging service and instructed Mu "if u serious about making hijrah then download [the Internet messaging application] and add the head sister committee leader." The defendant told Mu that Umm Isa "helps sister and has to make sure ur not a spy."[26]

When Mu informed the defendant about difficulty contacting Umm Isa via the Internet messaging service, the defendant further assisted Mu by sending Mu a screenshot of Umm Isa's Internet messaging service address/name/profile. Then, in May 2016, the defendant and Mu started communicating via the Internet messaging service. During one

---

[24]    The defendant provided this information during her November 15, 2016 video-recorded statement to the FBI.

[25]    The information was contained in the "Notes" section of the cell phone.

[26]    The defendant frequently used the term "spies" throughout 2016 to refer to individuals who might try to undermine ISIS. For example, in March 2016, the defendant posted a screenshot titled "Anonymous Spy Wanted DEAD." See Exhibit 8. The screenshot included a photograph of the targeted individual as well as his phone number, address and what appears to be a satellite image of the area around his home. The defendant called the person a "spy," and a "filthy kafir in the U.S. trying to mess with Muslims and possibly get them arrested," and asked people to "please share" the targeted individual's information. The defendant reverted to this language again in 2018 while on presentence release.

exchange, the defendant asked Mu, "R u ready to make hijrah Inshallah because they need sister now. . . . asap."  When Mu asked what she should do, the defendant sent Mu a photo of Manager's Internet messaging service account and stated that Manager "gives you help with anything."  Then, in June 2016, the defendant followed up and instructed Mu via the Internet messaging service that "Manager is looking for you," and asked Mu "Why you don't reply to him."  The defendant, in other words, repeatedly and proactively sought to connect Mu to Manager for the purpose of adding a new recruit for ISIS.

### 4. Individual 2

At the end of June 2016, the defendant began communicating via Facebook with a U.S.-based individual who was previously convicted in Florida state court for armed robbery and assault on police officers ("Individual 2").  Individual 2 was released from prison in or around February 2016.  PSR ¶ 28.

The defendant and Individual 2 began discussing Individual 2's desire to make hijrah to join ISIS, and the defendant provided Individual 2 with the contact information for ISIS facilitators Manager and Centre on the Internet messaging service.  Specifically, on July 3, 2016, the defendant sent Individual 2 a series of messages about contacting Manager and Centre for the purpose of traveling abroad to support ISIS.  She told Individual 2, "Now we can go to my contact for hijrah," "They are serious, "They don't play games" and "You must add all groups to stay updated with dawla."  See Exhibit 9.  The defendant then sent a list of chat groups on the Internet messaging service that she told Individual 2 to join in order to stay current with news from ISIS.  PSR ¶¶ 29-30.   Several of these groups, including "Khilafah News," are the same virtual groups or versions of the same groups that the defendant re-joined or searched for while on presentence release in June 2018.

Then, on July 4, 2016, after a series of exchanges on the Internet messaging service, the defendant told Individual 2, "my contact ppl will text you later."  Later that day, the defendant sent to Individual 2 screen shots of the Internet messaging service pages for Manager and Centre and instructed him, "They said contact them directly" and "text them."  PSR ¶ 30.  The defendant later followed up with Individual 2 via the Internet messaging service, inquiring what happened.

As a result of the defendant's connecting them, Individual 2 engaged in a series of exchanges with Manager using the Internet messaging service during which they discussed Individual 2's desire to make hijrah to ISIS-controlled territory.  After making the initial connection, the defendant remained involved; on July 7, 2016, Individual 2 sent the defendant a screenshot of his conversation with Manager on the Internet messaging service in which Manager instructed Individual 2 that, because the travel to ISIS-controlled territory would take too long for Individual 2, "it would be better for u to do work there.  Till then.  And scare them."  PSR ¶ 31; Exhibit 9A.  The defendant later told the government that she understood

Manager to be encouraging Individual 2 to do something for ISIS inside the United States, "like a robbery."[27]

Individual 2 also contacted Centre using the contact information provided by the defendant. Centre asked Individual 2 what he wanted to do and, using coded language, Individual 2 said he wanted to make hijrah to Iraq or Syria. Also Individual 2 also offered to send money in support of ISIS to Centre. PSR ¶ 31.

Two days later, on July 9, 2016, Individual 2 was arrested for violating the terms of his probation by traveling to New York, where he met with the defendant. ██████████████ ████████████████████████████████████ Individual 2 was later sentenced in Florida state court to approximately five years' imprisonment. ████████████████████████ ██████████████

In August 2016, the defendant received approximately $250 through Western Union from an individual in Afghanistan and was later told by Centre, via the Internet messaging service, that the defendant received the money because "u did big work" PSR ¶ 33; see also Exhibit 10. The defendant likely received this payment from ISIS for her recruiting efforts.

5. ████████



---

[27]   The defendant provided this information during her November 15, 2016 video-recorded interview with the FBI.

14

In addition to her role as an ISIS recruiter and facilitator as described above, the defendant herself planned to travel abroad to join ISIS. PSR ¶¶ 35, 37. In her plea allocution quoted above, she stated that she "intended to make [Hijrah] to Dawla to join the group," meaning ISIS. Feb. 2017 Plea Tr. at 27:3-7. At one point in 2016, she obtained a visa to travel to Afghanistan and communicated with Centre through the Internet messaging service about her plans to travel abroad to join ISIS. And, in a conversation using the Internet messaging service with another individual in approximately September 2016, the defendant expressed her desire to travel to Afghanistan in November to "fight for Allah and be shaheeda" – a martyr. The defendant also told the FBI following her arrest that in 2016 she obtained from Centre a visitation letter in support of her visa application to Afghanistan.





### D. The Obstruction of Justice Offense

On March 7, 2019, the defendant pleaded guilty to the Obstruction of Justice Offense arising from her deletion of at least 1,000 electronic communications while released on bail. The defendant admitted that she deleted these messages with the intent to conceal them from the government. As part of her plea, she also admitted to knowingly and intentionally making multiple false statements when interviewed by the government on January 2, 2019 (the "January 2019 Interview"). See March 2019 Plea Tr. at 32:8-12; 35:17-36:25.

The Obstruction of Justice Offense – and the facts surrounding it – are significant and deeply troubling. Understanding the scope of the defendant's conduct subsequent to her presentence release in April 2018 is essential to understanding both the new crime to which she pleaded guilty and the threat she continues to pose. That conduct is discussed here.

