UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------X

UNITED STATES OF AMERICA          :

    -against-          :          17 CR 48 (JBW)
                          19 CR 117 (JBW)

SINMYAH AMERA CEASAR          :

    Defendant.          :

----------------------------------------------X

[FILED UNDER SEAL]


**DEFENDANT'S SENTENCING MEMORANDUM**


Deirdre D. von Dornum, Esq.
Samuel I. Jacobson, Esq.
Federal Defenders of New York
Eastern District of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201


TO:   Richard P. Donoghue, Esq.
       United States Attorney
       Eastern District of New York
       Attention: AUSA Joshua Hafetz, Esq.
       Attention: AUSA Ian Richardson, Esq.

TABLE OF CONTENTS

Preliminary Statement .......................................................................... 1

Objections to the Presentence Report ............................................... 2

Background ............................................................................................ 3

I. AMERA CEASAR HAS ENDURED EXTRAORDINARY ABUSE AND
HAS BEEN SEARCHING FOR A STABLE HOME AND COMMUNITY 3

   A. Amera Suffered Shocking Levels of Abuse and Neglect During
      Childhood and Adolescence, Leading to Lasting Trauma, Chronic
      Medical Problems and the Need To Find Community ......................... 3

   B.  The Bureau of Prisons Has Not Been Able To Adequately Care for
      Amera's Multiple, Chronic, Life-Threatening Medical Conditions .... 8

   C.  Amera's PTSD Is Aggravated By Being Confined In Prison ........... 12

   D. There Is A Significant Concern That Confinement in the Bureau of
      Prisons Can Have A Radicalizing, Rather Than De-Radicalizing,
      Effect ................................................................................................. 13

II. THE DEFENSE EXPERTS …………………………………………13

   A. Dr. Katherine Porterfield ................................................................. 14

   B. Dr. Marc Sageman ........................................................................... 15

   C. Ms. Daisy Khan ............................................................................... 17

III. OFFENSE CONDUCT ........................................................................ 18

   A. ISIS Offered Amera A Fantasy of Escape from Suffering ................ 18

   B. Amera's Immediate Cooperation with the Government Illustrates That
      Her Interest in ISIS Was Never Serious Or Ideological ................... 21

C. Amera's Mistakes on Bail Could Have Been Prevented Through a Proper Aftercare Plan ........................................................................ 22

1. Lack of Any Aftercare.................................................................. 22

2. Mistakes on Bail......................................................................... 23

IV. THE PROPOSED SENTENCE AVOIDS UNWARRANTED DISPARITIES AND ACCOUNTS FOR THE FUNDAMENTALLY FLAWED TERRORISM GUIDELINES……………………………...25

A. Avoiding Unwarranted Disparities With Other Cases ……………...25

B. Terrorism Sentencing Guidelines Produce Unjust Results for Many Defendants and in Particular for Ms. Ceasar...................................... 29

1. The Adjustment is Not Based on Empirical Research.................. 30

2. Equating a First Offender with a Career Offender Contradicts the Premise of the Guidelines ........................................................... 32

3. The Terrorism Adjustment Disproportionately Impacts People Under 25 ...................................................................................... 35

C. General Deterrence ……………………………………………….... 36

V. RISK OF RECIDIVISM AND SPECIFIC DETERRENCE …………...37

A. Amera Is A Low Risk of Recidivism, Even Compared to Her Risk Level in 2018.................................................................................... 37

B. Specific Deterrence ……………………………………………….... 38

1. Life Expectancy ……………………………………………...39

VI. AMERA'S NUMEROUS CREATIVE PURSUITS HAVE HELPED HER BEGIN TO PROCESS HER FEELINGS, ILLUSTRATE HER DESIRE TO UNDERSTAND HER PAST TRAUMAS, CONNECT

WITH OTHERS IN A HEALTHY WAY, AND LEAD A
MEANINGFUL LIFE. ...................................................................... 40

A. Amera's Autobiographical Writing Shows Her Early Capacity for
Reflection ...................................................................... 40

B. Amera's Poetry Represents Her Ability for Self-Reflection As An
Action for Change ...................................................................... 44

C. Amera's Paintings and Crocheting Illustrate Her Desire to Connect
With Others  ...................................................................... 45

D. Amera Has Had 28 Months In Jail to Reflect On Her Crimes, Her
Life, and Her Future ...................................................................... 46

VII. WITH A STRONG REENTRY PLAN IN PLACE, AMERA CAN
RECEIVE THE HELP SHE NEEDS, BUILD A SUPPORTIVE
COMMUNITY, AND NOT RECIDIVATE ...................................... 48

A. A Comprehensive Reentry Plan Will Provide Amera the Stability She
Needs ...................................................................... 48

B. Instead of Draconian Sentences, Young People Have Been Given
Opportunities to Positively Change Their Lives, Improving
Community Relations Along the Way ................................ 49

1. This Court Should Fashion A Diversion Program Similar to the
One Instituted by the District of Minnesota ................................ 50

C. A Substantial Term in the Halfway House Will Add An Additional
Punitive Measure and Mitigate Any Risks of Reoffense During The
Crucial Initial Period When She Is Released ...................................... 51

D. The Proposed Supervised Release Conditions Further Diminish
Amera's Chance of Recidivation ...................................................... 52

E. Amera's Health and Life Are at Stake ............................................... 54

Conclusion ...................................................................... 56

## PRELIMINARY STATEMENT

This is not a case about terrorism. It is not a case about taking up arms for ISIS – as John Doe, whom this Court sentenced last year, did; it is not a case about planning a domestic terrorism attack for ISIS – as Emanuel Luchtman did. It is a case about a young woman who was failed and abused continuously by the people closest to her. She has been utterly alone in the world. In desperation, she grasped at a fantasy, offered by the only people who ever said they would care for and protect her. Those people were ISIS. She now knows that it was truly a fantasy, that it would have been an unsafe place for her. She is remorseful, and she has begun to process the traumas that led her into that fantasy. She is not a danger to the public. And her likelihood of recidivism, with the proper treatment and support, is low. Indeed, the public will be most protected if she is rehabilitated. That cannot happen in the BOP.

## OBJECTIONS TO THE PRESENTENCE REPORT

While we have no objection to the guidelines calculation set forth in the government's letter, for the many reasons set forth below, we believe that it vastly overstates the appropriate sentence in this case.

We have several minor factual objections to the PSR, which are as follows:

Alias(es):     We have no knowledge of the name "Sinmyah An'tera Ceasar" only "Sinmyah Amera Ceasar." We ask that this "alias" be stricken from the PSR.

Paragraph 81: First, in addition to              abusing Ms. Ceasar, it should be noted that Ms. Ceasar's father also physically and emotionally abused her on a regular basis. Second, although the PSR states that "[i]ndependent searches of the New York and New Jersey Department of Corrections database records yielded negative results" for Ms. Ceasar's father,                                , verification of his prior convictions and current pending charge for sex crimes can be found on the New Jersey Courts Public Access website and local New Jersey newspaper accounts. *See* Exhibit A (NJ Courts Public Access); Exhibit B (Media Reports).

1

Paragraph 82:

Additionally, Ms. Ceasar does have the contact information of

Paragraph 83:  First, Ms. Ceasar felt pressure from her aunt not only to forgive Ms. Ceasar's father for                    , but for                            as well.  Second, in addition to staying with people in New Jersey and Philadelphia, Ms. Ceasar also resided at homeless shelters and SROs in Philadelphia and New York City.

Paragraph 84:  The ages of the men Ms. Ceasar entered into "religious marriages" with is incorrect.  The PSR should be amended to clarify the ages of these men at the time of the marriages:                    was 25,              was 39, and              was 42.

Paragraph 88:  The PSR should clarify that although Ms. Ceasar was previously                            , she had to discontinue use            .  This has meant that Ms. Ceasar at times            .

Paragraph 89:  First, it should be clarified that Ms. Ceasar's

*See* Obj. Par. 116.  Second, Ms. Ceasar

Paragraph 91:  Some of the dates and locations for Ms. Ceasar's education timeline are not correct.  Ms. Ceasar attended                    High School EOP in                      from several months in 2014 to 2015.  She attended              High School in              for several months in 2013.  She attended              High School in                            from over a year in 2011 to 2013.  She attended              High School in                            for several months in 2010.  She attended              High School in                    for her entire freshman year, 2009 to 2010.

Paragraph 116: First, as stated above, Ms. Ceasar was the victim of                            abuse.  Second, the PSR identifies only two instances when Ms. Ceasar                            .  In fact, she

2

Most recently, in May 2019 at MCC, the government's expert Dr. Kostas Katsavdakis,

We do not anticipate that any of these objections will require a hearing.

## BACKGROUND

I.   **AMERA CEASAR HAS ENDURED EXTRAORDINARY ABUSE AND HAS BEEN SEARCHING FOR A STABLE HOME AND COMMUNITY**

    **A. Amera Suffered Shocking Levels of Abuse and Neglect During Childhood and Adolescence, Leading to Lasting Trauma, Chronic Medical Problems and the Need To Find Community**

Amera's young life has been marked by tragedy, abuse, and medical difficulties.                                      Amera is the only child of                            PSR ¶ 81.  Her parents divorced when she was three, because of her father's physical abuse of her mother.  *Id.*  Her father had custody of her on weekends,

and Amera finally understood enough to tell her mother what was happening.  *Id.*; *see* Exhibit C (news report that Amera's father was charged with aggravated sexual contact with thirteen-year old girl).  Her mother got a restraining order against her father and her parents battled over custody of her.  PSR ¶ 81.

During this same period,                                               her mother's health was declining steadily.  Her mother had always suffered from diabetes and kidney issues; when Amera was just seven years old, her mother went completely blind from diabetes-related complications.  *Id.*  Her mother's kidneys failed to a degree that she had to go to twice weekly dialysis.  *Id.*  She was no longer able to work so she and Amera struggled financially, living only on benefits.  PSR ¶ 83.  By the time Amera was just 10 years old, she was the primary caretaker for her mother, stopping at the store on the way home from school to buy

food, cooking meals for her mother, cleaning their apartment, and keeping track of her mother's medications and medical appointments.

Amera's extended family was not able to be helpful.  Her paternal aunt and grandparents were angry at her and her mother for having called the police                                         Her mother had been raised in foster care, and her mother's foster parents brought food when they could, but were not able to take Amera and her mother in to their home.

Amera is an only child but has two older paternal half-siblings                                         and two significantly younger paternal half-siblings                                         Her older half-siblings were themselves just teenagers during the period of Amera's      caretaking of her mother, and, thus, unable to help.

The effects of these traumas and family dysfunctionality began to emerge by the time Amera was ten years old.  In the fourth grade, her school district placed her in special education under the classification of "communication impaired."  *See* Exhibit D, at 3                                         Her health, like her mother's began to fail: in an evaluation written by the school social worker when Amera was just 16, the social worker notes that                                         —highly unusual ailments for a teenager.  *See* Exhibit D, at 3.  That school evaluation also included cognitive testing indicating that Amera's overall IQ is average, but that her reading comprehension and mathematical understanding were in the 6th percentile, far, far below average.  *See* Exhibit D, at 4-5.

The situation only worsened in her teenage years.  After a series of strokes and heart attacks, her mother was placed into a nursing home when Amera was 13, and Amera was placed in foster care – three different foster homes between ages 13 and 17.  *Id.*; *see also* Exhibit D                          (Amera's "mother,                          has significant health issues and resides in a local nursing home.                          has been unable to care for [Amera] for approximately the last two years due to deteriorating health.")).  At the first foster home, Amera's foster mother locked her in a room for a month and fed her only peanut butter.  *Id.*  She did not allow Amera to speak to her mother at all during this time.  After Amera reported this to her teachers, she was removed from the foster home and placed with her paternal aunt and grandparents.  *Id.*  Her aunt and paternal grandparents pressured her to forgive her father for                          abusing

her; Amera was deeply hurt by their taking his side and requested to live elsewhere. *Id.*; *see also* Exhibit C (there were "issues in the paternal grandparents' home. [Amera] is reticent to share details but statements suggest some degree of abuse."). Her mother's foster parents took her in, but refused to spend the money the state provided for her care on books or clothes for her, instead spending it on themselves. *Id.*

As Probation has made clear, in "this particular case the abuse suffered by the defendant is so severe that it may warrant a departure from the advisory guideline range." *See* PSR ¶ 116.

From the age of thirteen, Amera moved 35 different times. In fact, the MDC Brooklyn and MCC Manhattan are, even taken separately, the two places she's lived the longest for the majority of her life. Amera attended five different high schools from 2009 to 2014. *See* PSR ¶ 91. Amera did not graduate from high school. *See* Exhibit E (Academic Record                          ). In 2011, at age 17, feeling angry and hopeless, she went to live on her own, staying with friends and at homeless shelters.

Homeless and penniless other than the limited income she was able to earn from babysitting and as a store clerk, she was not able to break free of the cycle of trauma. At age 17, she married a friend of a friend,                     in the hope of finding a stable home. Her husband immediately began physically abusing her and she discovered that he was using drugs. PSR ¶ 84. She left the marriage and returned to moving from friend's couches to homeless shelters. At age 18, in 2012, she tried again,                          who was more than 20 years older than she. He punched and kicked her frequently. Again, she fled. *Id.* Then, in 2013, she married                  , who was again much older. She immediately became                          became abusive and controlling. He locked her inside the house. Out of fear for herself and their child, she fled.

At this same time, her mother was in and out of the Intensive Care Unit.

In the hope of escaping these difficulties, Amera went to Morocco in January 2015 and stayed with friends. She returned in the late spring, when her mother's health again worsened. In 2016, she moved to New York City and found work as a home health aide. She completed a 100-hour health aide course at                                      in Brooklyn, New York and became a registered home health aide. PSR ¶ 92. Although living in a

5

homeless shelter was still challenging, she sought to do better, by enrolling in a GED program          .