On April 27, 2018, while pending sentencing, the defendant made a bail application and was released on bond subject to stringent release conditions. Among other things, the defendant was barred from using any computer or mobile communication device without the prior notification to and consent of Pretrial Services and/or the FBI. Her computer usage was limited to educational and vocational research. She was also prohibited from knowingly contacting individuals or organizations affiliated with foreign terrorist organizations, or individuals or groups that promote violence for the purpose of effecting political change. Her cellular telephone use was limited to contacting her counsel, treatment providers, sureties, the residential staff of the location where she would be residing on pretrial release, the U.S. Attorney's Office or the FBI, or to call for assistance in the event of a medical or other grave emergency. To facilitate the monitoring of her communications, the defendant's presentence release terms required that all of her communications via telephone or computer be in English.

Within weeks of her release, the defendant violated her bond conditions by, among other things, obtaining and using a laptop without the knowledge or consent of Pretrial Services, downloading and using multiple cell phone applications without the knowledge or consent of Pretrial Services, and creating and using multiple Facebook accounts under various

pseudonyms to contact and attempt to contact numerous people, including individuals she previously identified to the FBI as supporters of ISIS or other extremist groups. On July 19, 2018, following a hearing on the violations, the Court revoked the defendant's bond and remanded her to the Metropolitan Correctional Center ("MCC").

The government conducted an extensive investigation into the scope and content of the defendant's communications and activities while on presentence release. The investigation revealed that in just a couple of months, the defendant illicitly created numerous pseudonymous social media accounts, including at least three Facebook accounts, and used them to contact or attempt to contact at least seven people she previously identified to the FBI as supporting ISIS or other extremist groups. ███████████████████████████████████

████████████████ The defendant also contacted or attempted to contact other individuals about whom she did not previously provide information to the government, but who have expressed support for ISIS or are associated with ISIS supporters.



The defendant also searched for and initiated Facebook communications with an individual whom she previously identified to the FBI as associated with United Kingdom-based ISIS supporters linked to terrorist attacks ("Facebook User 3"). Specifically, on June 13, 2018, after Facebook User 3 posted "Be very careful as to who you trust on here especially if they send you any links that maybe incriminating," the defendant posted the following response on Subject 3's Facebook page: "Yea that's true that how I went to prison because some the Muslims were spies :(". See Exhibit 12.

The defendant also contacted another former associate via Facebook whom she previously identified to the government as an ISIS supporter ("Facebook User 4"). Facebook User 4, an admitted former ISIS supporter, pleaded guilty in the Eastern District of New York in 2017 to one count of access device fraud and is currently serving a term of probation in Florida.

The defendant also engaged in Facebook communications with an individual based in Belgium with whom the defendant had been in contact before her 2016 arrest

("Facebook User 5").  As background, in February 2016, the defendant and Facebook User 5 engaged in a multi-user Facebook posting exchange with ISIS Operative 2 to whom, as set forth above, the defendant referred people for help traveling to ISIS-controlled territory.  During her cooperation the defendant did not disclose her contact with Facebook User 5 to the government.

Following her presentence release in June 2018, the defendant again searched for and communicated with Facebook User 5 in an exchange conducted mostly in Arabic.  In this conversation, the defendant told Facebook User 5 that she used to be with the Islamic State and had been in jail, to which Facebook User 5 responded, "Me too," and stated that he had also been in jail.  The defendant subsequently deleted from her own Facebook account all of her written communications with the Facebook User 5.  Nevertheless, the government was able to obtain copies of the communications and learned that, in addition to their written exchanges, the defendant and Facebook User 5 also engaged in an approximately 40-minute-long voice call.

The defendant also "friended" Facebook User 8, whose posts dating back to 2016 demonstrate support for ISIS and contain numerous ISIS propaganda videos, including one stating, "May Allah grant victory to the Mujahideen and destroy the Tawagheet, Mishrikeen and Munafiqeen and all enemies of Islaam. Ameen!"

The defendant also admitted during the January 2019 Interview to unsuccessfully trying to contact a man she previously identified to the government as ███████████████████████████████████████ ("ISIS Operative 3").[29]  When asked during the January 2019 Interview why she attempted to re-contact ISIS Operative 3, the defendant said she did so to get information on the status of ISIS.  When asked why she would contact ISIS Operative 3 for that purpose, the defendant responded that she was "curious."

As part of her March 2019 plea to the Obstruction of Justice Offense, the defendant admitted to deleting her communications with numerous Facebook accounts to prevent Pretrial Services and the FBI from finding the messages because she knew the communications violated her bond conditions and the terms of her cooperation agreement.  The defendant's conduct was calculating and deceitful.  On June 28, 2018, the day before she was to meet with Pretrial Services, she used Facebook to tell at least eight of her associates, including Facebook User 5, that she was about to delete her Facebook accounts.  She did this because she knew if she did not delete them, Pretrial Services would find the messages the next day.  The defendant also provided many of these people alternative means of contacting her, showing that she planned to use other communication platforms to continue her illicit contacts.   The defendant also admitted to instructing others with whom she was

---

[29]     The defendant provided this information to the government during proffer sessions on November 30 and December 7, 2016.

communicating via Facebook to delete their Facebook messaging conversations with the defendant from their own accounts, including Facebook User 4, described above.

E. The Defendant's Re-Engagement With ISIS and Extremist Propaganda, and Her Denials of Responsibility

In addition to contacting and attempting to contact ISIS supporters with whom she previously communicated, the defendant also resumed consuming ISIS-related news and propaganda while on presentence release.

For example, the defendant searched for the internet group Khilafah News, which she previously used to communicate with ISIS supporters and which she described to the government as a significant source of news about the group, including links to jihadist material and information about ISIS links to terrorist attacks.

The defendant also searched for AMAQ News, an ISIS-linked news outlet that is often the first point of publication for claims of responsibility for ISIS attacks, and for Tawheed Network, which she previously described as a secret pro-ISIS Facebook group where she communicated with ISIS-supporters, including individuals she claimed were involved in the June 2017 London Bridge attacks.

The defendant's cell phone records also indicate she was conducting searches for "iSlamic state videos," that she downloaded the app "ISIS Watch," which offers "full coverage of ISIS news," and that she bookmarked on her cell phone's internet browser the search results within the Al Jazeera website for "ISIS 2018."

While on presentence release the defendant also sent numerous Facebook messages in which she indicated that her actions leading to her conviction for conspiring to provide material support to ISIS were not wrong and that she does not bear responsibility for them. For example, on June 13, 2018, the defendant wrote to another individual "I didn't do any thing . . . they snitched on me." That same day, the defendant also wrote, "I am praying for all muslimin locked up as I was once was a prisoner in dar ul kufr and won't let anyone else put in jail ever... I will watch who is my true friends of jannah [smiley face emoji]". The defendant also wrote "I'm not going to add spies," again reverting to her pre-arrest trope of ISIS operating against a network of "spies" in the land of "kufr" or infidels. See Exhibit 13.