Amera had met a 30-year Muslim man in Sweden online and was preparing to travel to Sweden to marry him, again with the dream of finding stability, at the time of her arrest in this case.  She had never been arrested before.  She immediately cooperated, waiving her rights to counsel and to presentment, and providing hours and hours of information to the agents.  This extraordinary, intensive cooperation continued for months.  Amera pled guilty to an information alleging material support on February 13, 2017.  Throughout this period of cooperation she was detained at the MDC, with no concrete idea of when she would be able to be sentenced.  In June 2017, her only real family member, her mother, died, at age 49, from a heart attack, suddenly, and without Amera being able to say goodbye or prepare for her mother's death.  Over the government's opposition, Judge Matsumoto, acting as the Miscellaneous Judge, released Amera on bail for several hours so that she could attend her mother's memorial service in Atlantic City, NJ.  Amera was greeted at the memorial service by the father who         , whom she had not seen in years; he loudly criticized her for being in jail and bringing dishonor to her family, as she stood by her mother's open casket crying and stroking her mother's hair.

Due to her chronic medical difficulties, Amera was released on bail on April 27, 2018 so that she could receive comprehensive treatment at          .  Even at the height of her offense conduct she was trying to be productive, illustrating her strong work ethic.  PSR ¶ 93-99.  While on bail she interviewed for a home health aide position but was unable to start due to the mismatch in her name—she was released under the name "Hawwa Safani"—and lack of identification.  Less than three months later, she was remanded, because she had reached out to her friends whom she had cooperated against, and had sought to reconnect with ISIS-involved individuals on Facebook.  She has been detained at the MCC since July 19, 2018.

Despite her many medical and emotional difficulties, while at MDC and MCC, Amera has sought to improve herself.  She has taken basically all of the classes that are available to women: GED preparation, resume management, blood pressure management, parenting, art and community leadership.  PSR ¶ 86.  Amera has taught herself to crochet beautiful stuffed animals and clothing items.  *See* Exhibit F (crocheted animals and items).  She has made efforts at painting and poetry as ways to relieve stress and express herself.  *See* Exhibit G (poems and paintings).  The defense has tried to have a psychologist, Dr. Kate Porterfield, meet

with Amera as often as possible; Amera has welcomed these sessions and participated fully, as Dr. Porterfield sets out in her evaluation.  *See* Exhibit H (Dr. Kate Porterfield's evaluation).   Together, they have tried to develop appropriate coping strategies, as this diagram they made together reflects:



     The Chaplain at MCC, Z. Yousif, writes on her behalf "I have found inmate Safani to be very patient, consistent, respectful, and ready to assist and provide guidance", "[s]he has carried out my instructions to the letter," "[h]er spirituality is very commendable", and "I am certain she will be a contributing member of society if permitted to do so."  *See* Exhibit I, Letter of Chaplain Z. Yousif.  Hana Yamahiro, a paralegal who worked closely with Amera at the Federal Defenders, before leaving to attend NYU School of Law, describes Amera as "incredibly artistically gifted, funny, kind, and full of compassion and generosity, though she's never been the recipient of those valuable intangibles."  Hana further describes, "[a]ccompanying Ms. Doe to see her mother for the final time before her burial was incredibly difficult, but what was harder to witness was the other family members' treatment of her on the most painful day of her life.  She was not greeted with a hug, loving affirmations, or sincere condolences.  But rather with harsh words admonishing her for missing the funeral and upsetting details regarding who would inherit her mother's very short list of possessions.  Judging by Ms. Doe's reaction, the callous lack of sympathy and support was predictable, but I found watching the mistreatment of Ms. Doe on this day was especially hard."  *See* Exhibit J (Letter from Hana Yamahiro).

It is not surprising that the two people who wrote letters of support for Amera are a former member of her legal team and a member of the MDC staff. Given Amera's traumatic and often homeless life, it makes sense that the first time she might make meaningful connections would be when situated in one location. These recently formed relationships illustrate Amera's deep desire to connect with others—it is clear that if given the correct tools and opportunities, Amera can build the supportive community she never had.

### B. The Bureau of Prisons Has Not Been Able To Adequately Care for Amera's Multiple, Chronic, Life-Threatening Medical Conditions

The Bureau of Prisons has neglected and even shamed this young woman because of her chronic, serious medical conditions.

Prior to her arrest and incarceration at age 22, Amera already had a significant medical history and a cautionary family medical history.  As an adolescent, she already suffered
.  She had been diagnosed with

*See* Exhibit K (
Hospital Medical Records).  Because of her lack of a stable family and her homelessness, she had not had regular medical care, but instead had only received treatment in emergency room settings.  *Id*.  Amera's mother died in 2017, in her 40s, of heart failure, after a long stay in a nursing home for diabetes-related illnesses.  Her father suffers from            disease,
.

While incarcerated at MDC Brooklyn from November 2016 to April 2018, Amera's medical records from                  and                  reflect that she was
*See* Exhibit L (
).

*Id;* Exhibit M (
); Exhibit N (            Additional Medical Records).
During one of these hospitalizations,
*See* Exhibit M.  From March to April 2018,

During these

episodes, she was written up by a nurse for "faking"            ; and, she was threatened with being sent to the SHU if she did not stop complaining.  Dr.

reviewed Amera's records as of April 25, 2018, and determined those records reflected the following issues of concern:  obesity; asthma; pre-diabetes mellitus; iron-deficiency anemia; PCOS, with i

*See*, Exhibit O (Letter of Dr.            ).  Dr. , both in his letter, and in his testimony before this Court at Amera's April 2018 bail hearing, expressed particular concern about the combination of

*See id.* Dr. recommended that Amera be seen at a medical center that could treat her various issues comprehensively, and with communication among the specialists.  *Id.*

While Amera was released on bail from April to August 2018, she was seen regularly at            Medical Center            , and the doctors there expressed serious concerns about her health, particularly given her age.  Testing and clinical evaluation                   *See* Exhibit P (Remaining Medical Visits Post Remand); Exhibit Q (          Diagnostic Lab); Exhibit R ( Medical Record); Exhibit S (                  Medical Records).   Her primary care physician also diagnosed her with                   *See* Exhibit T (            Medical Record).  Amera was sent to a                         *See* Exhibit U            Medical Record                  ).  She was prescribed a                  .  *See* Exhibit V (                  Pharmacy Record).  Amera received                   *See* Exhibit W (May 2018 Emergency Room Visit). Amera was instructed to have a                  consult as soon as possible. She had an appointment scheduled but was remanded on the bail violations prior to that appointment.

During her incarceration at MCC, Amera has experienced both long stretches of time                                    The MCC currently has no            on staff.  On January 7, 2019, Judge Levy ordered the government to ensure that the BOP took Amera to outside medical specialists for these concerns.  On January 17, 2019, the government filed a letter with the

9

Court stating that Amera would be taken to                         in early February.  She
was finally taken for that appointment two months later, in March 2019, and the
                urged that she be seen by                 as soon as possible because of
the                       .  Indeed, MCC's own medical staff recommended that she
be seen by                                  .  Amera wrote to the medical
staff at MCC on March 11, 2019,
                                    see Exhibit X (Medical Records), Trulincs of Amera to
Medical, and again on 4/6/19: "I am still in pain                  … Please I can't
take this pain                                              ." See id.
We have repeatedly sought                 follow up.  MCC has repeatedly told
Amera they are too short-staffed to take her to see                 .  She still has not
been seen. Her latest lab work shows
                                                              See Exhibit X
(Medical Records).

Even the most basic personal care is a struggle for Amera (and the other
female inmates) in the BOP.  For example, Amera has struggled to obtain
sufficient sanitary napkins while at MCC.  After a hearing on this matter before
Judge Levy, at which the government argued that these products were available for
purchase – ignoring that Amera is indigent – they became more readily available.
Even before this, the DOJ Office of the Inspector General, had concluded that the
BOP was not supplying sufficient feminine hygiene products.  See Exhibit Y (OIG
Review of the Federal Bureau of Prisons' Management of Its Female Inmate
Population, at ii).  Congress, as part of the First Step Act, has now mandated that
feminine hygiene products be provided to all female inmates at the BOP.

Amera was recently given
                despite her allergy         being clearly marked in her BOP medical
records—and had a strong allergic reaction to it.  She sought medical attention
from the COs but was told there was insufficient staff for her to be taken to the
doctor.  This lack of coordination of care is dangerous for someone with so many
medical conditions.

Finally, her confinement has been marked by serious public health concerns.
A recent visit by defense counsel and the Deputy Chief of the Civil Division of the
U.S. Attorney's Office, SDNY, to the women's unit at the MCC where Amera is
housed revealed the following, see Exhibit Z (Memo to Chief Judge Irizarry and
Chief Judge McMahon Re. Visit to MCC Women's Housing Unit on May 23,
2019); Exhibit AA (April 12, 2019 email of Amera); Exhibit BB (April 16, 2019
email of Amera).

- **Raw Sewage Floods and Clean-Up.** On April 12, 2019, feces and urine flooded the unit from pipes overhead, as well as overflowing toilets. Women described being locked in their cell with raw sewage up to their ankles and the toilet in the cell continuing to overflow with sewage. Other women described feces in their hair from above and raw sewage coming through the common area, into the small rec room, and throughout the shower areas. COs present on the unit instructed the women to clean up the sewage. They had no safety equipment. After several hours, the women were provided with gloves. Masks, pairs of boots, and safety goggles were also given out, several hours after the sewage flood occurred, but there were not enough for all the women involved in the clean-up effort. The furniture in the unit was never sterilized after the raw sewage flood.
- **Rodents and Roaches.** Numerous women described rats and mice infesting their cells, and running through the common areas, particularly in the laundry rooms. They reported seeing mice coming out of the toilets in their cells when they are locked in at night. Women also noted that when they receive commissary items, there are sometimes bite marks on them. During one of government expert Katsavdakis's evaluations of Amera, conducted in the legal visiting rooms at the MCC, on the floor above the women's unit, Dr. Katsavdakis noted that he heard repeated scrabbling in the walls and he believed it to be a rat infestation.
- **Black Mold.** Many women complained of black mold on the walls and floor tiles in the showers that returns right after it is cleaned. They described mold on the shower ceilings, and the ceilings in the hallways outside the ceilings where there have been leaks, as well as mold on the shower tiles, and the floor tiles in rooms where water has come up from below repeatedly. Several women complained of skin rashes and fungal infections on their feet, which they believed were caused by the black mold in the showers and other floor tiles. Other women have toenail beds where their toenails had fallen off, and spots on their feet that appeared to be bacterial infections.
- **Unsanitary Food.** In addition to the concerns posed to their food by rodents and roaches, the women stated that they frequently receive produce that is rotten, particularly lettuce and apples. Many women complained of diarrhea from eating the food provided.
- **Medical Treatment Concerns.** Many women reported frequent cancellation of the once weekly medical visits due to either short staffing or a male medical emergency. The near-universal complaint among the

women was the lack of gynecological care, both for routine checkups, and for more urgent concerns, such as women with endometriosis, amenorrhea, or dysmenorrhea. Individual women also described serious medical issues going untreated.

- **Clean-Up Prior To The Visit**. On the morning of the scheduled visit, Correctional Officers told the women that visitors were coming that day and ordered them to: scrub the entire unit with bleach to remove the mold, sweep up all rodent droppings, remove all rat traps from sight, clean all the air vents, remove all buckets that had been placed under leaks from the ceiling and light fixtures, and remove all clothing that had been placed in air vents to block them.

### C. Amera's PTSD Is Aggravated By Being Confined In Prison

As set forth in detail in Dr. Porterfield's evaluation, *see* Exhibit H, Amera suffers from complex post-traumatic stress disorder, as a result of abuse at the hands of the adults who were supposed to be protecting her: her father and her foster parents.

As a foster child, Amera was locked for a month in a bedroom and not allowed any contact with her mother, who was by then quite ill. Thus, the experience of being locked in a cell in prison triggers that trauma and loss of control Amera experienced as an abused child. It makes her desperate to make contact with anyone who will respond to her – as though without that communication she has ceased to exist. The death of her mother in 2017 while she was incarcerated only heightened the feeling that she is being obliterated and must constantly raise alarms to be seen. *See* Exhibit J (Letter from Hana Yamahiro).

Amera has experienced suicidal ideation both prior to and during her incarceration, beginning at age 11. *See* PSR ¶ 89; Exhibit K (Temple University record of suicidal ideation following miscarriage, 9/15/14). This suicidal ideation is directly related to her sexual abuse by her father and her PTSD, and aggravated by the death of her mother, and by her abusive relationships with men whom she married in the hope of stability. The BOP does not provide sufficient mental health resources to help her cope with the severity of her past trauma, and, instead, being imprisoned inflicts new traumas on a regular basis. *See* OIG Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population, at i, attached as Exhibit Y (concluding that BOP's programming and policy decisions did not fully consider the needs of female inmates for trauma treatment

programming, pregnancy programming, and feminine hygiene).  Indeed, while at MDC and MCC she has received no counseling whatsoever.  She has received only a prescription antidepressant.  *See* Exhibit DD (BOP Prescription of
            ).

Also contributing to her anxiety and depression is the fact that confinement in the BOP does not permit for sufficient privacy for a devout Muslim woman. Amera must uncover her head for male guards.  She has been searched, frequently, by male guards.  For extended periods she has been without a hijab, because she was too indigent to purchase one from the commissary.  When she tried to use a towel to cover her head, so that at least her hair would not be exposed, she was forbidden from doing so for security reasons.  She has to expose her body in order to shower in a group setting.   She receives medical care from male nurses and doctors without a woman present.  Each of these experiences is uncomfortable and contrary to her beliefs about modesty.

In addition, the BOP also does not provide a safe religious community for Amera that would help her work towards improving her mental health.  The majority of other Muslim women in the BOP are radicalized Muslims charged with terrorism offenses.   For example, while at the MCC, Amera has been housed with
      , an alleged ISIS-inspired homegrown terrorist.