On June 25, 2018, the defendant wrote "…I didn't do anything wrong under Islam but stand up for my deen and got arrested for what I believe in but you have Muslim here did dangerous crimes like drugs etc but they don't want to say sh** isn't bad but temptation of this dunya got all of us!! I'm focus to beware of what it is.." See Exhibit 14. In other words, more than a year after pleading guilty to providing material support to ISIS, and while she was in the middle of violating this Court's conditions of release, the defendant was publicly denying responsibility for her actions and claiming that her only offense was standing up for her religious beliefs.

F.  The Defendant's False Statements to the Government

During the January 2019 Interview the defendant was given the opportunity to explain her conduct on presentence release.  Instead, she lied and deceived, repeatedly.  While truthful about certain activities, the defendant was evasive on numerous topics and provided many answers that were incomplete, inaccurate and intentionally false.  Also, by the time of the January 2019 Interview, the defendant knew from the government's in-court statements and filings related to her bond revocation that the government knew certain information about her activities on release and had already obtained evidence of some of her statements.  Thus, at multiple points in her interview, the defendant admitted what she believed the government already knew and denied or attempted to mislead the government about new information that the government had not previously revealed in court.

The defendant's most troubling lies during the January 2019 Interview were her claims that she never used the name "Umm Nutella" to identify herself to others while on presentence release in 2018.   As background, throughout her work for ISIS in 2016, "Umm Nutella" was the defendant's "kunya."   As Dr. Vidino explains in his report, in the jihadist world in which the defendant operates, a "kunya" is an adopted *nom de guerre*.  Vidino Rpt. at 25-26.  The name "Umm Nutella" was how the defendant identified herself to the other ISIS operatives and supporters with whom she communicated.

The defendant falsely told the government during the January 2019 Interview that she had not identified herself as "Umm Nutella" while on presentence release.  To the contrary, at least twice the defendant identified herself on Facebook as "Umm Nutella."  Specifically, on June 13, 2018, the defendant contacted Facebook User 3 via Facebook and wrote, "I'm umm nutella" and "I'm staying on down low" and "lie in not going to go to prison for nobody anymore."  See Exhibit 15.  As set forth above, the defendant previously identified Facebook 3 as an ISIS supporter.

That same day, the defendant identified herself as "Umm Nutella" to another Facebook User ("Facebook User 7").  Worse still, when interviewed by the government about this in January 2019, in addition to falsely denying that she identified herself as Umm Nutella, the defendant also denied any recollection of Facebook User 7's name or of contacting the account, despite the fact that she *initiated the exchange* and began it by writing, "It me" and then "Do you remember" and "I'm umm nutella" and then "The only one lol."  The defendant also wrote to Facebook User 7, "just got out of prison….and not going back never" and "I didn't do anything. . . . They snitch on me."  See Exhibit 16.

Because the defendant illegally deleted so many of her Facebook communications, it is impossible to know how many other times she may have identified herself by her ISIS kunya while on presentence release.

The defendant admitted at her March 2019 plea hearing that she intentionally lied to the government during the January 2019 Interview about using her "Umm Nutella" ISIS kunya while on presentence release.  See March 2019 Plea Tr. at 32, 35-37.  These lies are significant and deeply troubling.  The defendant has associated the name with her support for

ISIS since 2016 and told the government, unambiguously, that if she used the name "Umm Nutella" it would mean she was "back supporting ISIS." And yet, in the January 2019 Interview, when asked at least five separate times whether she had used the "Umm Nutella" name while on presentence release, the defendant adamantly denied that she had.

The defendant also lied and provided misleading statements about numerous other matters during the January 2019 Interview, including her creation and use of a third pseudonymous Facebook account and her creation and use of an email account. The defendant used this third Facebook account to contact, among others, Facebook User 3 who, as set forth above, is an ISIS supporter based in the United Kingdom. She also provided false and misleading statements about her interactions with Facebook User 5 while on release. At first, the defendant denied any knowledge of Facebook User 5's account, or the identity of its owner. When confronted with records indicating that she searched for the account and engaged in a lengthy exchange with Facebook User 5, the defendant stated she remembered the exchange but denied knowing who the owner of the account is. Then, when asked about writing to Facebook User 5 "I used to be with the Islamic State," the defendant admitted to doing so and claimed that she then immediately followed up that statement by writing, in Arabic, that she no longer supported ISIS and was getting her life back together. This is false; there is no record of the defendant making any statement to Facebook User 5 disavowing her support for ISIS. Moreover, the defendant's claim to not recall the identity of Facebook User 5 is belied by the fact that she interacted with the same account in 2016, and that Facebook records show a 40-minute voice call between her and Facebook User 5 after one of their written exchanges in 2018.

The defendant also provided false and misleading information about her contacts with ISIS-related propaganda outlets while on bail in 2018. Specifically, she denied any knowledge of or connection to the Facebook account "AQAH." However, Facebook records show that the defendant became "friends" with the AQAH account in June 2018. Moreover, on several occasions the defendant used her Facebook account to "like" postings from the AQAH account. This is significant because at the time she was interacting with the AQAH Facebook account, the AQAH account was posting messages supporting ISIS, including one post that read "Waiting is over . . . Official announcement of Islamic State."

The defendant likewise made misleading if not entirely false statements about her interactions with "ISIS Watch" app, described above. At first, the defendant denied any knowledge of the app. Then, when shown a record from the search of her cell phone indicating the defendant searched for and sought to download the app to her phone, she acknowledged that she might have viewed the app but denied downloading it. Again, the defendant's shifting accounts appear aimed at avoiding accountability for interacting with ISIS material.

Records obtained from the cell phone the defendant used on presentence release revealed numerous examples of what appear to be extremist imagery stored on the phone. These included a photo of several individuals in military-style attire labeled "Green Birds," a

potent symbol used by ISIS to describe those who die as martyrs for the group,[30] and numerous other extremist-related photographs. When shown these photographs during the January 2019 Interview, the defendant could not explain their presence on her phone.

Finally, when given the opportunity during the January 2019 Interview to explain her statements made on presentence release in which she disavowed responsibility for her crime, the defendant at first denied making such statements. Then, when confronted with Facebook records containing such comments, the defendant claimed that any denials of accountability she made on Facebook were intended to cover up her cooperation with the government. The defendant's self-serving explanation is not credible and is belied by, among other things, the fact that she has continued making similar statements well after her cooperation agreement was terminated. As just one example, as recently as February 28, 2019, the defendant engaged in a recorded telephone call while incarcerated at the MCC, which is excerpted below. In the call with her associate "JA," a previously convicted felon, the defendant denied responsibility for her actions and equated her material support for ISIS with the legitimate practice of her religious beliefs, as follows:

> JA: I know you didn't do anything. I know that you're innocent. I know you didn't understand a lot of things…
>
> . . .
>
> …you were trying to survive, you weren't trying to do anything wrong.
>
> Defendant: Yeah. And I didn't understand when, when I got arrested and he told me 'oh you gotta enter a plea and plead guilty' and I said why do I have to plead guilty, if I feel like I've not committed a crime, yes, I understood that United States don't like certain religious beliefs and don't allow you to exercise certain beliefs. I did understand that. That was something that was against the law. But I didn't know it was a crime. You know what I mean? I didn't know it was a cyber crime [interrupted] No. They said it was a cyber crime. I don't understand.