### D. There Is A Significant Concern That Confinement in the Bureau of Prisons Can Have A Radicalizing, Rather Than De-Radicalizing, Effect

The Bureau of Prisons has developed no system to rehabilitate convicted terrorists while they serve their term of incarceration.  *See, e.g.*, Exhibit EE (Lorenzo Vidino, Seamus Hughes, "America's Terrorism Problem Doesn't End with Prison—It Might Just Begin There", www.lawfareblog.com, June 17, 2018). Instead, because Muslim inmates are isolated from the mainstream Muslim community, frequently denied access to Muslim clerics and religious services and their beliefs are treated with suspicion, confinement in the BOP has the tendency to radicalize and harden beliefs, rather than de-radicalizing.  *See, e.g.* Exhibit FF (James Brandon, "The Danger of Prison Radicalization in the West, CTC Sentinel Vol. 2, Issue 12 (December 2009) ("While few … individuals adopted extreme Islamist beliefs solely as the result of their time in prison, their prison experiences significantly accelerated their radicalization through isolating them from mainstream society while also exposing them to ideologies to which they ultimately proved highly vulnerable.")).

13

Amera is highly vulnerable to persuasion that appeals to her trauma-based paranoia and to her desire to have a community.  There is little indication from the offense conduct or other assessments that she is driven by Islamic ideology.  Rather, she desires attention and has frequently recreated the abusive relationships of her childhood.  *See* Exhibit H (Evaluation by Dr. Porterfield).  These characteristics mean that a strong radical Muslim fellow inmate could lead her astray.  There is little in the Bureau of Prisons to counteract this.   Even in facilities such as the ADMAX in Florence with a large Muslim population, an Imam only visits once or twice a year (whereas there is a Christian cleric on staff).   The BOP staff have little knowledge of Muslim customs and beliefs, and, thus, frequently violate them, particularly for Muslim women inmates.

In addition, the DOJ Office of the Inspector General issued a special report, after reviewing the BOP's selection of Muslim Religious Services Providers that found serious deficits in the BOP's handling of Muslim religious needs, including a shortage of Muslim clerics within the BOP, a failure to provide volunteers or staff clerics from the Shiite sect, and failure to supervise inmate-led Muslim services.  *See* Exhibit Y ("A Review of the Bureau of Prisons' Selection of Muslim Religious Services Providers." OIG Report (April 2004)).

A young person without formal religious education such as Amera needs mainstream influences, education, and a true Muslim community.   The BOP offers none of these.

## II.     THE DEFENSE EXPERTS

Your Honor will hear from three defense expert witnesses who will assist the Court in understanding Ms. Ceasar's behavior and its psychological underpinnings, help place her conduct in context of the overall threat of ISIS, address her understanding of her conduct and her remorse, and propose methods of both protecting the community and facilitating her rehabilitation.

### A. Dr. Katherine Porterfield

Dr. Porterfield has been meeting with Ms. Ceasar several hours per week on average since soon after Ms. Ceasar was arrested.  In total, she has spent more than 120 hours with Ms. Ceasar at MDC, MCC, and while on pretrial release.  Dr. Porterfield's evaluation is enclosed as Exhibit H.

Dr. Porterfield is a clinical psychologist, and since 1998 has worked as a clinical psychologist at Bellevue Hospital and NYU School of Medicine at the Bellevue/NYU Program for Survivors of Torture.  She has evaluated, treated and supervised the treatment of numerous children, adolescents and adults who have experienced war trauma and torture.  She has evaluated individuals and served as an expert witness for court proceedings in the Military Commissions in Guantanamo Bay, U.S. federal court in the Southern and Eastern Districts of New York, Superior Court, and for immigration proceedings in courts through the Executive Office of Immigration Review.  She has trained hundreds of health professionals and attorneys in the country on the evaluation and treatment of war trauma and torture survivors and has lectured and conducted seminars on issues of torture and complex trauma sponsored by a wide variety of organizations, including human rights organizations, governmental entities, universities, and the International Criminal Court at the Hague.

Dr. Porterfield will testify that Amera's behavior was deeply rooted in her traumatic history, and her fantasies of escaping it.  She will discuss Amera's suicidality, her severe depression, and her history of abuse.  The abuse she suffered made it difficult for her to choose healthy people in her life, and led her towards more hurt.  She will testify that Amera was, at the time of her offense conduct, feeling utterly hopeless, and was desperate to make connections.  ISIS was fantasy for her—its seductive power was that it offered an escape from her miserable and lonely reality.  If offered all of the things she never had: hope, home, protection, family, support, community.  These are not ideological causes; they're emotional, development, and maturational.

Dr. Porterfield will also testify about the progress Amera has made in her thought process and decision-making, but also, of course, her setbacks along the way.  She will also discuss recommended treatments and rehabilitation.

### B. Dr. Marc Sageman

Dr. Sageman's expert notice is enclosed as Exhibit HH. Dr.  Sageman is a Senior Fellow in the Foreign Policy Research Institute's Center for the Study of Terrorism.  His scholarship focuses on terrorism, the process of radicalization, and political violence.  Dr. Sageman testified before the 9/11 Commission, and has extensively consulted for U.S. government agencies including the National Security Council, the Department of Homeland Security, the Federal Bureau of Investigation, the Department of Justice, the Department of State, the Department of Defense, the Secret Service, the National Threat Assessment Center, local law

enforcement agencies, and more than twenty foreign governments.  Dr. Sageman is also the author of numerous books and articles on terrorism, including *Turning to Political Violence: The Emergence of Terrorism* (2017), *Misunderstanding Terrorism* (2016), *Leaderless Jihad: Terror Networks in the Twenty-First Century* (2008), and *Understanding Terror Networks* (2004)

Dr. Sageman served as the Special Adviser to the Deputy Chief of Staff of the Army and to the Deputy Chief of Staff of the International Security Assistance Forces (Intelligence) on the Insider Threat in Afghanistan, and was a scholar-in-residence at the NYPD.  Dr. Sageman is also a forensic psychiatrist, having previously served as a flight surgeon in the U.S. Navy and completed a residency in psychiatry at the University of Pennsylvania.  He holds a sociology Ph.D. and an M.D. from New York University, and an A.B. from Harvard College.

Dr. Sageman will testify concerning the social and psychological underpinnings of attraction to groups like the Islamic State.  He will testify that he met with Amera for several hours and reviewed the case materials, and that Amera's actions are rooted in her personal history, abuse and trauma, and her lack of trust and community.  He will discuss some of the language she uses on social media, and testify that it is very different from the language used by a jihadist.  Dr. Sageman will further testify that while her attraction was personal and psychological, to the extent that it was rooted in actual ideology or belief, it is not necessary to distance oneself from those beliefs to be law-abiding.

Dr. Sageman will distinguish between the role of recruiter and facilitator in the Islamic State, and will contextualize Ms. Cesar's conduct: providing to several individuals in the United States who wanted to travel the contact information for individuals she believed could assist them in traveling; and then she herself attempting to travel.  He will discuss her lack of connection to the plots and operations the government has described in its letter.

Sageman will further testify concerning the current territorial status, threat, and online presence of ISIS.  He will discuss the use of indicators to identify the potential for violence, and will opine that Amera poses no risk of violence.  He will discuss her mindset in the context of the 53 individuals charged with crimes of terrorism who he has interviewed.  Finally, Dr. Sageman will discuss Amera's suitability for rehabilitation based on his meeting with Amera and his review of the case materials.

## C. Ms. Daisy Khan

Ms. Khan's expert notice is enclosed as Exhibit II.  She is the founder and executive director of the Women's Islamic Initiative in Spirituality and Equality (WISE), the largest global network of Muslim women committed to peacebuilding, gender equality, and human dignity.  Khan is an expert in counter-extremism, and is the editor of *WISE UP: Knowledge Ends Extremism*, a 365-page report in collaboration with 72 Muslim academics, scholars, imams, activists, and field specialists, to create a counter-momentum to the rise in violent extremism.  *WISE UP* serves in part as a manual to differentiating Islamic theology from extremist ideology.

Ms. Khan also founded the first global Muslim women's shura council to amplify Muslim women's scholarship.  Khan is a prolific speaker who has lectured at major institutions, like the Council on Foreign Relations, Aspen Institute, Chautauqua Institution, World Economic Forum and many others.  She is a media commentator and an Op-Ed writer who has appeared on CNN, MSNBC, ABC, PBS and BBC and is featured in documentaries and publications like TIME, Newsweek, New York Times, Wall Street Journal, Elle and many others.

Khan was listed among TIME Magazine's "100 Most Influential" People and *The Huffington Post* listed her among "Top Ten Women Faith leaders" and *MORE Magazine* described her as "a link between moderate Islam and the West." She is the recipient of twenty awards and honors including the Eleanor Roosevelt Human Rights Award, Edinburgh Peace Award, and Interfaith Center's Award for Promoting Peace.

Ms. Khan will testify concerning a framework—developed in conjunction with the NYPD and outlined in *WISE UP*—of the push and pull factors that draw people to extremist organizations like ISIS.  Ms. Khan will testify that she has met with Amera a number of times—at MDC, MCC, and while on pretrial release—and that the relevant factors that both pulled and pushed Amera towards ISIS were all highly personal in nature, rather than ideological.  Ms. Khan will testify that Amera was particularly susceptible to ISIS' pull because she had been failed by almost everyone in her life.  She simply wanted to feel cared for.  This was a crime of yearning.

Ms. Khan will testify that Amera was not motivated by religion or radical ideology, and that her knowledge of her religion is superficial because it was not part of her upbringing.  Ms. Khan will further testify concerning the proper

placement of terms and phrases used by Amera in Islamic theology, and will opine that Amera is in fact incredibly Western, and neither radical in mindset nor committed to the ideological program of ISIS.

Ms. Khan will also discuss the transformation and shift in thinking she's seen in Amera. She will testify about the risks of recidivism and how it can be mitigated. She talk about how Amera has no fanatical thoughts, and is extremely accepting and eager to learn about mainstream Muslim beliefs. Finally, Ms. Khan will discuss potential plans for Amera's reentry and rehabilitation, including continued education and participation in mainstream Muslim religious practice through WISE and Ms. Khan.

## III.   OFFENSE CONDUCT

### A. ISIS Offered Amera A Fantasy of Escape from Suffering

The government is wrong. Amera was no more than a self-identified aspiring ISIS bride. At 21 years old, the time of her offense conduct in this case, everything she had done, and longed for in life, was about being loved, supported, and cared for, and having an escape from her miserable life. No one has ever protected her. Her life has been a series of abusive men. She has a biological father who              , fleeting foster parents who mistreated her, and three previous husbands who abused her.[1] Everything she has done in this case can be summed up as the desire to be a useful bride, and all of the connotations of safety and care that she fantasized would come with it. When she was arrested at JFK Airport, she was on her way to Sweden to get married.

The pattern of Ms. Ceasar's trauma, stemming in part from physical, sexual, and emotional abuse at the hands of men, is obvious in every aspect of her offense conduct. In April 2016, after trading only a few online messages with the confidential source in this case, having never met him or spoken to him or even seen him, Ms. Ceasar suggested that they get married. PSR ¶ 21. Same for the undercover FBI agent, a few months later. And in July 2016, Ms. Ceasar was in touch with another man who'd recently been released from Florida state prison

---

[1] Through leaders at her mosque, Ms. Ceasar had previously been entered into three marriages with much older and abusive men—a 25-year-old (when she was 16); a 39-year-old (when she was 17) who punched and choked her; and a 42-year-old (when she was 18) who controlled every aspect of her life.

("Individual 2"), who traveled up to New York City to see her, in violation of his probation. PSR ¶ 28.

In addition to her attempted travel to Sweden, Ms. Ceasar was at most a minor intermediary in a vast network. She put several individuals who had already expressed dedication to traveling to ISIS territory in touch with individuals who were purportedly abroad and could help facilitate, by providing their contact information. It is clear that no one in ISIS actually took Ms. Ceasar very seriously. When Ms. Ceasar gave the confidential informant the contact info for Umm Issa and Abu Isa Al-Amriki, two of her connections in ISIS, Abu Isa asked the confidential informant: "Do you have anyone that can vow or vouch for you"? The confidential source responded "no." Neither party believed Ms. Ceasar could provide any worthwhile vouching. Abu Isa proceeded to administer his own vetting process, connecting the confidential source with yet another individual who asked for money—though the money was never sent, Umm Isa and Abu Isa were killed in Syrian airstrikes, and nothing ever came of it. This additional vetting of the confidential source was necessary because everyone knew that Ms. Ceasar was a young girl who had no real dedication to the cause. In other words, everyone treated her like a Facebook poser, because she was.

Ms. Ceasar was not involved in the recruitment, logistics, or any actual facilitation of travel to ISIS territories—if she had been, she would herself have been able to travel much sooner, and not struggled so long to even get a Visa. And Ms. Ceasar had nothing to do with any of ISIS' operations abroad. She provided no oversight or direction to anyone in ISIS. PSR ¶ 7. Moreover, she had nothing to do with any of the arms of ISIS that plan, coordinate, and execute violent attacks. And it remains an open questions whether she ultimately would have even made it to an ISIS territory after arriving in Sweden. Her plan was to marry the Swedish man she'd never met, and then live with him in Sweden while they saved enough money to, in theory, at some point try to make their way to a place where they could live under an Islamic state.

Her ISIS fantasy did not alleviate her feelings of hopelessness, and it almost seems like she was desperate to be caught. In July 2016, Individual 2 was arrested in her presence, in New York City, by the same FBI agents who would eventually arrest Ms. Ceasar. She knew, without a doubt, that she would be under investigation if she wasn't already, because she knew what the agents would find on Individual 2's phone. And yet she did nothing to cover her trail. Taking her own self-sabotage a step farther, in October 2016 she left two of her cellphones on a New York City subway, and then reported her missing phones to the New York

19

City Transit Police using her real name, again knowing exactly what the police would find on her phones.[2]

Aside from the things she *did*, discussed above, there are also the things she *said*. Once she'd been swept up in the online community of ISIS supporters and swayed as a 21-year-old by ISIS' notoriously effective online propaganda, she did express some ugly sentiments on social media—which she now regrets deeply and do not in any way reflect the true Amera. For example, before her initial arrest she posted certain vile statements about the attack on the gay nightclub in Florida, and about people she saw on the subway who she thought were gay. But in reality, the brother with whom she recently re-connected, and who is her only real family support, came out as queer. Amera talks often about how proud of him she is for this, and feels nothing but love for him, his identity and sexual orientation included.