---

[30]     See Vidino Rpt. at 24.

### III. The Advisory Guidelines Sentencing Range

#### A. The Government's Guidelines Calculation

The government submits that the Guidelines calculation below, which is different from the Guidelines calculation in the PSR, should be applied:

Docket No. 17-CR-48 Count One: Conspiracy to Provide Material Support to a Foreign Terrorist Organization

| | |
|---|---|
| Base Offense Level (§ 2M5.3(a)) | 26 |
| Plus: Offense involved the provision of material support and resource with the intent that they be used to commit or assist in the commission of a violent act (§ 2M5.3(b)(1)(E)) | +2 |
| Plus: Terrorism Enhancement (§ 3A1.4(a)) | +12 |
| Total: | 40 |

Docket No. 19-CR-117 Count One: Obstruction of an Official Proceeding

| | |
|---|---|
| Base offense level (§ 2J1.2(a)(1)) | 14 |
| Plus: Defendant's false statements and concealment of evidence resulted in substantial interference with administration of justice (§ 2J1.2(b)(2)) | +3 |
| Plus: Offense involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects (§ 2J1.2(b)(3)(A)) | +2 |
| Plus: Defendant committed the offense while on bail (§ 3C1.3; 18 U.S.C. § 3147) | +3 |
| Less: Acceptance of responsibility (§ 3E1.1(a)) | -2 |
| Less: Acceptance of responsibility (§ 3E1.1(b)) | -1 |
| Total: | 19 |

Because the total offense level of 19 calculated for the Obstruction of Justice Offense is more than nine levels less serious than the total offense level of 40 calculated for the Material

Support Offense, the offense level for the Obstruction of Justice Offense is disregarded and does not increase the applicable offense level for purposes of determining the defendant's Guidelines sentencing range. See U.S.S.G. § 3D1.4(c).

Thus, the combined offense level is 40. Notably, the defendant stipulated as part of her March 2019 plea agreement with the government that her combined offense level is 40. (Mar. 2019 Plea Agreement ¶ 4).

In this case, the defendant's offense level is enhanced by 12 levels and her Criminal History Category is set at VI as a result of the application of the terrorism enhancement pursuant to U.S.S.G. § 3A1.4(a). The defendant stipulated in her March 2019 plea agreement to the applicability of this enhancement. The terrorism enhancement is the result of legislation passed by Congress in 1994 that mandated that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. See United States v. Stewart, 590 F.3d 93, 172 (2d Cir. 2009) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting terrorism enhancement at U.S.S.G. § 3A1.4(a) reflects Congress's intent that individuals convicted of terrorism offenses, like the defendant, serve sentences that are appropriate in light of the extreme dangerousness of their crimes and the unique risk of recidivism that they present. As Judge Walker explained in his concurrence in Stewart:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

Id. at 172-73 (quoting United States v. Meskini, 319 F.3d 88, 91-92 (2d Cir. 2003)). As the Second Circuit explained in Meskini, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Meskini, 319 F.3d at 92. Thus, the effect of the terrorism enhancement on the applicable Criminal History Category reflects the Sentencing Commission's assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has endorsed. See Stewart, 590 F.3d at 143 (citing Meskini, 319 F.3d at 92).

Based upon the defendant's Criminal History Category of VI, the advisory Guidelines sentencing range is 360 months' to life imprisonment. However, because the statutory maximum sentence for the defendant's Material Support Offense is 240 months' imprisonment under 18 U.S.C. § 2339B(a)(1), and the statutory maximum sentence for her Obstruction of Justice Offense is 240 months' imprisonment under 18 U.S.C. § 1512(c)(1), with an additional 120 months' imprisonment authorized under 18 U.S.C. § 3147, which must

be imposed consecutive to any other sentence of imprisonment, the restricted Guidelines sentencing range is 360 to 600 months' imprisonment. See U.S.S.G. § 5G1.2(d).

## B. The Probation Department's Errors in Calculating The Guidelines Range

The government's Guidelines calculation differs from the Probation Department's Guidelines calculation in two respects. First, the Probation Department erroneously applied the obstruction enhancement under § 3C1.1 to increase the defendant's total offense level for the Material Support Offense by two levels to offense level 42 (PSR ¶¶ 58-59), and denied the defendant a three level reduction for acceptance of responsibility under § 3E1.1(a) and (b) for the Obstruction of Justice Offense. Notably, the government has not argued that the defendant obstructed the investigation of the Material Support Offense, and the defendant has timely accepted responsibility for the Obstruction of Justice Offense, even while denying responsibility for the Material Support Offense. Thus, the obstruction enhancement should not be applied in determining the offense level for the Material Support Offense and the calculation of the offense level for the Obstruction of Justice Offense should include a total reduction of three levels for the defendant's timely acceptance of responsibility.

Second, in this case the defendant's Guidelines sentencing range of 360 months' to life imprisonment exceeds the statutory maximum sentence authorized for the defendant's crimes of conviction, not one of which carries a maximum authorized term of life imprisonment. Because the defendant's Guidelines range cannot exceed the maximum punishment authorized by statute for her counts of conviction, see U.S.S.G. § 5G1.2(b) & app. n.3, the Probation Department calculated the defendant's restricted Guidelines sentencing range as 360 to 480 months' imprisonment by combining the maximum sentences authorized for violations of 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 1512(c)(1), but erroneously disregarded the additional ten-year term of imprisonment authorized by 18 U.S.C. § 3147. (PSR ¶ 104).

Application Note 3(A) to U.S.S.G. § 5G1.2(b), provides that

the court shall determine the total punishment (i.e., the combined length of the sentences to be imposed) and shall impose that total punishment on each such count, except to the extent otherwise required by law (such as where a statutorily required minimum sentence or a statutorily authorized maximum sentence otherwise requires).

In circumstances where the applicable Guidelines range is higher than the count carrying the highest statutorily authorized sentence, such that "the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment," then the Guidelines provide that "the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d). Thus, in calculating the restricted Guidelines sentencing range, the maximum authorized terms of imprisonment on each count are added together to determine the restricted upper limit of the Guidelines sentencing range.