The same stark contrast between her dogmatic make-believe online presence and the softer and more agnostic views of the real Amera can be seen in her feelings about religion. Although some of her online activity suggests that she subscribes to a fundamentalist interpretation of Islam, in real life she is hungry for pluralistic and diverse forms of spirituality. She reads and talks frequently about the Bahá'í faith, Buddhism, Sufism, and many other religions that would be pure apostasy to any true ISIS adherent.

But she is not being sentenced for the things espoused online. We as a country don't jail people for bad thoughts, vile thoughts, or prurient thoughts. She is being sentenced for what she did, and for who she is under the online bluster that masked her traumas.

Providing material support to ISIS is of course a serious crime. No one— including Ms. Ceasar—would say otherwise.[3] But material support cases cover a

---

[2] The way her conduct on bail was discovered fit a similar pattern. Ms. Ceasar was accessing social media on her cellphone, which she knew was monitored by Pretrial Service's software, as well as on a laptop. With very obvious remnants of her two weeks of online activity visible on the laptop, she informed her counsel that she wanted to turn it over to Pretrial Services so that computer-monitoring software could be installed, and then proceeded to turn it over to Pretrial.

[3] The government's reliance on Ms. Ceasar's downplaying of her offense in phone calls and emails with acquaintances from prison as evidence she is "unrepentant" is disturbing

wide range of conduct, including training for combat, procuring weapons, plotting and carrying out attacks against civilians, and fighting in foreign wars that directly affect U.S. interests.  But Ms. Ceasar's conduct is at the lower end of the spectrum. In the end, she should be sentenced for what she did: purchasing a plane ticket to Sweden to marry a purported ISIS-supporter she'd never met; providing contact information to several individuals interested in traveling; and deleting her social media activity while on bail.

### B. Amera's Immediate Cooperation with the Government Illustrates That Her Interest in ISIS Was Never Serious Or Ideological

Ms. Ceasar's attempted cooperation is relevant and important to the Court's consideration of an appropriate sentence in this unusual case.  Notably, from her very first contact with the arresting agents, Ms. Ceasar waived her *Miranda* rights, waived her speedy presentment rights, and waived her right to counsel.  Over the course of a week in the custody of the Joint Terrorism Task Force ("JTTF") agents, she freely volunteered information regarding her own offense conduct and the activities of ISIS and its supporters, during dozens of hours of interrogation, before she was finally brought to the EDNY and provided a lawyer for the first time.

During her numerous proffers with the government (including but not limited to her week in the custody of the agents following her arrest, and numerous subsequent proffers after that), Ms. Ceasar candidly disclosed her own criminal conduct, as well as her knowledge of criminal activity carried out by members of ISIS.  She did not minimize her own conduct, nor exaggerate the culpability of those she cooperated against.  The information Ms. Ceasar provided regarding individuals affiliated with ISIS was largely corroborated and proven reliable.  Ms. Ceasar, at great risk to herself, also engaged in proactive cooperation with the government, in an operation designed to elicit inculpatory statements from a target of the FBI's ongoing investigation.  Moreover, Ms. Ceasar volunteered to speak with other troubled youth about her mistakes in the hopes that they could avoid them, but in part due to her mental health struggles the government did not arrange for this to happen as they did with John Doe.

---

(Govt. Sent. Mem., at 34): is she supposed to discuss the seriousness of her terrorism offense on a recorded public phone with inmates and guards standing all around her? How can these social conversations make her unrepentant, when she has repeatedly shown her remorse and acceptance to this Court?

Ms. Ceasar also repeatedly told the agents and prosecutors that she did not condone violence, and would never do violence against another human in any circumstance. And she repeatedly expressed her renunciation of ISIS and that she realized she had been duped by its lies. This was not an act. It was how she felt and how she still feels. That she briefly expressed views that can be interpreted to the contrary while on bail is not evidence of some deceptive ploy, but the natural back-sliding of a traumatized and suicidal young person with no support system, still struggling with her arrest, her incarceration, and her identity.

Ms. Ceasar's immediate truthful cooperation with the government is a testament to how lacking in ideology she was and is. This makes sense in the context of what we know about Ms. Ceasar's life and motivations. She was engaged in a relational attempt to join a community, but not as a person wanting to do any harm. She was lost and misguided. Had she been a true radical supporter of ISIS, she would not have been so forthcoming, so friendly, so eager to help the agents in any way she could. Despite the breach of her cooperation agreement, Ms. Ceasar continues to be willing to provide any assistance to the government she can.

## C. Amera's Mistakes on Bail Could Have Been Prevented Through a Proper Aftercare Plan

### 1. Lack of Any Aftercare

The weeks after she was released on bail were a critical period in Amera's life:

- She had just, as a 21-year-old, experienced the traumas of detention at MDC having never before been arrested.
- Her mother, her only love, had died while she was in custody.
- She was released due to her acute chronic life-threatening illnesses and the inability of BOP to adequately treat her. She was suffering physically.
- She was cooperating with the government against the very fantasy she thought could save her.
- She'd been making progress with Dr. Porterfield and Daisy Khan.

We should have been able to see it at the time, but she needed care the most in that moment. There were certainly a lot of rules and conditions in place, and that was important, but there was no real support, and no continuity. No FBI visits. No people to form a community. No aftercare appointments. No GED classes or

Medicaid or therapy.  No Muslim community.  And for someone who already has a dissociated and fragmented sense of self, no use of her own name.[4]

Although the EDNY is home to the Disruption and Early Engagement Project   ("DEEP"), discussed more below, she was not connected to any of its personnel for meetings or debriefings or Countering Violent Extremism ("CVE") engagement.

She continued to see Dr. Porterfield, but she should have been engaged in intensive outpatient treatment including psychiatric care, counseling, and psychotherapy.  She should have been participating in the group programs that so many defendants in the Eastern District participate in while on bail.  She should have been attending programs at the Arab-American Family Support Center in New York City, which offers trauma-informed domestic violence counseling for Muslim women, as well as economic empowerment courses.  She should have been attending group counseling at a place like Queens Counseling for Change, which has a contract with Pretrial Services and where many defendants on bail in this district attend intensive group sessions.  Your Honor has seen many sentencing letters written by Queens Counseling counselors, and knows their great work in helping people with trauma histories forge interpersonal connections, build community, and gain insight into their conduct.

Because her case was sensitive, she received far less programming than the average Pretrial defendant, when of course she needed it far more.  Instead, she was locked in an empty house, alone, on home detention.

## 2.  Mistakes on Bail

Amera was dealing not just with her mental health struggles and her lack of support and home confinement, but was also in a great deal of physical pain.  She continued to                                              , and was in and out of the hospital, emergency room, and specialist offices numerous times during her three months on bail.  And she didn't understand what was happening in her case, because no sentencing date was set, and no firm plan in place.  She felt like she was in limbo with no sign of sentencing on the horizon.  And so she initially did some online searches and

---

[4] In the Bureau of Prisons she was a pseudonym, Hawwa Safani; to her mom she was Sinmyah; to us she's Amera; online she was Nutella; in court she was Jane Doe; at the house she was living in she was only allowed to be Hawwa; and she didn't have identification to be any of these people while on bail.

connected with certain individuals on Facebook to try to ascertain the status of the people she had cooperated against.  But during her two weeks on social media in June 2018, she started having conversations that crossed the line, and then less than 10 days later deleted most of it so that Pretrial wouldn't see that she'd been on social media.

Though the PSR correctly states that while online she invited an individual to visit her in New York, it was a friend of hers with no ISIS-affiliation whatsoever.  *See* PSR ¶ 43.  The PSR also notes that Ms. Ceasar initiated searches for known ISIS-affiliates.  *Id.*  But those searches were simple Google queries and Wikipedia entries.  The PSR further notes that Ms. Ceasar made a phone call to Arabian Travel Trans Corporation, which suggests, because no additional context is offered, that there was some sort of nefarious intent.  But as the government is aware, this is a taxi cab business in the Bronx, and Ms. Ceasar used it on a number of occasions to return to her home confinement from the emergency room or doctor appointments when her counsel was not available to coordinate her transportation.  And while there is no justification for violating the conditions of her bond, the majority of her social media usage during that two-week period was totally innocuous: photos of cats and flowers, healthy food recipes, inspirational quotes, discussions of her art and creative pursuits, and updates about her medical issues.  And many of her messages to people from her prior life—with no ISIS affiliation whatsoever—were centered around asking for helping finding charity organizations and programs that could offer her assistance.  She was desperate for help and support.

Following Ms. Ceasar's bail violations, the FBI interviewed several individuals with whom she'd communicated.  PSR ¶ 44.  At least one of these individuals was already cooperating with the government, and the substance of the individual's communication with Ms. Ceasar was in part a mutual acknowledgment that they were both working with the same FBI agent.  To this day, even following the breach of her cooperation agreement, Ms. Ceasar has nothing but positive feelings for this agent, which demonstrates—as does the rest of the record in this case—that ideology and radical thinking play no role in animating her conduct.

In one of the message chains recovered by agents, Ms. Ceasar wrote on Facebook in June 2018 that "the fbi put me under a different name because they wanted my case too be sealed from the country etc" and "they didn't want to charge me under my name so I can go back to my daily life after telling the information they want."  In her characteristic mode of self-sabotage, Ms. Ceasar

was not only laying the groundwork for the breach of her plea agreement by revealing her cooperation, but simultaneously putting herself in grave danger at the hands of the very organization she'd previously been attracted to, because ISIS puts a high premium on murdering "spies" (cooperators) in its midst.  In late June, however, a mere two weeks after obtaining the laptop, Ms. Ceasar told at least a few of the individuals she'd been communicating with that she was going to delete her Facebook account.  She turned her laptop over to Pretrial Services soon after.

Dr. Porterfield will testify that although it was a huge mistake, it was an indicator of a young person still actively in the process of grappling with her own decision-making.  Young people take steps backwards in treatment, but for Amera those mistakes are magnified given the stakes of her legal predicament.  But how Amera responded to those mistakes is telling—with renewed commitment she kept working on herself and on these new issues with Dr. Porterfield, and that is exactly what you're looking for with young patients.  She worked with new focused energy to gain insight into her actions.

## IV.   THE PROPOSED SENTENCE AVOIDS UNWARRANTED DISPARITIES AND ACCOUNTS FOR THE FUNDAMENTALLY FLAWED TERRORISM GUIDELINES

### A. Avoiding Unwarranted Disparities With Other Cases

According to the Center for National Security at Fordham Law School, the average sentence for the people who have pleaded guilty in ISIS-related terrorism federal cases is 11.2 years, with a median sentence of ten years.  *See* The American Exception: Terrorism Prosecutions in the United States – The ISIS Cases, March 2014 – August 2017, https://news.law.fordham.edu/wpcontent/uploads/2017/09/TheAmericanException 9-17.pdf at 8.  The average sentence for women defendants in this category is 5.1 years.  *Id.* at 13.  Since that report was issued, at least 29 more defendants have been sentenced in ISIS-related federal terrorism cases.  The mean sentence of all 43 sentenced defendants is 10.5 years.

The government makes much of its comparison to another case before Your Honor, *United States v. John Doe*, 14-cr-612 (JBW).  While John Doe's extensive cooperation with the government was admirable, he is different in a number of ways from Ms. Ceasar.  First, John Doe had a stable and normal upbringing with loving parents, and attended an Ivy League University.  Compare to Amera, whose

childhood was filled with an endless stream of horrifying traumas.  John Doe had none of the severe physical and mental health issues that Amera has.  Second, when approached by members of the New York Joint Terrorism Task Force ("JTTF") in 2014, rather than cooperating and abandoning his plans John Doe fled the United States and joined ISIS in Syria.  Third, John Doe actually went to *fight* for ISIS.  He trained with and carried firearms in connections with his duties within ISIS, picked up arms during at least one battle against US-allied Kurdish forces and did violence.  Amera, on the other hand, put people in touch with ISIS and was arrested on her way to Sweden to get married.  Finally, Amera has already served longer in custody than the two years John Doe was incarcerated.

In *U.S. v. Michael Wolfe*, 14. Cr. 213, Western District of Texas, Mr. Wolfe, age 23 attempted to travel to the Middle East to lend his support to ISIL. He admitted at his change of plea hearing that in preparation, he applied for and acquired a U.S. passport, participated in physical fitness training, practiced military maneuvers, concealed his preparations, and bough an airline ticket for travel to Europe, which he believed would be the first leg of a trip to the Middle East. Instead, he was arrested on the jet way at the Houston, Texas airport as he attempted to board a flight to Toronto, Canada.  Mr. Wolfe was part of a group led by Mr. Khan (see above) that pledged loyalty to a deceased Taliban leader.  He pled guilty to attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge Sam Sparks to 82 months in prison. He faced a maximum of 15 years.

Furthermore, a single digit sentence of five years or less in prison accords with sentences handed out in similar cases in New York's federal districts. *See, e.g., United States v. Mohammed Al-Moayad*, 03 Cr. 1322 (80 months for materially supporting Al Qaeda and Hamas); *United States v. Idriss Abdelrahman*, 09 Cr. 1244 (S.D.N.Y.) (46 months in prison for materially supporting Al Qaeda and FARC); *United States v. Sahim Alwan*, 02 Cr. 214 (114 months in prison for materially supporting Al Qaeda); *United States v. Mahdi Hashi*, 12 Cr. 661 (E.D.N.Y.) (108 months in prison for materially supporting Al-Shabaab); *United States v. Shafal Mosed*, 02 Cr. 214 (W.D.N.Y.) (96 months in prison for materially supporting Al Qaeda); *United States v. Harouna Toure*, 09 Cr. 1244 (S.D.N.Y.) (63 months for materially supporting Al Qaeda and FARC); *United States v. Mohammed Zayed*, 03 Cr. 1322 (E.D.N.Y.) (80 months for materially supporting Al Qaeda and Hamas).