The Probation Department followed this approach in calculating the restricted Guidelines range, but neglected to account for the additional term of imprisonment authorized by 18 U.S.C. § 3147, a sentencing enhancement applicable to the defendant's Obstruction of Justice Offense because the defendant committed that offense while released on bail. Here, 18 U.S.C. § 3147 provides that "A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense, to a term of imprisonment of not more than ten years if the offense is a felony," and further mandated that "[a] term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment." Because 18 U.S.C. § 3147 authorizes the court to impose an additional 120 months' imprisonment for the defendant's Obstruction of Justice Offense beyond the 240 months' imprisonment authorized by 18 U.S.C. § 1512(c)(1), the Probation Department's determination of the restricted Guidelines sentencing range should have included that term of imprisonment in calculating the restricted upper limit of the Guidelines range. Accordingly, the correctly calculated restricted Guidelines sentencing range, including the term of imprisonment authorized by 18 U.S.C. § 3147, is 360 to 600 months' imprisonment.

## III. The Appropriate Sentence

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Those purposes are "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In determining that sentence, this Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

Here, the statutory sentencing factors call for a sentence within the Guidelines.

A. The Nature and Seriousness of the Defendant's Conduct, the Need for Just Punishment and the Need to Protect the Public From the Defendant Warrant a Guidelines Sentence

1. The Material Support Offense

The defendant's Material Support Offense is unquestionably serious. For nearly a year, she devoted herself to and worked on behalf of ISIS, encouraging and attempting to assist in the extreme violence it perpetrates by providing recruits to the group. The defendant was not merely spewing hate from a basement computer or fantasizing about imaginary ties to

ISIS while never actually doing anything to support the group. On the contrary, she was actively involved in recruiting for it. She was, by her own admission, an "assistant" to ISIS and a " good router" who could get ISIS supporters in the United States in touch with the right people abroad. The defendant's own contact information was found on the cell phone of a confirmed ISIS facilitator abroad. She even received payment from an overseas ISIS facilitator for doing "big work."

And while her Material Support Offense did not result in a terrorist attack, it is clear the defendant knew she was operating in world and with people where catastrophic violence was not only possible, but often the express goal of the assistance she was providing. When Facebook User 1 posted that "I would love to die has a Shaheed it a big honor," the defendant instructed him, "then do hijrah" and then connected him to ISIS Operative 1, an individual whom the defendant believed to be in Libya and who wanted to help people travel to join ISIS.

Reckoning with the severity of the offense requires understanding the context in which committed it. In her role as an ISIS recruiter, the defendant worked with extremely dangerous people. To be sure, she is not an El Bahnasawy or Emanuel Lutchman, described above; she did not herself plot to blow up the New York City subway system or attack people with knives. But she worked with Abu Isa, a confirmed ISIS plotter who the defendant herself called the "head master for the mujahideen" and who, before he was killed in an airstrike, helped radicalize El Bahnasawy and helped him and Lutchman plan their thwarted attacks. It is no credit to the defendant that "Abu Talib," the potential recruit she connected to Abu Isa, was a law enforcement source; the defendant just as easily could have connected Abu Isa to another El Bahnasawy or Luchtman, bent on committing an act of mass murder in the name of ISIS. And the defendant did connect Individual 2, a convicted violent felon, to two ISIS facilitators, one of whom – as set forth above – encouraged Individual 2 that "it would be better for u to do work there" meaning take action in the United States, to "scare them." See Exhibit 9A. It is, again, no credit to the defendant that Individual 2 was promptly arrested, thereby disrupting him from any potential attack.

Moreover, throughout the period the defendant was posting and writing ISIS propaganda and recruiting for the group, she was keenly aware of the group's commission and encouragement of extreme violence. And she supported it. In her plea allocution, the defendant acknowledged her familiarity with the March 22, 2016 terrorist attacks in Brussels, for which ISIS claimed responsibility. Those attacks, bombings of a metro station and an airport, killed 32 people and injured hundreds.[31] Just a few weeks later, the defendant was assisting Abu Talib to make hijrah to ISIS-controlled territory by connecting him to Abu Isa. She knew the risk this posed.

As another example, at approximately 8:30 p.m. on September 17, 2016, a homemade explosive device detonated on West 23rd Street in the Chelsea neighborhood of

---

[31] See https://www.bbc.com/news/world-europe-35869985.

Manhattan, injuring numerous people and causing significant property damage. The bomb was planted by Ahmad Khan Rahimi, who also planted a similar device which exploded earlier that day in New Jersey, as well as another device in Chelsea which failed to detonate.[32] On February 13, 2018, U.S. District Judge Richard Berman sentenced Rahimi to two terms of life imprisonment following his conviction at trial for setting off weapons of mass destruction and using explosives in furtherance of a violent crime.[33]

At approximately 1:30 p.m. on September 18, 2016, less than 24 hours after the Chelsea explosion, the defendant sent news of the bombings, and her support for them, to one of her ISIS contacts abroad. PSR ¶ 35. Specifically, using her "Rita Daoudii" account on an Internet messaging application, the defendant initiated the following message exchange with Centre, one of the ISIS facilitators abroad with whom she worked:

**9/18/2016 1:29:33 PM(UTC+0),** ███████ **(Rita Daoudii)**

As salamualaykum…..

Hope you and mujahedeen is doing great inshaAllah khair….

NJ and NYC is under attack and everyone is wondering if it's Islamic state so we can make duaa against kuffar

**9/18/2016 3:35:14 PM(UTC+0),** ███████ **(Senter)**

Walikimasalam....

Alhamdulliha....

Yes

plz send me original local details….

**9/18/2016 3:35:45 PM(UTC+0),** ███████ **(Rita Daoudii)**

Ok….

Hold on….

---

[32]    See https://www.nbcnews.com/storyline/ny-nj-bombings/terror-timeline-ny-nj-bombings-first-blast-arrest-n650716.

[33]    See https://www.nytimes.com/2018/02/13/nyregion/bomber-chelsea-manhattan.html.

New York explosion: 29 injured in 'intentional bomb blast', with second device found in Manhattan

http://www.telegraph.co.uk/news/2016/09/18/explosion-in-new-york-city-25-reported-injuries/....

Also another state under us New Jersey yesterday

**9/18/2016 3:38:17 PM(UTC+0),** ███████ **(Senter)**

Alhamdulliha….

**9/18/2016 3:38:43 PM(UTC+0),** ████████ **(Rita Daoudii)**

So is it possible it Islamic state

**9/18/2016 3:39:00 PM(UTC+0),** ███████ **(Senter)**

sure

**9/18/2016 3:39:17 PM(UTC+0),** ███████ **(Rita Daoudii)**

Allahu Akbar

**9/18/2016 3:39:28 PM(UTC+0),** ███████ **(Senter)**

alhamdulliha

**9/19/2016 3:48:07 PM(UTC+0),** ███████ **(Rita Daoudii)**

Allahu Akbar

Excerpted and attached hereto as Exhibit 17.