It is also important to note there are many cases where the conduct was far worse than Ms. Ceasar's, but the government's recommended time for Ms. Ceasar is still significantly longer than what was given in the below sentences:

- In 2003, *John Walker Lindh* was sentenced to 20-years in prison after pleading guilty in the Eastern District of Virginia, 02-cr-00037, to providing material support to terrorists and carrying an explosive during the commission of a felony.  The allegations included claims that he had attended an al-Qaeda training camp, agreed to conduct operations against the United States and Israel, and participated in a violent prison uprising which resulted in the death of a CIA agent in Afghanistan.

- In 2003, *United States v. Wesam al Delaema*, 5-cr-337 (D.D.C.), the defendant received a sentence of 25 years.  Mr. al Delaema traveled to Fallujah, Iraq, where he made propaganda supporting the insurgency, filmed himself placing improvised explosive devices ("IEDs") by the roadside, and then filmed the aftermath of several IED explosions, which killed numerous people including two American soldiers.

- In 2012, *Rezwan Ferdaus* was sentenced to 204 months of imprisonment after pleading guilty in the District of Massachusetts, 11-cr-10331 (RGS) to attempting to provide material support to terrorists and attempting to damage and destroy a federal building by means of an explosive.  The charges included allegations that he constructed and delivered to undercover agents mobile phone detonation devices to use with explosive devices that were intended to kill military personnel.  He also made a training video on how to construct the devices and took substantial steps towards bombing the Pentagon and United States Capital Building.

- In 2012, *Douglas Wright* was sentenced to 11 ½ years after pleading guilty in the Northern District of Alabama, 12cr00238-PAG, to conspiracy to use weapons of mass destruction. The charges were based on the theory that the defendant had agreed and attempted to detonate a bomb on a bridge in a national park. Mr. Wright and his co-defendants reportedly planted the explosives and sought to detonate them remotely. Daniel Boyd was sentenced to 18 years of imprisonment upon pleading guilty in the Eastern District of North Carolina, 09cr00216-FL, to conspiring to provide material support to terrorists and for plotting to murder United States military personnel at Quantico, Virginia.

- In 2013, *Abdifatah Isse,* and S*alah Ahmed,* 09cr50-MJD-FLN, were both sentenced to 36 months of imprisonment on May 29, 2013 for Providing Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339A(a). Their behavior involved actual travel—the two went to Somalia, joined al Shabaab, participated in a training camp for two and a half months, and then returned to the United States.

- In 2016, *Akba Jihad Jordan,* 14-CR-58, in the Eastern District of North Carolina was sentenced to 108 months of imprisonment on July 5, 2016, for Conspiracy to Provide Material Support to Designated Foreign Terrorist Organization in violation of 18 U.S.C. §2339A. Mr. Jordon was a physical fitness trainer and a tactics instructor to his co-defendant. He was arrested with an AK-47 and a Mini-14 assault rifle.

- In 2016, Judge Kuntz imposed a sentence of 25 years' imprisonment for a Malian national who shot and murdered U.S. defense attaché William Bultemeier in Niger. The imposed sentence was the result of a disposition under Rule 11(c)(1)(C). United States v. Mohamed, 13-CR-527 (E.D.N.Y. Apr. 26, 2016).

- In 2017, *Emanuel Luchtman*, was sentenced to 20 years of imprisonment, in the Northern District of New York, for conspiring with ISIS to conduct a terrorist attack in Rochester, New York, including killing civilians using knives and a machete on New Years' Eve.[5]

These sentences, regardless of their length, necessarily turn on the specific mitigating and aggravating circumstances found to be present in the underlying cases, but it nonetheless provides a helpful benchmark as the Court considers the mitigating circumstances in this case:

- Amera's horrific life: a father who      , the pain of watching her mother deteriorate in a nursing home for years, her mother's ultimate death after Amera's arrest, and the trauma of bouncing from foster family to abusive foster family, and to numerous homeless shelters with no place to call home.

---

[5] Despite seeking a sentence 10 to 30 years longer for Ms. Ceasar than what Luchtman received, the government strongly concedes that Ms. Ceasar is far less culpable than Luchtman. Gov't Sent. Mem. at 27 ("To be sure, she is not an … Emanuel Luchtman … she did not herself plot to … attack people with knives.").

- Amera's young age. She was merely 21 when she first engaged with ISIS supporters online.
- Amera's resort to an online community when she was completely socially isolated, living in a homeless shelter without any sort of community.
- Her deep desire to find a community, receive further education, and hold stable work, ideally helping other people.
- Amera's attempted cooperation with the government, and continued desire to assist the government in any way she can.
- The multiple new authority figures she has met since her arrest including many medical professionals, social workers, her lawyers and a positive Muslim community figure, Ms. Daisy Khan, all of whom have helped relieve Amera's isolation and adjust her worldview by their presence, support and counsel.
- The absence of any actual identifiable harm as a result of her actions. The longest sentences are reserved for defendants who get much closer to doing physical violence and who do not accept responsibility for their actions, *see., e.g*, *United States v. Mohamed Osman Mohamud*, 10 CR 475 (D. Ore) (360 months for defendant convicted after trial of taking the last step – dialing a number to detonate a bomb).
- Her full acceptance that what she did was wrong, and as the Court will hear at sentencing, her public renunciation of ISIS and its ideology.

### B. Terrorism Sentencing Guidelines Produce Unjust Results for Many Defendants and in Particular for Ms. Ceasar

As an initial matter, we agree with Probation that a downward departure is warranted under Policy Statement 5H1.3. The PSR notes as follows:

> As detailed above, the defendant is the victim of child        abuse, and she was              abused on repeated occasions by her father. In addition, the defendant                                        . She also reportedly endured physical and emotional abuse at the hands of former husbands and family members, and experienced an overall upbringing rife with neglect, emotional trauma and family estrangement. Although Policy Statement 5H1.3 indicates that mental and emotional health are not ordinarily relevant for departure purposes, in this particular case the abuse suffered by the defendant is so severe that it may warrant a departure from the advisory guideline range.

*See* PSR ¶ 116.  The government simply ignores Ms. Ceasar's past, as though it has no role in the sentencing determination.   To Probation's note, we add only that the same factors that warrant a downward departure also counsel a variance outside of the guideline system.  The guidelines simply cannot capture the many ways in which Ms. Ceasar's case is *sui generis*.

Furthermore, Section 3A1.4 of the Sentencing Guidelines applies where "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," as defined in l8 U.S.C. § 2332b(g)(5).  U.S.S.G. $ 3A1.4 & comment n. 1.  The Second Circuit has held that by requiring that the underlying crime "be calculated to influence or affect . . . or to retaliate against government conduct," the statute does not require "proof of a defendant's particular motive." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010).  "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." *Id*.  By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." *Id*.  However, this enhancement should be given very little weight in this case, and an equivalent downward variance is warranted.  Ms. Ceasar had no political or ideological motivation for her conduct.  Her actions were purely to fill a personal need, which both reduces her culpability and increases her ability to be rehabilitated.

Dissatisfaction with the terrorism adjustment is demonstrated by the fact that the overwhelming majority of judges have imposed sentences below the range generated by the adjustment.  Since 2008, approximately 46% of all sentenced federal defendants received a sentence below the Guideline range.  Yet for defendants facing an adjustment under 3A1.4, the rate of downward variance is 77%.

## 1.  The Adjustment is Not Based on Empirical Research

The astronomical Guidelines range in this case derives in large part from the application of U.S.S.G. § 3A1.4, which works a 12-level increase in the base offense level and raises the criminal history category of Ms. Ceasar, a now 24-year-old first offender, from I to VI, the category reserved for career criminals with extremely high risks of recidivism.  The first flaw with the terrorism adjustment is that "it is not backed by any empirical evidence." *United States v. Jumaev*, CR 12-00033-JLK, 2018 WL 3490886, at *10 (D. Colo. July 18, 2018). The entire

Guidelines system "begins with, and builds upon, empirical data." U.S.S.G. Part A, Introduction and Authority ¶ 3, at 5. The Sentencing Commission "took an 'empirical approach,' beginning with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past and the modifying and adjusting past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." *Rita v. United States*, 551 U.S. 338, 349 (2007). A Guideline promulgated outside of this empirical approach does not "exemplify the Commission's exercise of its characteristic institutional role" because it does "not take account of empirical data and national experience." *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007) (internal quotation marks omitted).

The government argues that the terrorism enhancement "reflects Congress's intent that individuals convicted of terrorism offenses, like the defendant, serve sentences that are appropriate in light of the extreme dangerousness of their crimes and the unique risk of recidivism that they present." Gov. Sent. Memo. at 24. For support, it quotes a Second Circuit case that asserted "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists in §3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003); *see* Gov. Sent. Memo. at 24 (citing *Meskini*).

But "neither the Sentencing Commission nor the courts applying the Terrorism Enhancement have provided *any* empirical evidence to support the presumption that terrorism defendants are uniquely dangerous." Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1550 (2017) (emphasis added). Indeed, "when U.S.S.G. section 3A1.4 was adopted, the number of the anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline." James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 112 (2010)

So "when the Terrorism Enhancement was promulgated, no statistically sound evidence was used to substantiate that all terrorism defendants were so different as to necessitate such a large increase in the Guidelines range." *Id.* Ahmed, 126 Y.L.J. at 1550. Thus courts, like the Second Circuit in *Meskini*, who believe "terrorism defendants 'are unique among criminals...' have also not cited

31

any evidence to support that opinion." *Id.* (quoting *Meskini*, 319 F.3d at 92). Or as Judge Breyer recently explained in rejecting the § 3A1.4 adjustment and noting "the court in *Meskini* cited *no authority* for its assertion" about the uniqueness of terrorism defendants, "repetition of that assertion might give it the ring of truth, but does not make it true." *United States v. Alhaggagi*, CR 17-387-CRB, 2019 WL 1102991, *7 (N.D. Cal. Mar. 8, 2019).

A district court can reject Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role," by not taking into account "empirical data and national experience." *Kimbrough*, 552 U.S. at 109-10. Like the crack cocaine and child pornography Guidelines, the terrorism adjustment in § 3A1.4 is based on neither empirical data nor national experience and this Court should use its discretion to reject it. *See United States v. Henderson*, 649 F.3d 955, 962-63 (9th Cir. 2011) (noting changes to child pornography Guideline "were Congressionally-mandated and not the result of an empirical study" and so "district courts may vary from the child pornography Guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case") (citing *Kimbrough*, 552 U.S. at 109-10).

So outlandish is this enhancement that even the government failed to include it in the plea agreements in this case. *See* Gov't Ltr., Apr. 15, 2019, Dkt No. 94 (Pimentel Correction Letter). No judicial deference is owed to that section, which was promulgated in response to a congressional and political directive without empirical analysis of policy considerations, and which fails to account for the nature and circumstances of the case and the history and characteristics of the defendant.

## 2. Equating a First Offender with a Career Offender Contradicts the Premise of the Guidelines

Yet another flaw with the § 3A1.4 terrorism adjustment is that it artificially inflates a defendant's criminal history category to VI even when that person has no prior criminal record at all. *See* U.S.S.G. § 3A1.4(b). As with the lack of empirical evidence and the equation of all terrorism offenses, the decision to treat every § 3A1.4 offender as a career offender contradicts the entire premise of the Sentencing Guidelines scheme.

As this Court knows, part of calculating the advisory Guidelines range in a case involves determining the defendant's criminal history score. The Sentencing

Commission has explained that a defendant's prior criminal record is "directly relevant" to sentencing because a "defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment." U.S.S.G. Chapter Four, Criminal History and Criminal Livelihood, Part A – Criminal History Introduction Commentary. Moreover, "Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation." *Id.*

Unsurprisingly, apart from § 3A1.4, the only other provisions of the Guidelines that automatically raise a defendant's criminal history beyond the properly calculated criminal history score all involve defendants with aggravated prior criminal convictions. *See* U.S.S.G. §§ 4B1.1(b) (automatic assignment to criminal history category VI for career offenders who have prior convictions for drug trafficking or crimes of violence); §§ 4B1.4(c)(2), (3) (automatic assignment to criminal history category IV or VI for defendant sentenced under Armed Career Criminal Act due to prior conviction for "violent felony" or "serious drug offense"); § 4B1.5(a)(2)(B) (automatic assignment to criminal history category V for certain sex crime defendants with prior sex offense convictions involving minors). Conversely, the Guidelines authorize a downward departure when "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1).

Equating Ms. Ceasar, who has no criminal record, to someone with an extensive criminal history—such as career offenders, armed career criminals and sex offenders—is unreasonable and should be rejected. In fact, application of the adjustment to Ms. Ceasar is even more unreasonable because she has no prior record at all, as opposed to being in criminal history category I due to prior convictions too old to score for criminal history points. Sentencing Commission data indicates first offenders like Ms. Ceasar are at the lowest risk of recidivism of all federal defendants.

Moreover, "there is no published statistical data demonstrating that defendants convicted of violating" terrorism related statutes "are any more likely to be recidivists than any other first offenders." McLoughlin, Jr., 28 Law & Ineq. at 114–15. Likewise, "nothing in the history of U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist." *Id.* at 115.

In fact, as Judge Breyer of the Northern District of California recently noted, "there is some evidence that first-time terrorism offenders are no more likely to reoffend than individuals who commit other crimes," based on Sentencing Commission statistics concerning first offenders. *Alhaggagi*, 2019 WL 1102991, at \*7. He also noted "the very limited data suggests that individuals convicted of terrorism offenses do *not* recidivate at higher rates than those convicted of other crimes." *Id.* (citing Ahmed, 126 Y.L.J. at 150) (emphasis in original). As a result, in *Alhaggagi* Judge Breyer found the § 3A1.4 enhancement applied but departed to the defendant's true criminal history category of I because "automatically assigning to all terrorism defendants a criminal history category of VI—is inappropriate based on the seriousness of the crime, inappropriate based on assumptions about recidivism, and inappropriate as to this Defendant." *Alhaggagi*, 2019 WL 1102991, at \*5.