     The defendant's words are unmistakable. Her immediate reaction to a violent terrorist attack in the city she lived in was not empathy or concern for the victims or questioning of her support for ISIS. Instead, the defendant tried to verify with one of her ISIS facilitators that the attack was ISIS-related. When she was told "sure," she provided positive reinforcement with the phrase, "Allahu Akbar" or "God is great." *The defendant was rooting for the attack to be ISIS-related* and reveling in the news that it was. Then, when Centre asked for local news coverage of the bombings, the defendant eagerly provided it.

     Later that same day, Facebook User 4 (as described another U.S.-based supporter of ISIS with whom the defendant was in frequent contact), asked the defendant via an Internet messaging application whether the bombings were done by "our people," meaning ISIS. The defendant wrote back, "My people saying they will check it out." The next day, the

defendant followed up and wrote back "Yes it was ISIS…..Allahu Akbar….They told me…He did it bombing NJ nyc….Allah Akbar…..Takbeer [the best]…"

Then, on September 19, 2016, the defendant posted the following to one of her Facebook accounts:

> So it was a Muslim brother who did bombing NJ and NYC too so . . . why they sent alerts to all our phones no Muslim will tell on him nope the FBI arrest him already SMH [shakes my head]…they already know #AhmedRahmi2016" and

> Whoever snitch on a Muslim for kuffar can win then you are not from Ahlil Sunnah because you shouldn't give up it brother and send him to kuffar custody [angry face emoji].

See Exhibit 18.

Again, in the wake of a violent terrorist attack the defendant identified herself with ISIS, took pride in the group's association with the bombing, venerated the perpetrator and condemned as unfaithful Muslims anyone who may have assisted law enforcement in the investigation.

The defendant displayed a similarly chilling reaction following the June 12, 2016 massacre at the Pulse Nightclub in Orlando, Florida, which killed 49 people and wounded dozens more. As was widely reported at the time, during the attack on the gay nightclub the shooter called 911 and pledged his allegiance to ISIS.[34] Within days of the attack, the defendant celebrated the shooting and linked it to her own extremist beliefs and association with ISIS. In one post on or about June 15, 2016, the defendant wrote "I seen 2 gay men on train and thought of Florida shooting and I wanted to blow them up…Baqiyya." PSR ¶ 17.

Understanding the term "Baqiya" is critical here. It is a term commonly used as a greeting among ISIS supporters in conjunction with the phrase "Dawlatul Islamiya" and

---

[34]     See https://www.washingtonpost.com/news/post-nation/wp/2016/06/12/orlando-nightclub-shooting-about-20-dead-in-domestic-terror-incident-at-gay-club/?utm_term=.dd9151482cec

one which the defendant used in 2016 and to which she continues to gravitate now.[35]  Baqiya, or "remaining" is a

> a concept that has been part of a concerted messaging campaign by Islamic State propagandists, and adopted by its followers, that the caliphate remains despite the many territorial losses suffered by the group. As early as 2015, when campaigns against ISIS were well underway, *baqiyah* slogans were deployed as a sign of resistance and as a message to followers/supporters to stand firm in the wake of territorial losses. *Baqiya wa tatamaddud*, or "remaining and expanding," was one prominent iteration of this messaging campaign, which drew particularly on ISIS's affiliates in countries outside of Syria and Iraq as a sign that it was not only remaining, but expanding.

Vidino Rpt. at 25.

In other words, in the wake of brutal massacre by a man who explicitly linked himself and his attack to ISIS, the defendant expressed her support for the attack and its relation to ISIS's core "Baqiya" message of violent expansion and to her own desire, in this instance, to kill gay people in the name of Islam.  If the defendant's message were not clear enough, she wrote the following in another Facebook post after the Orlando attack:



"Dawla," as the defendant stated in her plea allocution, means ISIS.  In this case, ISIS doing "their thing" meant murdering 49 innocent people.

As the defendant was championing these ISIS-inspired attacks, she was actively working for ISIS as a facilitator or, in her own words, an "assistant."  She knew the group

---

[35]     As discussed herein, while on presentence release in 2018, the defendant friended the Facebook account of AQAH.  This Facebook account expressed public support for ISIS and contained the word "baqqiya" on the profile page.

engaged in extreme violence, she celebrated that violence and she encouraged and assisted others in attempting to join the group to perpetrate more violence.

In short, the defendant's Material Support Offense is indisputably serious and should be treated as such.

## 2. The Obstruction of Justice Offense

While categorically different from the Material Support Offense, the defendant's obstruction of justice while under this Court's supervision is serious. As set forth above, while on presentence release, she deleted at least 1,000 Facebook messages with numerous individuals. She did so for the explicit purpose of hiding them from this Court and from the government. The offense is particularly concerning because the underlying conduct – engaging in contact with individuals she is not supposed to talk to, including people she herself has identified as ISIS supporters – hues so closely to her Material Support Offense. Indeed, because she failed to delete *all* of her messages, and because the government was able to obtain certain messages through other means, we know that the defendant on at least two occasions during this short period used her ISIS kunya "Umm Nutella" to contact others, including contacting an ISIS supporter. And we know that, when asked repeatedly during the January 2019 Interview about whether she had used the name which she herself admitted indicates her support for ISIS, the defendant intentionally lied about it. There is no question this offense is serious, particularly because her commission of the offense shows she cannot be trusted to abide by conditions of this Court or to tell the truth.

## B. The Defendant's History and Characteristics Support a Guidelines Sentence

What brought the defendant before this Court is clear. Her criminal conduct, her support for ISIS and her adherence to a violent extremism bent on death and destruction, is all set forth above, often in the defendant's own words. The central question now is: what sentence is necessary to, above all, protect the public. A significant part of the answer lies in the defendant's history and characteristics, particularly as revealed through her conduct since her first guilty plea and its similarity to her actions that led to her arrest in 2016.

Throughout 2016, the defendant's prolific social media posts and messages provided a window onto her twisted worldview, with support of ISIS at its rotten core. The defendant's writings – and her hours of post-arrest interviews with the FBI – reveal an ideology built around "us" versus "them," with the "us" being ISIS and its supporters, the true believers, and everyone else being the kuffar, or unbelievers. This 2016 post Facebook by the defendant – one among many – makes the point:



**Rita Daoudii**
8 mins ·

Turn2deen:
If you are a police officer, you are a Kafir.
If you vote in democratic elections, you are a Kafir.
If you believe in Democracy, you a Kafir.
If you fight for your nation and not for Islam, you are a Kafir.
If you spy on Muslims, you are a Kafir.
If you ally with the Kuffar to fight Muslims, you are a Kafir.
If you give excuse to one who falls into major Shirk/Kufr, then you are Kafir.
If you don't make takfir on the one who insults the prophet, then you a Kafir.
If you are happy that Islamic State will be destroyed, then you are a Kafir.