Judge Breyer is not alone; courts who have applied the enhancement routinely reject the automatic assignment to criminal history category VI as inappropriate. *See Meskini*, 319 F.3d at 92 ("A judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes" *always* has the discretion under § 4A1.3 to depart downward in sentencing.") (emphasis added). In *United States v. Jumaev*, Judge John Kane of the District of Colorado declined to apply the § 3A1.4 adjustment and noted that, even if it applied, it would grant a departure to criminal history category I because the § 3A1.4 adjustment "substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." 2018 WL 3490886, at \*9 (quoting U.S.S.G. § 4A1.3(b)(1)). In *United States v. Mehanna*, Judge George O'Toole of the District of Massachusetts found "the automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness." *United States v. Mehanna*, CR 09-10017-GAO (D. Mass.), Dkt. 439, Reporter's Transcript of Proceedings on April 12, 2012 at 69:14-24.

It is unreasonable to equate a first offender such as Ms. Ceasar with someone at the highest criminal history category. The probation office agrees, writing that one reason to grant a variance if the adjustment applies is Ms. Ceasar's "no known prior arrests or criminal convictions" PSR ¶ 76. Thus this Court should reject the terrorism adjustment.

### 3. The Terrorism Adjustment Disproportionately Impacts People Under 25

Ms. Ceasar's young age at the time of the offense conduct is a critical characteristic that must be taken into account. The Supreme Court has recognized that "because juveniles have lessened culpability they are less deserving of the most severe punishments." *Graham v. Florida*, 560 U.S. 48, 68 (2010). The Sentencing Commission in turn has cited neurological research that shows brain development is not fully realized in most people until they turn 25 years old, meaning the brain of a defendant who commits a crime at the age of 21 or 22 is almost as undeveloped as a 16 or 17-year-old juvenile. *See* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf.

Adolescent brains are undeveloped and therefore more open to change. Adolescents have reduced culpability because they are naturally predisposed to impulsive decision making, negative peer influence, and have a greater capacity to change their behavior later in life. These are all traits ISIS targets when recruiting. The Court should consider these factors when sentencing Ms. Ceasar, barely out of her adolescence, for ISIS related offenses.

The Supreme Court has distinguished an adolescent's culpability from that of an adult. *See Miller v. Alabama,* 132 S. Ct. 2455, 2464 (2012); *Graham v. Florida,* 560 U.S. 48, 76 (2010); *Roper v. Simmons,* 543 U.S. 551, 569 (2005). None of the factors distinguishing adolescent culpability are crime specific. *Miller,* 132 S. Ct. at 2465. *See e.g.* David O. Brink, *Immaturity, Normative Competence, and Juvenile Transfer: How (Not) to Punish Minors for Major Crimes,* 82 Tex. L. Rev. 1555 (2004), available at http://davidobrink.com/sites/default/files/publications/ImmaturityNormativeCompetenceJuvenileTransfer.pdf; Barry C. Feld et. al., *Adolescent Competence and Culpability: Implications of Neuroscience for Juvenile Justice Administration,* in Stephen Morse & Adina Roskies, eds., *A Primer on Criminal Law and Neuroscience* (New York: Oxford University Press, 2013), at 183 ("Feld, *Adolescent Culpability")* available at http://www.oxfordscholarship.com/view/10.1093/acprof:oso/9780199859177.001.0001/acprof-9780199859177-chapter-7.

The Supreme Court recognizes three factors reducing adolescent culpability: (1) a lack of maturity and underdeveloped sense of responsibility often resulting in impetuous decision-making; (2) adolescents are more susceptible to negative

influence through peer pressure; and, (3) adolescents' character is more transitory than that of an adult. *Roper,* 543 U.S. at 569-70. These factors are supported by both neuroscience and developmental psychology. *See e.g.* Feld, *Adolescent Culpability;* Elizabeth S. Scott & Laurence Steinberg, *Blaming Youth,* 81 Tex. L. Rev. 799, 811-19 (2003) ("Scott & Steinberg, *Blaming Youth"*). Developmental psychologists agree with the Court that differences between adult and adolescent decision-making should translate into differences in sentencing. Scott & Steinberg, *Blaming Youth* at 839-40.

ISIS has tailored its recruitment efforts to appeal directly to the adolescent brain. This pull can be especially strong for adolescents who feel marginalized in the west. Consistent with data on adolescent criminal behavior, young people are amenable to de-radicalization programs and other interventions. John Horgan, *What makes a Terrorist Stop Being a Terrorist?,* J. for De-radicalization 1, 2 (2014); Mubin Shaikh, *Countering Violent Extremism Online: An Anecdotal Case Study Related to Engaging ISIS Members and Sympathizers on Twitter,* 98 Soundings 478, 485-86 (2015). This shows that adolescent affiliation with extreme groups is more a passing symptom of youth than a strong conviction of adulthood.

Yet the draconian terrorism adjustment disproportionately impacts defendants under the age of 25. Although from 2007 to 2017, such young defendants only made up 18% of all defendants sentenced in federal court, they made up 28% of all defendants receiving a § 3A1.4 adjustment. That is, defendants who should "have lessened culpability" and "are less deserving of the most severe punishments," *Graham*, 560 U.S. at 68, are actually more likely to receive the most severe adjustment in the entire Sentencing Guidelines. Once again, that demonstrates the irrationality of the § 3A1.4 adjustment.

### C. General Deterrence

The 28 months Ms. Ceasar has already been in custody satisfies the need for general deterrence. A longer custodial sentence would not provide any additional general deterrent effect. *See United States v. Lawrence*, 254 F. Supp. 3d 441, 442-46 (E.D.N.Y. June 6, 2017) (JBW) (summarizing expert testimony that there is no reliable evidence that appreciably longer periods of incarceration for violent crimes have a general deterrent effect on the population). Evidence-based studies support the conclusion that it is the certainty of *apprehension* rather than the severity of the ensuing legal *punishment* that more effectively deters crime. *See, e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 202 (2013) (reviewing empirical deterrence studies and their attendant literature).

Further, general deterrence relies on the purported impact of Ms. Ceasar's sentence on potential future offenders. *See Lawrence*, 254 F. Supp. at 443. In other words, to be generally deterred by a sentence in the instant case, the would be offenders would have to have some idea of the sentence ultimately imposed in Ms. Ceasar's case, appreciate the likelihood both of detection and of prosecution in the United States, and engage in a rational cost-benefit analysis focused on self-preservation and largely unaffected by ideology. Even assuming that potential future offenders could engage in this cost-benefit analysis, the research suggests that such decision-making is not responsive to the specific punishment that is imposed, but merely to the fact that Ms. Ceasar was arrested and prosecuted.[6]

## V. RISK OF RECIDIVISM AND SPECIFIC DETERRENCE

### A. Amera Is A Low Risk of Recidivism, Even Compared to Her Risk Level in 2018

As the Court will hear in greater detail during the expert testimony at sentencing, there is no empirical literature to support the validity of terrorism risk assessments tools. In a case last year before Judge Brodie, *United States v.*

---

[6] *See generally* Steven Raphael & Jens Ludwig, *Prison Sentence Enhancements: The Case of Project Exile, in* EVALUATING GUN POLICY 251 (Jens Ludwig & Philip J. Cook, eds., 2003); Richard Rosenfeld, Robert Fornango & Eric Baumer, *Did* Ceasefire, Compstat, *and* Exile *Reduce Homicide?*, 4 CRIMINOLOGY & PUB. POL'Y 419 (2005); Colin Loftin & David McDowall, *"One with a Gun Gets You Two": Mandatory Sentencing and Firearms Violence in Detroit,* 455 ANNALS AM. ACAD. POL. & SOC. SCI. 150 (1981); Colin Loftin, Milton Heumann & David McDowall, *Mandatory Sentencing and Firearms Violence: Evaluating an Alternative to Gun Control,* 17 L. & SOC'Y REV. 287 (1983); Colin Loftin & David McDowall, *The Deterrent Effects of the Florida Felony Firearm Law,* 75 J. CRIM. L. & CRIMINOLOGY 250 (1984); David McDowall, Colin Loftin & B. Wiersema, *A Comparative Study of the Preventive Effects of Mandatory Sentencing Laws for Gun Crime,* 83 J. CRIM. L. & CRIMINOLOGY 378 (1992); John J. Donohue III, *Assessing the Relative Benefits of Incarceration: Overall Changes and the Benefits on the Margin, in* DO PRISONS MAKE US SAFER? THE BENEFITS AND COSTS OF THE PRISON BOOM 269 (Steven Raphael & Michael Stoll eds., 2009); Thomas A. Loughran, Edward P. Mulvey, Carol A. Schubert, Jeffrey Fagan, Alex R. Piquero & Sandra H. Losoya, *Estimating a Dose–Response Relationship Between Length of Stay and Future Recidivism in Serious Juvenile Offenders,* 47 CRIMINOLOGY 699 (2009).

*Munther Omar Saleh*, 15-cr-393 (MKB), a letter from Dr. Barry Rosenfeld was submitted regarding the question of the validity of terrorism risk assessments. *See* Exhibit KK (Rosenfeld Letter in Saleh Case). As Dr. Rosenfeld explained, "there is absolutely no evidence that the addition of any (or all) of these [terrorism risk assessment] instruments improves the accuracy of clinical judgments." There is an "absence of any demonstrated validity for any of the instruments that have been developed for evaluating risk of terroristic violence." To the extent the government purports to offer a precise and scientifically-sound means of determining an elevated risk of extremism or extremist violence, the Court should reject it.

Amera's risk of recidivism is further lowered for an, additional, external reason: ISIS's power has greatly diminished, even in only the past year. ISIS has lost its physical space, the caliphate, and has also lost significant traction in inspiring recruiters from afar. Online recruitment, and the ISIS online community overall, has significantly decreased since the collapse of the caliphate. *See* https://www.newyorker.com/news/news-desk/americas-isis-members-are-coming-home; https://www.theguardian.com/commentisfree/2019/feb/17/without-territory-or-new-recruits-islamic-state-is-in-its-death-throes. For Amera, the physical territory aspect of ISIS was critical to her attraction, because her fantasy was that there was a place where she could be cared for and have community. As Dr. Sageman and Ms. Khan will testify, ISIS has all but lost any territory it had in 2016.

Not only is the power of the ISIS online community drastically reduced, but Amera now has healthy support from a Muslim leader who can steer her on the right path of Islamic teachings, exactly what she has wanted, and lacked, in her life. Amera's meetings with Ms. Daisy Khan have had a significant impact on her understanding of Islam and ISIS.

### B. Specific Deterrence

At her young age, with no prior arrests before this one, and the intensive conditions and programs she'd like to participate in while on supervised release, far less jail time is needed to meet the ends of specific deterrence for Ms. Ceasar. The almost two and a half years she's already been incarcerated is more than sufficient. This should already be apparent from her intense period of self-reflection over the last few months, through her writing, her letters to the Court, and her work with Dr. Porterfield discussed above. The revocation of her bail was an enormous wake up call.

Finally, Ms. Ceasar has had no issues while incarcerated, showing that she is able to abide by what's expected of her, whether in jail or on supervised release. She has also participated in numerous programs (GED prep and other classes), on top of the many hours she spends reading, writing, painting, drawing, and knitting her animal creations.  Her 28 months in jail has been more than sufficient to specifically deter her, teach her that her actions were unacceptable, and encourage her to look for safety and community elsewhere.

### 1.  Life Expectancy

Ms. Ceasar's life expectancy is already far below average due to her numerous chronic illnesses, many of which mimic the illnesses that led to her mother's admission to a nursing home in her late 30s, and her early death at the age of 49.  So far, her illnesses almost exactly match the progression of her mother's ailments.  Even if released to the community and provided with regular specialized care, she could easily be in a nursing home in the next 10-20 years.

If Ms. Ceasar were a free white male with a high school education, her current life expectancy would be approximately 76.5 years.  *See United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017) (citing Ctr. for Disease Control, U.S. Life Tables, 2014, Nat'l Vital Statistics Rep., June 30, 2016, at 8, available at: http://www.cdc.gov/nchs/data/nvsr/nvsr65/nvsr65_04.pdf.).  But "the life expectancy of an incarcerated person drops significantly for each year of incarceration." *Id*. (citing Evelyn J. Patterson, *The Dose–Response of Time Served in Prison on Mortality: New York State, 1989– 2003*, 103 Am. J. of Pub. Health 523, 526 (2013)).  For each year incarcerated, there is a two-year decline in life expectancy. *See* Evelyn J. Patterson, *The Dose–Response of Time Served in Prison on Mortality: New York State, 1989–2003*, 103 Am. J. of Pub. Health 523 (2013).

A lengthy term in prison will compound her already dire health.  As an incarcerated woman of color with chronic life-threatening illnesses, that general decline in life expectancy combined with BOP's inability to properly treat her could mean her death in jail at a much younger age than even her mother, who died at 49.  Five years in prison for Amera could be like twenty years for someone else. We fear that in prison, she won't survive a decade.

## VI. AMERA'S NUMEROUS CREATIVE PURSUITS HAVE HELPED HER BEGIN TO PROCESS HER FEELINGS, ILLUSTRATE HER DESIRE TO UNDERSTAND HER PAST TRAUMAS, CONNECT WITH OTHERS IN A HEALTHY WAY, AND LEAD A MEANINGFUL LIFE

### A. Amera's Autobiographical Writing Shows Her Early Capacity for Reflection

Amera wrote an autobiography, prior to the offense conduct. *See* Exhibit LL (Amera's Autobiography).  It is part journal, part creative release, part emotional and trauma processing.  She started writing it in the spring of 2012.  Amera continued writing and making edits up until December 2015.  Amera, without being directed to do so, was motivated to begin her own therapy.  By reflecting on her life, beginning at the age of 17, Amera was beginning the course of processing her past traumas that she will need to continue, with therapy, when she is released.