It is her belief in this poisonous, Manichaean ideology – and the violence it encourages and demands – that led the defendant to seek out a role assisting ISIS in recruiting people to join and fight for the group abroad.  And it is the defendant's refusal to disavow or separate herself from this destructive, hateful, violent ideology, or to even acknowledge the danger it poses, that causes such deep concern that when released, she will return to this world and begin supporting ISIS anew.

In his report, Dr. Vidino describes the "commonly cited signs" that experts look for in assessing an individual's disengagement from terrorism.  Vidino Rpt. at 21. While not an exhaustive list, these indicators are:

- Ending personal involvement in terrorism and related activities;
- Distancing oneself from terrorism and extremist activity by acknowledging the shortcomings of their actions;
- Distancing oneself from the group's ideology;
- Breaking contact with individuals associated with the group or supporting its ideology; and
- Accepting the punishment for crimes committed

Id.

In the John Doe case, when grappling with the issue of how to assess a terrorist defendant's likelihood of turning "back to radicalization," this Court heard testimony from two experts who identified several of the same factors as Dr. Vidino.  See United States v. John Doe, 323 F. Supp. 3d at 378-83.  Factors common to all three of these experts – one of whom

testified for the defense – were the importance of voluntary disengagement from the terrorist organization, cooperation with law enforcement and a willingness to confront the ideology. See id. at 378-81.

In <u>John Doe</u>, this Court agreed with the experts and found that "the defendant has recognized the severity of his crimes and is not likely to move towards violent extremist behavior" and that the defendant "appeared credible and forthright at sentencing about his intention to leave his radical past behind and his desire to live a normal life." <u>Id.</u> at 391. This was based on, *inter alia*, John Doe's voluntary surrender to law enforcement, his admission of remorse for his crime, his four years' of consistent and substantial cooperation with the government and his public appearances disavowing and condemning ISIS and his work discouraging others from doing the same. <u>Id.</u>

The comparison is here stark. The defendant has exhibited none of the positive factors relied on by this Court in deciding to sentence John Doe to an extended term of probation. Indeed, the Court gave the defendant a unique opportunity here, one rarely afforded to defendants in terrorism cases, when it released her on bail. She had the chance to show the Court she has changed, that she accepts responsibility for her criminal conduct, that she rejects her prior violent ideology, and that she is capable of choosing a different path.

The Court would face a far more difficult balancing question now had the defendant availed herself of this opportunity. But she did not. She has shown no contrition, taken no responsibility for her conduct, and failed to separate herself from the extremist world she reveled in before her 2016 arrest. Instead, as set forth above, she took advantage of the Court, violated its trust and committed a new crime. In so doing, she provided a preview of what she will do if released now. She utterly disregarded this Court's orders regarding her bail conditions, connected and sought to connect with numerous people she herself identifies as ISIS supporters, including by using her ISIS name "Umm Nutella," hunted for the same ISIS propaganda that she promulgated before, repeatedly expressed a total lack of remorse or acceptance of responsibility for her conduct, intentionally destroyed evidence to avoid detection and then, when given the chance to explain herself, repeatedly lied. At every turn, the defendant has demonstrated she cannot be trusted and remains a threat to return to her old ways.

What is most striking, and should most concern the Court, is the defendant's return to espousing the same extremist, "us versus them" sentiments while also denying responsibility for her crimes, contacting and attempting to contact ISIS supporters and seeking out more ISIS propaganda, and then covering it up and lying about it. As Dr. Vidino explains, the defendant "repeatedly argues that the behaviors she engaged in in support of ISIS might be illegal under US law but, at the same time, are simply manifestations of good *deen*, of correct adherence to Islamic creed." Vidino Rpt. at 27. Dr. Vidino points to several exemplars of this, including the following:

- The Facebook post from the defendant while she was on bail in June 2018 in which she wrote: "I didn't do anything wrong under Islam but stand up for my deen and got arrested for what I believe in. <u>See</u> Exhibit 14.

- A February 22, 2019 email from the defendant in which she "America a is hard for Muslims to live if you want to practice deen ul islaam."

- A February 28, 2019 email in which the defendant wrote "I understood that United States don't like certain religious beliefs and don't allow you to exercise certain beliefs."

Dr. Vidino describes these and other similar recent statements of the defendant this way:

> These statements do not indicate any abandonment of ISIS' worldview. Rather, they strongly suggest that the defendant believes that adopting ISIS ideology and acting in its furtherance constitute correct Islamic behavior, following one's *deen*. In substance, she equates being a good Muslim with supporting ISIS and, because American authorities arrest and prosecute ISIS supporters, a good Muslim cannot live in America. It is a position that only an ISIS supporter would hold and that the overwhelming majority of Muslims in America and worldwide would strongly oppose.
>
> Also indicative of the defendant's views are the various statements in which she disparages the US justice system. While negative views could be normal for any defendant, Jane Doe frames her criticism of the US justice system in religious terms by using the word kuffar, "infidels" (see email dated 2/22/2019 "win this case against these kuffar" and Facebook post 6/13/2018 "I was once a prisoner in dar ul kufr"). These statements indicate that the defendant does not recognize the legitimacy of the US legal system since it is not based on Islamic law but, rather, it is run by kuffar and based on laws other than sharia. It is, once again, a position that only somebody that believes in jihadist ideology would have.

Vidino Rpt. at 27-28.

The defendant also has repeatedly either minimized her crimes or entirely denied responsibility for them and claimed she has been persecuted because of her religion and/or because she is poor. As noted above, as recently as February 24, 2019, the defendant wrote "I did not do anything wrong as a Muslim but a cyber crime in social media which is a violation in USA to support certain shari'ah so al maghreb tul horriya." On February 27, 2019, the defendant wrote "the truth it very simple it a conspiracy of material support knowing and

35

supporting propaganda internationally…it cyber crime on social media and most it private msggs and it how they can look into our stuff just like they do to other pppl and plus I'm poor."

All of this is consistent with the conclusions of Dr. Katsavdakis, the forensic psychologist who examined the defendant and prepared the expert report which is attached hereto as Exhibit 2. The government will not rehash here Dr. Katsavdakis's report; however, certain of his conclusions and the bases for them are critical to understanding the risks the defendant continues to pose. His central conclusion is that the defendant "poses a moderate risk for violent/extremist beliefs, further radicalization and possible acts." Exhibit 2 at 15. This is based on, *inter alia*, his conclusion that the defendant demonstrates a "fixation or pathological preoccupation for extremist related causes," one which continued into 2018 despite the defendant's attempts to "cloak[]" this fixation in "curiosity." Id. at 16. This is seen in the defendant's conduct on presentence release in 2018 discussed in detail above, as well as in her more recent statements denying accountability for her actions and claiming, in essence, that all she ever did was stand up for her religion.