The autobiography was on a thumb drive that was seized by the government at the time of her initial arrest and returned to her through counsel in June 2019.  Amera was eager to review her past work and begin writing the chapters about her 16 months of incarceration.  A day after receiving a copy of her autobiography, she called a member of her legal team to share that she had begun to read through the early chapters of her life and was reflecting on how much she has learned about herself since then.  Amera wanted to make sure her readers were aware that many of her thoughts expressed in her writing should be understood as just that: her thoughts, and not her actions.  This stream of consciousness style is partly what is so special about this work: it is Amera's attempt to understand her life and this understanding can help repair past traumas.  *See* https://www.psychologytoday.com/us/blog/brain-babble/201208/turning-trauma-story-the-benefits-journaling.

During Amera's brief phase of engaging in her fantasy life with ISIS, she did not write or edit her autobiography.  This is illustrative of the fact that Amera does not consider ISIS to be part of her actual life—although it is something that deserves deep reflection and understanding it is not a part of how she sees her life narrative.

The following sections of Amera's autobiography are illustrative of her various ways of emotionally processing, and understanding, her life, even before therapy:

<u>Amera reflecting on her desire to help herself and others, even in the face of severe adversity:</u>

My dad                                                    So, what did I
do?  I kept in touch by MySpace, Facebook, and cell phone.
**Chapter 5: Changing Like Nature Cycles**

So I had chosen divorce it was the hardest thing I have ever to ask. I am 100%
telling the truth I will never break up in the relationship or leave until they get fed
up with it first. I couldn't keep going on letting player play me and I hate unworthy
people. Plus his prayers wasn't valid when we prayed together if you smoking the
intoxicant is still in your body it tell your in the Quran and Hadeeth that wait 40
days until it leaves out of the system.
**Chapter 8: Baby I'm your addiction**

I missed going to the guidance office to Mrs.         and Mrs.                , Also
my English teacher Mrs.        . I always was close to them with my personal life.
And they always gave me good advices and life skills too.
**Chapter 8: Baby I'm your addiction**

<u>Amera reflecting on her love for her mother:</u>

Mother              and I had a good daughter and mother relationship. Sometimes
we had conflicts, she really hated that, and so did I. I used to have temper tantrums
and took it out on her until age of 14. She tried to understand that my anger came
from the previously mental, verbal, and physical abuse from my dad
**Chapter 4: Fighting For My Life (Part 2)**

When I was 12-14 years old, my mother was getting sicker. She had several heart
attacks and strokes which had her on life support twice.  Wow…She's a strong
mother tiger! Then she had to be admitted to the nursing home. Now mi corazon
duele, because I loved my ummi even though we had our rough times, She always
took me to the movies, shopping, New York, and Baltimore, etc. Yes, I am
spoiled!! When she got admitted to the nursing home, I just went crazy. I didn't
want to listen to anybody or do anything for them unless it was for my mom.
**Chapter 4: Fighting For My Life (Part 2)**



<u>Amera reflecting on her successes:</u>

I started going to poetry contest in school and in the neighbor artist and known poets;                    and                    . I had got **sponsored** by some authors like                    from Philadelphia and the butterfly program in Camden that sponsored me in Newark. I have received certificates for awards. I was shocked they love me because in 10th grade, I was wearing niqab the veil covering my face and they couldn't see my face. But, they heard my poems when I recited them. The only one in America as young lady bold enough to express my feeling in the crowd. I am an ambitious and passionate chick. I wore my niqab with pride and fear of Allah out of modesty.

**Chapter 6 (Part 2): Changing like water cycle**

<u>Amera reflecting on her past traumas:</u>

I have been verbally, physically, and mentally abused by my birth father. He was the worst man I've ever met in my life. I'm surprised Tyler Perry or Oprah Winfrey haven't made a movie and story about him. I'm telling y'all this man is a kleptomaniac, pedophile, plus criminal minded.

**Tolerance and Perseverance**

First off, my father; the criminal minded pedophile, kleptomaniac, and Veteran of the Air Force, is the worst man. He is the filthiest mad dog I have ever seen. Besides! Kony, Osama Bin Laden, and Bashar Assad the terrorist's of history. My dad should be portrayed in movies or told in a story!!  He kept me in constant misery.

**Chapter 2: Maniac Father**

I was about 5 years old and I can clearly remember my Abi whipping me with his belt, after we came from skating ring, his reason for chastising me is, he was mad at the fact I couldn't skate well, so he said it was a waste of money! What? Yeah I don't understand why he hit me either? The military messed up his mind even more.

**Chapter 2: Maniac Father**

My dad beat me with her heel so hard and that biotch               , just watch me screaming for my mother while she's sitting on the couch with her fat ass self! And then that nigga choked me until I turned red, then his face expression and eyes lit up, I guess he thought I was going to die! Then the bastard had the nerve to smack me with his heavy hands. I kept crying wondering if he's ever going to stop! Allah! Please help me! "I said to myself". I wanted to leave my dad for good, when I was a toddler until I was a pre-teen.

**Chapter 2: Maniac Father**

I couldn't wait until my mother come pick me from her house my Mother                was pissed when she found out 2 bones was broken in my arm, the doctor was shocked I wasn't in a lot of pain, he said I was strong like a tiger.

**Chapter 2: Maniac Father**

He wrapped the black belt around our necks to find out what we had told to another person that he wanted to keep it a secret the day before. I was half asleep and I can't clearly remember that night as much, but it traumatized me ever since. When he was really upset I used to get punched in my chest or stomach like my big brother did. Oh yes! He's crazy or he was having side effects of a military veteran with mental issues!  I'm telling you sergeant and doctor...  He's a fool!

**Chapter 2: Maniac Father**

That pig punched me 2 times in the chest, One night at his sister crib and smacked me in the face over some dumb stuff like he want me to love him more than my mom he's not Allah! I couldn't even cry, only 2 tears fell down my cheeks, and you know damn well if I started yelling for help, I knew he was going beat me more.

43

**Chapter 3: Fighting For My Life**

I disrespected that lady to the utmost, got smart with her and then BOOM!! The devil burst out of her like a fire cracker!  She put me in my room for one month and she told me I couldn't come out unless I have to use the bathroom or when she's cooking dinner. (Oh Hell no she didn't!) "I said in my head" I was scared at first because she had vicious dogs in front of my door that she kept their day and night.  I was left in the room with 4 walls to look at.  I had only a notebook, Quraan, and 2 DVD's to watch; Slum Dog Millionaire and Flight Plan which were the worst movies to watch in times of tribulation I was going through. I read the Quraan everyday from the beginning to the end reciting surah's, also I offered solaat like it was my last day on earth. I became hungry after days of not eating.

**Chapter 4: Fighting For My Life (Part 2)**

<u>Amera reflecting on her personal capacity for joy:</u>

I am not going to lie I loved freshman year in                              High School. It was diverse, beautiful people, teachers were awesome, and lunch food was on point.

**Chapter 5: Changing Like Nature Cycles**



*See* More Photos in Exhibit QQ.

**B. Amera's Poetry Represents Her Ability for Self-Reflection As An Action for Change**

44

Amera's natural drive to help herself through self-reflection and emotional analysis is further seen through her poetry-writing.  During her time of incarceration, Amera wrote dozens of poems.  These poems range in theme.  Some reflect on her time of incarceration, others refer to her dreams for her future and the processing of her mother's death.  It is clear that poetry has been, and can continue to be, a part of Amera's therapy – formally or informally.  *See* Exhibit G (Poems and Paintings).



## C. Amera's Paintings and Crocheting Illustrate Her Desire to Connect With Others

Amera has painted multiple pieces while incarcerated.  These paintings include images of cheery suns, smiling lions, soaring birds, vibrant peacocks, and bright flowers.  She often gifts these paintings as a way to show her appreciation. The cheerful nature of these paintings illustrate how, at her core, Amera is in search of community and attempts to bring joy to others as a way to help create community.  It is this healthy impulse—to attempt to bring happiness to others by showing them that you care enough to create something for them—that suggests how, with a supportive community, Amera could live the meaningful life that she is deserved.  *See* Exhibit G (Poems and Paintings).



Additionally, Amera has crocheted dozens of animals, and other more practical items, such as hats and scarves, while incarcerated. Amera crochets not merely to fill her time, but, similar to her paintings, to make meaningful connections with others. After meeting members of her legal team, Amera took the time to make something she thought each person may like. For example, Amera crocheted an elephant for one of her attorneys after they had a lengthy conversation about the animal. She asked if any attorneys that work with her legal team had children, and if so, what type of animals each child would like. But it is not only members of her team that she hopes to bring joy to; Amera also created and gifted several crocheted items for the prosecutors and FBI agents on her case. It is natural for Amera to attempt to build connections, and to do so by bringing others joy. *See* Exhibit F (Crocheted Animals and Other Items); Exhibit H (Dr. Katherine Porterfield's Evaluation). This intense desire to make others happy is part of what makes Amera so moldable for success, with the proper guidance.

### D. Amera Has Had 28 Months In Jail to Reflect On Her Crimes, Her Life, and Her Future

Not only through art, but also through intense self-reflection, Amera has begun to process her past mistakes and is driven for change. She now understands her offense conduct, fully accepts responsibility for it, and has a vision for the future. In a letter she wrote to the Court, Amera movingly describes what led her to her conduct; why she knows it was wrong; and her vision of the future. *See* Exhibit MM (Amera's June 2019 Letter to Judge Weinstein). Amera's desire to understand herself, her life, and her wrongdoings are sincere—she wants to live a healthy life and has the opportunity to do so with structured rehabilitation. In

stark contrast to the government's claims in its Sentencing Memorandum that
Amera does not accept responsibility for her offense, or understand its seriousness
– claims based entirely on conversations Amera has had with friends asking about
her arrest, a context in which one reasonably would play it off as minimal,
particularly given her cooperation with the government— she makes clear her
understanding and remorse for both her initial offense conduct and her bail
violations:

> Since I was abused, I lacked companionship, and family support
> growing up. I could have turned to drugs and alcohol to cope but I
> didn't. I turned to social media! Actually, social injustices impacted
> me and I'd found comfort with their propaganda and it's my human
> nature to want attention, love, marriage and support, as well as
> structure. Those terrorists deceived me to believe what was on those
> videos; what they were promoting was lies, and toxic motives to
> isolate us from reality. I realized I don't have to be a part of social
> network or something. I can be myself and inspire the youth, to give
> back to humanity too!

> What I've mentally accomplished about my mental health with
> Doctor Porterfield, she has taught me boundaries, self-esteem, and
> cleansing myself from trauma. Also Ms. Daisy Khan helped me
> understand the confusion I had in my beliefs. I am more aware of
> my emotions and communicate better with my peers.

> My life has been chaotic, and I do not want to be a threat or a
> concern to the government.  All of this makes me feel very sad. At
> the time of my bail I was puzzled about my disorganized life, and I
> was overwhelmed about my legal case, and seeked information
> pertaining to my case. But I realize now that it was not healthy for
> me and it was wrong. I apologize to the government that I'd
> disappointed them and made dumb decisions.

> I will comply to the rules and to get my priorities fulfilled! Even
> more so, I will rebuild my life around positive people. To heal and
> grow is freedom!

> Exhibit MM.

## VII. WITH A STRONG REENTRY PLAN IN PLACE, AMERA CAN RECEIVE THE HELP SHE NEEDS, BUILD A SUPPORTIVE COMMUNITY, AND NOT RECIDIVATE

### A. The Comprehensive Reentry Plan Will Provide Amera the Stability She Needs

Exhibit NN explains Amera's reentry plan in detail. The following are key components to ensure her success:

- **Housing** at the                                             for an initial period (the "                    ") where Amera can be monitored by both staff and Probation.
- **Employment** as either, or both, a home health aide and as a seller of her many artistic goods supported by the NYC Department of Small Business Services' no-cost workshop.
- **Therapeutic Support** from:
  - o                                   . Amera's strong therapeutic relationship with Dr.              will help guide her toward healthy decisions.
  - o                          for those who have suffered childhood sexual abuse.
  - o                                for PTSD-focused individual and group therapy.
  - o                        for survivors of domestic violence who are Muslim women.
- **Educational and Vocational Training:**
  - o Take and pass the GED's math section (the only outstanding section Amera needs to pass to obtain her GED).
  - o College Initiative, Prisoner Reentry Institute at John Jay College of Criminal Justice
  - o Adult Career and Continuing Education Services-Vocational Rehabilitation which provides vocational rehabilitation for individuals with criminal justice involvement.
  - o Work with a Focus Forward Project volunteer teacher to help pilot their new curriculum designed specifically for women incarcerated in New York City federal jails.  Work one on one to help workshop the curriculum so it best meets the needs of women who are incarcerated.
- **Further Reentry and Reintegration:**

- o                        which provides the , healing circles, and self-care training.
- o                 Amera will be able to continue her work with Daisy Khan to learn about a healthy Muslim identity.
- o                        provides free and low-cost therapy, meditation, and acupuncture.
- o Reentry and Family Support from the Federal Defenders of New York.

## B. Instead of Draconian Sentences, Young People Have Been Given Opportunities to Positively Change Their Lives, Improving Community Relations Along the Way

At the time of her offenses, Amera was between the ages of 21 and 23. Given her traumatic childhood, lack of family support, lack of access to stable education, and homeless young adulthood, Amera should be considered to have the maturity and sensibilities of someone even younger than early twenties.

The sentence in *United States v. Natsheh*, 16 Cr. 166 (RS) (N.D. Ca.), is instructive. There, Judge Seeborg imposed a sentence of 60 months in custody because:

> There wasn't any training. There weren't any weapons involved. There wasn't any providing of financial assistance. There doesn't appear to have been any direct effort to recruit others. The conduct really was restricted to starting the process of joining up with a terrorist organization.