Dr. Katsavdakis' report also highlights that the defendant is reluctant to seek out care, "repeatedly find[ing] reasons to negate potential benefits of treatment." Id. And perhaps most disturbingly for the Court, Dr. Katsavdakis found that the defendant "demonstrated repeated instances of deceptive behavior, as well as a primitive attempt (e.g.. denial) for engaging in behavior despite evidence to the contrary." Id. at 17. The defendant exhibited this deception even during her time with Dr. Katsavdakis, answering "false" to his question about whether she ever lies to avoid getting into "tight situations." Id. This answer from the defendant is of course belied by, among other things, her recent guilty plea to destroying numerous electronic messages to avoid their detection by law enforcement and her admission to the Court that she lied to the government during the January 2019 Interview.

C. The Need to Avoid Unwarranted Sentencing Disparities Supports the Imposition of a Guidelines Sentence

Sentencing comparisons to other Section 2339B defendants are of limited use here because the defendant and her conduct stand apart from other convicted terrorism defendants. She is *sui generis*. Indeed, the government is unaware of any other defendant who has pleaded guilty to providing material support to ISIS (or any other foreign terrorist organization) and been released on presentence release only to violate the terms of her cooperation agreement, reconnect with people she herself identified as ISIS supporters, lie to the government, destroy evidence of her conduct, and be convicted of a new felony offense.

The most meaningful comparison for the Court's consideration is by way of contrast to this Court's own sentencing in John Doe, discussed above. There, in weighing the paramount need to "protect the public from any further crimes by the defendant" and "the required general deterrence of others who might help ISIS here or abroad,"[36] this Court rightly focused on the defendant's acceptance of responsibility, his regret for his actions and his

---

[36]     John Doe, 323 F. Supp. 3d at 370.

repudiation of ISIS and its brutal and corrupt ideology. The Court quoted John Doe's conclusion about ISIS, "'It was . . . senseless. These people [,ISIS members,] are liars. These people are not Muslim. That's not how Islam is or the Koran.'" John Doe, 323 F. Supp. 3d at 373 (quoting from sentencing transcript at 15:22-25).

But this Court did not rely solely on John Doe's words for proof of his repudiation of ISIS and its hateful violence and his commitment to live a law-abiding life upon release. It did not have to. Because for indicators of what John Doe would do upon release, the Court could rely also on his actions, noting that for nearly four years after his arrest he provided extraordinary cooperation with the government's counterterrorism efforts, including *voluntary* efforts such as making public statements denouncing ISIS, all at significant risk to his and his family's safety. Id. at 375. In the end, the Court "believe[d] that [John Doe] has recognized the severity of his crimes and is not likely to move towards violent extremist behavior." Id. at 391. It was for all these reasons that the Court concluded that further incarceration of John Doe would "not serve any legitimate penological goal" and that "neither retribution, rehabilitation, deterrence, nor recidivism" justify sentencing defendant to an additional term of incarceration." Id. at 392.

As set forth above, the defendant here stands before this Court in total contrast to John Doe. She does not accept responsibility for her actions; rather she downplays the seriousness of her crimes and blames others for her getting caught and for persecuting her. She did not honor her cooperation agreement with the government; rather, she violated it repeatedly. She has not repudiated ISIS, its supporters or its brutal violence, which she previously celebrated; on the contrary, when released for just a brief period, she contacted and attempted to contact ISIS supporters and sought out more ISIS news and propaganda. She was not honest and forthright; instead, when given a chance to explain her conduct on presentence release the defendant lied, repeatedly, including about using her ISIS *nom du guerre*. She clings, still, to the hateful and divisive 'us versus them' dichotomy of true Muslims versus non-believing "kuffar."

### D. A Guidelines Sentence Is Necessary To Afford Adequate Deterrence and To Promote Respect for the Law

A Guidelines sentence is also necessary to adequately deter criminal conduct— in this case, terrorism aimed at harming Americans and American interests—and to promote respect for the law prohibiting such destructive conduct. See 18 U.S.C. § 3553(a)(2)(A)-(B). As Judge Walker stated in his concurrence in Stewart, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." Stewart, 590 F.3d at 181.

The capacity of a terrorist organization like ISIS to thrive hinges in large part on its ability to grow its membership—to attract, indoctrinate, and enlist new followers, like the defendant, who are committed to advancing and serving ISIS's murderous agenda or die trying. It is only through this support that ISIS and other terrorist groups are able to fulfill their missions of hate, murder, and violence. Deterring such conduct is particularly important

in today's environment, when so many young people in the West, including in the United States, have become radicalized by jihadist propaganda online and have either traveled or tried to travel to the Middle East to join ISIS and other terrorist groups.  It is vital for our country's national security that other young men and women who reside in the United States, when exposed to hateful extremist teaching, be deterred from choosing to follow a path similar to the defendant and engaging in potentially devastating conduct in support of such groups.  It is important for those contemplating joining a terrorist organization to know that the consequences for such conduct are serious.  And it is important for the public to know that those who seek to join and support terrorist organizations will face serious punishment preventing them from causing harm to society.  A Guidelines sentence is necessary and warranted in this case to serve the pressing need for general deterrence of such terrorism offenses.

Finally, a Guidelines sentence is also required to deter other individuals from engaging in the type of wanton obstruction and deception engaged in by the defendant *after* she pleaded guilty to the Material Support Offense and agreed to cooperate with the government.  The importance of this cannot be overstated.  Despite the serious nature of her terrorism offense, the government – as it must do to cooperate any defendant in order to pursue additional serious criminal activity – trusted the defendant and took a significant risk in doing so.  The defendant, instead of embracing this extraordinarily rare opportunity to repay that trust with honesty, and thus chart a better course for herself, instead abused it.  She lied and destroyed evidence to hide her actions from the government and this Court.  In so doing, she jeopardized ongoing terrorism investigations.  Moreover, the defendant made manifestly clear that she cannot be trusted to follow even the most basic conditions of supervision, including to tell the truth, let alone abandon the extremist ideology that she continues to espouse.  It is thus vital that the Court send a message not only to this defendant, but also to future cooperating witnesses that their failure to honor their agreements, obey the law and comply with the Court's orders will be punished severely.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 360 to 600 months' imprisonment

as such a sentence is sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    /s/ _____
Josh Hafetz
Ian C. Richardson
Assistant U.S. Attorneys
(718) 254-7000

Enclosures (Exhibits)

cc:    Clerk of Court (JBW) (by ECF) (without enclosures)
Deirdre D. von Dornum, Esq. and Samuel Jacobson, Esq. (by Email and ECF)
Shayna Bryant, Senior U.S. Probation Officer (by Email)