Transcript of Sentencing Proceeding, *United States v. Islam Natsheh*, No. 16-cr-166 (RS) (N.D. Cal. December 7, 2016). Like *Natsheh*, Ms. Ceasar never trained for combat, never procured weapons, never recruited anyone, though she did put three people in touch with travel facilitators, as discussed. Twenty-eight months in jail is sufficient punishment for an aborted effort to travel to Sweden by a vulnerable, misled, and horrifically traumatized young girl who had led an otherwise law-abiding life. She undertook no violence and had no concrete plans for any violent acts. She never sent any money. No harm whatsoever resulted from her conduct, and she was halted before she even left the United States. She undertook no military training, and has never handled a weapon of any sort. And

49

unlike Ms. Ceasar, Mr. Natsheh and Mr. Doe had strong, supportive, and largely loving lives.

### 1. This Court Should Fashion A Reentry Program Similar to the One Instituted by the District of Minnesota

For example, Judge Michael J. Davis of the District of Minnesota decided that young people who had acted as ISIS recruiters should be given the opportunity to improve their lives through a process of re-pluralization.  People who are radicalized are de-pluralized: they see their problems as winnowed down to being solely caused by the problems of the western world and therefore see radicalization as the answers to their problems.  Six young men pled guilty to conspiring to provide material support to a terrorist organization and one of them chose to participate in Judge Davis's pilot program: District of Minnesota's Terrorism Disengagement and Deradicalization Program.  This young man, Abdullahi Yusuf, aged 18 during the time of his offense conduct, was sentenced to time served (he had already served 22 months) and 20 years supervised release.  Daniel Koehler, the founder of the German Institute for Radicalization and Deradicalization Studies, and a fellow at George Washington University's Program on Extremism, was hired by Judge Davis to create the program.  Koehler explains that he "ha[s] already seen fierce criticism from the law-and-order people, saying these are terrorists and they don't deserve to be treated by any program, but we need to have another option, because we can't kill or imprison our way out of why ISIS looks cool to these kids."  Koehler further described that "[t]he US, unfortunately, is about 20 or 25 years behind European countries in building these kinds of networks and programs. Intervention to counter violent extremism is really missing." Other supporters of the program explain that it is not only useful to de-radicalize individuals, but to cultivate trust with the communities that are most at risk for radicalization.  *See* https://www.wired.com/2016/11/u-s-judge-may-sentence-wannabe-terrorists-deradicalization/; https://www.theguardian.com/us-news/2018/jan/04/american-isis-abdullahi-yousuf-rehabilatation; https://extremism.gwu.edu/daniel-koehler.

The program was successful for Mr. Yusuf—he went from being one of the ringleaders planning a move to Syria, to someone who sees his role as a member of his society rather than as an outsider.  He went from being a surly, closed-down kid to an open, warm, intelligent, thoughtful, introspective young person.  Mr. Yusuf is now someone who recognizes why he had been attracted to ISIS and now realizes there are so many other options for him.  Mr. Yusuf completed the carefully tailored program centered on studying literature, philosophy and writing poetry and

in late 2017 was integrated back into society where he will be monitored for the next 20 years.  *See* https://www.foxnews.com/us/how-rep-ilhan-omars-minnesota-district-became-the-terrorist-recruitment-capital-of-the-us-officials-highly-concerned; https://www.theguardian.com/us-news/2018/jan/04/american-isis-abdullahi-yousuf-rehabilatation.  Amera's reentry plan, particularly continuing her work with Daisy Khan, is of a similar vein: Amera is learning that her problems are not solved by the simplistic belief that ISIS will serve as her community, as her savior.  Amera already has come to understand and accept that she would not have been loved and protected by the ISIS community and she merely wants to find a community that will love and support her.  *See* Exhibit NN (Reentry Plan).

Furthermore, right here in the Eastern District, Judge Brodie recently sentenced Imran Rabbani, who was almost eighteen at the time of his material support for ISIL criminal activity, to a below-guidelines sentence of 20 months.  Explaining her decision, Judge Brodie stated that she believes there is "much more good than evil" in Mr. Rabbani. Different than Amera, Mr. Rabbani was more strongly radicalized and was driven for violence, having purchased weapons.  He ran toward law enforcement officers in an attempted attack, and helped with the planning of a potentially violent attack on Americans.  *See* 15-cr-302 (E.D.N.Y.) (MKB), ECF No. 79.

As part of her reentry plan, Amera could also participate in anti-extremism programming through the Disruption and Early Engagement Project ("DEEP") at the U.S. Attorney's Office for the Eastern District of New York.  The Eastern District of New York is uniquely suited as a place for Amera to be on intensive supervised release, in part because of the existence of a terrorism prevention program, DEEP, a strategic public/private partnership aimed at reducing the threat of terrorism by building a pool of subject matter experts across disciplines.  The project includes prosecutors, investigators and analysts from the JTTF, the Federal Defenders, law firms, the Probation Department, Pretrial Services, mental health professionals, private citizens and others dedicated to reducing the threat of violent extremism.  Amera looks forward to participating in this collaborative network, and discussing her experiences in the hopes that public safety professional and partners could learn from her personal path in this case.

Amera should be given the same opportunities as her fellow young people.  She is equally driven for positive change, focused on finding a healthy community, and worthy of the Court's understanding of her past.

### C. A Substantial Term in the Halfway House Will Add An Additional Punitive Measure and Mitigate Any Risks of Reoffense During The Crucial Initial Period When She Is Released

Placement in the halfway house would ensure a smooth transition back into society, place Ms. Ceasar under intensive restrictive conditions, and allow her to get the proper medical and mental health care she so desperately needs.

The imposition of a term of six months to one year in the Brooklyn halfway house will mean that Amera will have very restricted freedom of movement in her initial release period. She will be able to leave only for purposes of school/employment and medical and psychological care. She will not have access to the Internet. She will be forced to adjust slowly to her freedom, but will be able to do so in a context that will allow her rehabilitation to truly begin, through the continuation of her education, the commencement of trauma-based therapy, and the continued support of a wise Muslim community, through Daisy Khan. Unlike when she was released on bail, these controls will be in place to make sure the adjustment is slow, but steady, and that the slightest hiccough is observe and can be corrected immediately. The Probation Department has an extremely good relationship with halfway house management, and will be able to work closely with them. The halfway house is also close enough to counsel's office to allow regular visits by counsel and our Chief Social Worker.

In connection with Amera's reentry plan, we spoke with the director of the Brooklyn halfway house specifically about her case, and he advised that she could be restricted from using the computer entirely if the conditions of supervision required it. Alternatively, she could be granted access to the computer but with special strict content filtering, also in accordance with her supervision conditions. The halfway house director advised that her computer usage could, for example, restrict access to violent/extremist websites and social networking. *See* Exhibit OO (Sample Halfway House Content Filtering)

### D. The Proposed Supervised Release Conditions Further Diminish Amera's Chance of Recidivation

In addition to all of the standard conditions, as well as a period of commitment to the halfway house, we propose all of the special conditions recommended by Moustafa Ayad and Seamus Hughes, the government's experts in *John Doe*:

(1) requiring counseling and mentoring support to the defendant;

(2) limiting and monitoring defendant's online activities;

(3) restricting defendant's interaction with known or suspected terrorists unless sanctioned by law enforcement; and

(4) implementing various "tripwires," such as online monitoring and systematic check-ins/threat assessments in the supervised release process that would alert law enforcement to possible regression into radical beliefs.

They further recommended creating a "cocoon" around the defendant comprised of community groups, law enforcement, religious leaders—in this case Daisy Khan and WISE—and others. An alert system could be used to notify law enforcement immediately if Amera shows any signs of regression into extremist behavior. She would not be permitted to associate with any individuals involved in radical extremist groups, or to access any extremist websites. Probation would be required to report to the Court every six months—or even more frequently in the initial stages—on Amera's compliance, and if there are any suspicions at all regarding criminal activity, Probation would report that to the Court, the United States Attorney's Office, and the FBI immediately. *See United States v. Doe*, 323 F. Supp. 3d 368, 381 (E.D.N.Y. 2018).

On the other hand, as seen in above section titled There Is A Significant Concern That Confinement in the Bureau of Prisons Can Have A Radicalizing, Rather Than De-Radicalizing, Effect, additional prison time could serve to radicalize, as opposed to rehabilitate.

"A lengthy prison sentence increases the risk that defendant will become embittered and regresses into radical beliefs. The prison system can be a breeding ground for radicalization. Islamic extremists often use prisons to recruit new followers, reinforce the commitment of existing extremists and to network and exchange ideas with like-minded individuals." *United States v. Doe*, 323 F. Supp. 3d 368, 391 (E.D.N.Y. 2018) (citing James Brandon, *The Danger of Prison Radicalization in the West*, 12 Combating Terrorism Ctr. Sentinel 1, 1 (Dec. 2009) (internal quotation marks omitted)).

The government experts in *John Doe* agreed that prison serves to both radicalize and re-radicalize individuals with histories of extremism. Seamus Hughes testified "that supervised release, rather than incarceration, would increase defendant's chances to be rehabilitated." *United States v. Doe*, 323 F. Supp. 3d 368, 382 (E.D.N.Y. 2018). Your Honor asked him the following:

COURT: Well, can that system [of reducing the risk of recidivism] be best developed during supervised release or during incarceration?

MR. HUGHES: Your Honor, I'm not aware of any systematic approach for individuals in jail with these charges. In fact, in many ways individuals I've interviewed that have been in jail essentially go back to the same networks and extremist beliefs. There the Bureau of Prisons officials are struggling with that question. Do you spread these individuals out into different prisons where they potentially could radicalize others or do you put them altogether? If you put them all together what does that mean for relapse and removal from radical beliefs. If the court were to consider those two options, we need to weigh those two and require some level of monitoring and social services.

*Id.*

### E. Amera's Health and Life Are at Stake

Among the factors that the Court must consider in imposing a sentence no greater than necessary to achieve the statutorily-described goals of sentencing is to provide the defendant with needed medical care. 18 U.S.C. §3553(a)(2)(D). The medical care needed to promote Ms. Ceasar's medical health and thereby advance her interests and those of the community will not be provided within the Bureau of Prisons, which may serve to undermine her rehabilitation. The correctional environment is by definition antithetical to the particular treatment Ms. Ceasar needs, and whatever services she may obtain may as likely cause harm as benefit. *See supra* section B. The Bureau of Prisons Has Not Been Able To Adequately Care for Amera's Multiple, Chronic, Life-Threatening Medical Conditions. The unfortunate reality of American correctional healthcare is that Ms. Ceasar is unlikely to receive anywhere near the level of services within BOP that she would in the community.

Ms. Ceasar, both in jail and upon release, is both Guelph to the Ghibellines and Ghibelline to the Guelphs. To members of ISIS, because she cooperated with the FBI and the United States government, naming numerous co-conspirators over hundreds of hours of proffers, Ms. Ceasar will forever be labeled a "spy" for the United States, which is punishable by death under ISIS' interpretation of sharia law. ISIS is particularly brutal towards suspected "spies," which is their term for anyone who does anything to help the West and hinder members of ISIS or get them arrested. It is immaterial to ISIS that there was breach of the cooperation agreement. As the Court is aware, there are members of ISIS who are ready and

willing to make good on this sort of violence.  She will have a mark on her head for her cooperation for the rest of her life.

Conversely, for the rest of her life Ms. Ceasar will be subject to the stigma of having been affiliated with ISIS, and it is likely that even many years from now she will be treated harshly by members of the public in the United States who rightly condemn the organization.  The collateral consequences of a conviction like this on her record, and her name in the media, range from difficulty finding employment, to being the victim of violent attacks.

Ms. Ceasar thus faces foreseeable threats from both ISIS, which she will publicly denounce at the sentencing hearing, as well as from members of the community who feel hate and animosity towards her for being affiliated with ISIS, even as a very young woman. She will inevitably live with an increased level of risk to herself, facing retribution from all angles.  *See* Gov't Sentencing Ltr., June 8, 2018, *United States v. John Doe*, 14-cr-612 (JBW); see also Gov't Ltr. at 12 n.26 ("The screenshot included a photograph of the targeted [Spy Wanted DEAD] as well as his phone number, address and what appears to be a satellite image of the area around his home").

For these reasons, a sentence no greater than necessary to comply with Section 3553(a) should be as short as reasonable under all the circumstances and perhaps no more than the years until the onset of Ms. Ceasar's mid-twenties when her cognitive development will be complete.  A sentence reflecting the seriousness of the offense [Section 3553(a)(2)(A)] and to afford general deterrence [Section 3553(a)(2)(B)] are substantially outweighed by the unavailability of needed medical care upon designation by BOP [Section 3553(a)(2)(D)], the low risk of recidivism [Section 3553(a)(2)(C)], and the nature and circumstances of Ms. Ceasar and her history and characteristics. Section 3553(a)(1).  Probation also believes that Ms. Ceasar's health problems warrant considering a below guidelines sentence: "[a]lthough Policy Statement 5H1.3 indicates that mental and emotional health are not ordinarily relevant for departure purposes, in this particular case, the defendant's condition may warrant a departure from the advisory guideline range." PSR at ¶116.

This precedent shows that time served, with an intensive period in the halfway house and a substantial term of supervised release would avoid unwarranted sentencing disparities.

## **<u>CONCLUSION</u>**

For the aforementioned reasons and any others that may appear to the Court, we ask Your Honor to impose a sentence of time served, a substantial term in the halfway house, and supervised release with intensive special conditions.

Thank you for your consideration of this letter.

DATED:     June 20, 2019
             Brooklyn, NY

Respectfully Submitted,

_____/s/_____
Deirdre D. von Dornum
Attorney-in-Charge
Samuel I. Jacobson
Assistant Federal Defender
(718) 330-1210

Enclosures (Exhibits)

cc:    AUSA Josh Hafetz (via Email)
      AUSA Ian C. Richardson (via Email)
      Shayna Bryant, Senior U.S. Probation Officer (via Email)