**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 30 2019 ★

BROOKLYN OFFICE




UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

SINMYAH AMERA CEASAR,

Defendant.

Statement of Reasons Pursuant to
18 U.S.C. § 3553(c)(2)

17-CR-48
19-CR-117

**Parties:**

For United States

For Defendant

**Appearances:**

Josh Hafetz
Ian C. Richardson
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

Deirdre D. von Dornum
Samuel I. Jacobson
Federal Defenders of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201



**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I. Introduction ............................................................................................................... 1

II. Facts ....................................................................................................................... 3

   A.  Defendant's Background .................................................................................. 3

   B.  Defendant's Health ......................................................................................... 5

   C.  Defendant's Involvement with ISIL ............................................................... 7

     1.  Brief Background of ISIL ......................................................................... 7

     2.  Defendant's Conduct in Material Support of ISIL .................................... 9

     3.  Defendant's Plans To Travel to ISIL-Controlled Territory ..................... 13

   D.  Defendant's Arrest and Material Support Guilty Plea ................................... 14

   E.  Defendant's Obstruction of Official Proceeding .......................................... 14

III. Sentencing Hearing ............................................................................................. 19

   A.  Expert Testimony ......................................................................................... 19

     1.  Dr. Lorenzo Vidino ................................................................................. 19

     2.  Dr. Kostas Katsavdakis ........................................................................... 24

     3.  Daisy Khan ............................................................................................. 30

     4.  Dr. Marc Sageman .................................................................................. 32

     5.  Dr. Katherine Porterfield ........................................................................ 34

   B.  Defendant's Testimony ................................................................................. 38

   C.  Letter of Defendant's Half-Brother .............................................................. 39

IV. Offense Level, Criminal History Category, and Sentencing Guidelines Range ..................... 40

V. Law ....................................................................................................................... 41

VI. 18 U.S.C. § 3553(a) Considerations ................................................................... 43

   A.  Rehabilitation, Punishment, and Deterrence ................................................ 43

   B.  Potential Harm of Long Incarceration ......................................................... 47

   C.  First Amendment Issues ................................................................................ 48

VII. Sentence ............................................................................................................. 49

VIII. Conclusion ........................................................................................................ 53

## I. Introduction

Sinmyah Amera Ceasar ("Ceasar" or "Defendant") pled guilty to (1) conspiring to provide material support and resources to the Islamic State of Iraq and the Levant ("ISIL" or "ISIS"), designated by our government as a foreign terrorist organization, and (2) obstruction of an official proceeding.

Extensive sentencing hearings were conducted. The parties filed briefs and provided the court with more than 1,000 pages of exhibits. Over the course of three days, the court heard testimony from five experts. Defendant's half-brother submitted a letter in support of his sibling. She spoke at length on her own behalf.

Defendant had a traumatic life: Now 24 years old, she is a survivor of serious sexual, physical, and emotional trauma. Her father abused her sexually. Her mother's limiting physical conditions prevented her care of Ceasar, so Defendant was repeatedly shifted from foster care placement to foster care placement, and abused continuously along the way. Her three husbands were each physically and emotionally abusive.

Identifying as Muslim, as a young adult, Ceasar sought acceptance with an organization advocating violence and destruction in the United States and other parts of the world: ISIL. She connected individuals in the United States with individuals affiliated with ISIL and posted propaganda for ISIL online. She planned to travel to ISIL territory and to join the organization there. Subsequent to her guilty plea for conspiracy to provide material support, when on presentence release because of health problems, Ceasar engaged in similar conduct, lied to the government about it, and deleted records of her communications favoring ISIL.

Against this backdrop of aiding ISIL, under federal penal jurisprudence, the court considers general and specific deterrence, incapacitation, rehabilitation, and punishment. She is sentenced to a total of 48 months of incarceration—about 28 months already served while she

awaited sentencing in jail. Incarceration is to be followed by eight years of supervised release. The sentence is designed to ensure that (1) the public is adequately protected from ISIL and organizations like it, (2) Ceasar is punished for her dangerous criminal conduct, and (3) her rehabilitation to a productive, lawful citizen of the United States is encouraged.

It is apparent that this young woman is in need of long-term intensive educational, emotional, and economic support to address her traumas, which have, in part, motivated her actions to join a dangerous organization as a substitute for normal family life.

In Europe, countries such as Denmark and the Netherlands have designed and used intensive disengagement and deradicalization programs to assist prisoners charged and convicted of terrorism-related offenses. The United States has no such program. The Bureau of Prisons should seriously consider designing an appropriate program to deal with American terrorists like this one. Without access to treatment while incarcerated or on supervised release, Defendant will likely remain an unrehabilitated supporter of ISIL and a continuing danger to the United States. Ceasar's counsel and the Probation Department are developing a program of intensive treatment and support for the term of her supervision after her incarceration; the treatment should begin in prison and connect seamlessly with control and assistance by Probation.

The sentence is sufficient, but not greater than necessary. The Bureau of Prisons and other relevant federal agencies should design and use disengagement and deradicalization programs to help ensure that people in similar circumstances have a reasonable chance at rehabilitation. *See United States v. Doe*, 323 F. Supp. 3d 368 (E.D.N.Y. 2018) (explaining the non-incarceration sentence of a young person who had broken from ISIL and was on the path to reintegration into lawful society).

## II. Facts

### A. Defendant's Background

Ceasar had a difficult childhood: She was born in New Jersey in 1994. Revised Presentence Investigation Report ("PSR") ¶ 81. She is the only child born to her parents, who divorced when she was three years old following her father's physical abuse of her mother. *Id.* Ceasar's mother had custody of her during the week, and her father had custody on weekends. Def.'s Sent. Mem. 3, No. 17-cr-48, ECF No. 102. Defendant has four paternal half-siblings, but has a passing relationship with only her oldest half-brother. PSR ¶ 82. He is now supportive, intending to help her live a lawful way of life. *Id.*; Def. Ex. XX (letter of Defendant's half-brother in support of Defendant).

Ceasar's father sexually abused her from the age of four to 11. PSR ¶ 81. Defendant's mother reported the abuse. *Id.* A restraining order was issued against him. *Id.* Though out of contact with him for many years, she saw him mostly recently in 2017, when he criticized her for her involvement in the instant offenses and for bringing dishonor on her family. Def.'s Sent. Mem. 6. She has been ostracized by all in the family but the half-brother.

Ceasar's mother was gravely ill for most of Defendant's life, suffering from diabetes and kidney failure. PSR ¶¶ 81, 83. Her mother was unable to work as a result of her physical maladies; the two suffered financially. PSR ¶ 83. When Ceasar was seven, her mother became blind because of diabetes-related complications. PSR ¶ 81; Def.'s Sent. Mem. 3. By the time Ceasar was ten, she was her mother's primary caregiver. Def.'s Sent. Mem. 3–4. Defendant was responsible for grocery shopping, cooking meals, cleaning their apartment, and monitoring her mother's medication and medical appointments. *Id.* The mother's medical complications became so serious that when Ceasar was 13, her mother was admitted to a nursing home, where she remained until her death from a heart attack in 2017 at the age of 49. PSR ¶¶ 81, 83.

3

Defendant was placed in foster care and lived with three families in four years. PSR ¶ 83. Her first foster parent locked her in a room for one month and fed her only peanut butter. *Id.* This foster parent would not allow Ceasar to speak to her mother. Def.'s Sent. Mem. 4. Ceasar told her teachers about this and she was removed from this foster placement. *Id.* Defendant's next foster placement was with a paternal aunt and her paternal grandparents, who pressured Ceasar to forgive her father for abusing her. PSR ¶ 83; Def.'s Sent. Mem. 4–5. She was hurt that they supported him over herself and requested a transfer to a new home. *Id.* The final foster placement was with a family that had previously served as a foster placement for Ceasar's mother. Def.'s Sent. Mem. 5. It lasted two years, but Ceasar reports that the family refused to spend the foster care maintenance payments it received from the state on her care. *Id.*; PSR ¶ 83. She signed herself out of foster care when she was 17. PSR ¶ 83.

Ceasar's living and family situations became increasingly unstable. From 2011 until her arrest in 2017, she lived with friends, romantic partners, and in homeless shelters. PSR ¶¶ 83–85.

Seeking a stable family, between 2011 and 2013, she entered into successive religious marriages with three older men. PSR ¶ 84; Def.'s Sent. Mem. 5. Each of the relationships ended quickly. PSR ¶ 84. Defendant's first marriage in 2011 to a 25-year-old man ended because he physically abused her; he was using drugs. Def.'s Sent. Mem. 2, 5. Her next marriage in 2012 was to a 39-year-old man who frequently punched and choked her. PSR ¶ 84; Def.'s Sent. Mem. 2, 5. Ceasar's final marriage, in 2013, was to a 42-year-old man who was possessive and controlling. *Id.* Their relationship ended shortly after Defendant had a miscarriage. PSR ¶ 84.

At the time of her arrest, Ceasar contends that she was en route to Sweden to marry a fourth man, whom she met online. Def.'s Sent. Mem. 6, 18. The government suspected her real reason for wanting to go abroad was to join ISIL. *See* Sent. Hr'g Tr. 149:22–150:12.

Throughout her life, Defendant struggled in school and shifted from one educational institution to another. PSR ¶ 91; Def.'s Sent. Mem. 4–5. When she was in the fourth grade, she was placed in special education classes under the classification "communication impaired." Def.'s Sent. Mem. 4. She attended five high schools before dropping out during her senior year. PSR ¶ 91. Ceasar went on to hold different temporary jobs—as a childcare provider, grocery store clerk, and line cook. PSR ¶¶ 93–99. In 2016, she completed a health aide course and registered as a home health aide. PSR ¶ 92. She worked as a health aide for less than one year. PSR ¶¶ 94–95.

**B. Defendant's Health**

Ceasar has struggled with chronic physical health problems for years. Def.'s Sent. Mem. 8–10. Her physical medical diagnoses have required frequent specialist attention during her incarceration. *Id.* She has experienced suicidal ideation since age 11. *Id.* at 12; PSR ¶ 89. She suffers from complex post-traumatic stress disorder ("PTSD") as a result of abuse.

Expert Dr. Katherine Porterfield was called by the defense. She explained Defendant's serious PTSD at length during the sentencing hearing. *See also* Section III.A.5. Dr. Porterfield is a clinical instructor at New York University School of Medicine and a senior psychologist at Bellevue New York University Program for Survivors of Torture. Sent. Hr'g Tr. 233:16–19. For 20 years, she has worked with children, teenagers, families, and adults who have suffered severe violence as a result of war, prison, or torture. *Id.* 234:12–20. Individuals held in Guantánamo Bay Naval Station and young people involved with various forms of extremism in the United States and elsewhere, including ISIL, paramilitary organizations, and white

supremacist groups have been treated and studied by her. *Id.* 235:19–236:9. Dr. Porterfield has

also conducted research on issues relating to torture and other physical and psychological abuse,

as well as their effects. *Id.* 234:20–21. She met with Ceasar for about 130 hours over the last

two years and reviewed medical records and other materials relevant to Ceasar's offenses.

*Id.* 238:13–21.

Dr. Porterfield testified that Ceasar "has a childhood history of such severe and chronic

and pervasive trauma as to really be quite astonishing." *Id.* 239:17–19. Her childhood presents

nine of ten Adverse Childhood Experience factors ("ACE factors") that are indicative of great

adversity and bad outcomes: (1) physical abuse in childhood that was chronic and ongoing;

(2) sexual abuse in childhood that was chronic and ongoing; (3) emotional abuse in childhood

that was chronic and ongoing; (4) physical neglect; (5) emotional neglect; (6) parental separation

and abandonment; (7) mother treated violently; (8) an incarcerated family member; and

(9) mental illness and/or substance abuse in a family member. *Id.* 239:20–241:1. "[Nine] out of

10, it means that person is going to be suffering with severe impairments . . . ." *Id.* 241:5–6. Dr.

Porterfield explained:

> When you have childhood trauma over and over and over again,
> what we now understand is that children make their bodies and their
> brain functioning, their neurophysiological response to that, is that
> those functions change and the child develops patterns of what we
> call emotional regulation, handling emotions, that are very impaired.
> They develop a sense of self that's very impaired and they develop
> relationships to other people that are very impaired. Those are sort
> of the hallmark of complex post-trauma[tic] stress disorder. And
> then what's also with that is the other parts . . . of the original Post-
> Traumatic Stress Disorder, which are hyperarousal, problems with
> feeling frightened, startle difficulties, et cetera. If I could just wrap
> that up . . . [:] Ms. [Ceasar's] diagnosis of Complex Post-Traumatic
> Stress is severe and she has . . . [what] I called emotional
> disregulation, that means inability to recognize emotions and deal
> with them. And she has a very severe condition of dissociation and
> dissociation is a really problematic symptom that happens . . . when

children get overwhelmed, scared and hurt and left over and over again, because the child's brain and body reaction to that is to begin to shut it off, make it stop, make it go away. And that dissociation then leads to real trouble in adulthood if it doesn't get treated.

*Id.* 242:3–243:2. Defendant's offenses, Dr. Porterfield opined, are directly related to her clinical problems. The expert testimony is discussed in more detail *infra*, in Section III.A.5.

### C. Defendant's Involvement with ISIL

#### 1. Brief Background of ISIL

ISIL is an organization with roots in a Sunni Islamist group founded in 1999. Gov't Ex. 1 ("Vidino Rep."), at 2. It was designated by the United States as a foreign terrorist organization in 2004, when it was known by its former name, al-Qa'ida in Iraq. U.S. Department of State, *Foreign Terrorist Organizations*, https://www.state.gov/foreign-terrorist-organizations/ (last visited July 25, 2019). Around 2012, the organization began operations in Syria, and in 2013, it became known by its current name. Vidino Rep. at 2.

Though reportedly it no longer controls any territory, at the height of its power in approximately 2015, ISIL ruled territory the size of France across Iraq and Syria. *Id.* Its power stretched further abroad. *Id.* at 3–4. Abu Bakr al-Baghdadi, ISIL's leader, urged Muslims to migrate to ISIL territory and take up arms on behalf of the organization. In 2014, he said, "O Muslims everywhere, whoever is capable of performing hijrah to the Islamic State, then let him do so, because hijrah to the land of Islam is obligatory." *See Isis leader calls on Muslims to 'build Islamic state'*, BBC (July 1, 2014), https://www.bbc.com/news/world-middle-east-28116846.

Dr. Lorenzo Vidino, Director of the Program on Extremism at George Washington University, and the government's expert on radicalization, mobilization, disengagement, and deradicalization from jihadist groups, explained the meaning of the term 'hijrah':

> *Hijrah* in the Qur'an refers to the prophet Muhammad's (and his followers') migration from Mecca—his place of birth and upbringing—to Medina in 622 CE to flee persecution. Those who followed Muhammad were the first converts and followers of Islam and demonstrated their faith by fleeing with Muhammad before fighting alongside him and helping establish the first Islamic society.
>
> For jihadists, *hijrah* is a term used predominantly for supporters/followers in countries outside the operational zones of the jihadist group to travel to those zones and join the group. To make *hijrah* is to travel from a "land of disbelief" . . . to a territory where a jihadist group has created or seeks to create what it deems a perfect Islamic society.

Vidino Rep. at 23 (italics in original). It is believed that about 5,000 European citizens migrated to ISIL territory and became ISIL fighters. *Id.* at 4. About 250 individuals from the United States are said to have traveled or attempted to travel there to participate in the conflict. *Id.*

ISIL has claimed responsibility for numerous terrorist attacks. On March 18, 2015, gunmen at the Bardo Museum in Tunis, Tunisia killed 23 people; ISIL claimed responsibility. Tim Lister et al., *ISIS goes global: 143 attacks in 29 countries have killed 2,043*, CNN, https://www.cnn.com/2015/12/17/world/mapping-isis-attacks-around-the-world/index.html (last updated Feb. 12, 2018). A series of attacks in Paris, France on November 13, 2015, committed with assault rifles and explosives, killed at least 130 people and wounded more than 350 others; ISIL claimed responsibility for these attacks. *Id.* Other attacks have been inspired by ISIL. Here in the United States, on June 12, 2016, a gunman killed 49 people at Pulse, a gay nightclub in Orlando, Florida; the gunman is believed to have been inspired by ISIL. *Id.*

ISIL also engaged in serial human rights violations in the territory it controlled. Yazidis, a religious minority, were targeted by ISIL and "subjected to almost unimaginable horrors," including killings, sexual slavery, enslavement, torture, forced religious conversion, and the transfer of Yazidi children from their families to ISIL fighters. *See* United Nations Human Rights Council, Independent International Commission of Inquiry on the Syrian Arab Republic, *"They came to destroy": ISIS Crimes Against the Yazidis* (2016), https://www.ohchr.org/Documents/HRBodies/HRCouncil/CoISyria/A_HRC_32_CRP.2_en.pdf. ISIL imposed severe restrictions on those people living in the territory it captured. *See* Human Rights Watch, *"We Feel We Are Cursed": Life under ISIS in Sirte, Libya* (2016), https://www.hrw.org/report/2016/05/18/we-feel-we-are-cursed/life-under-isis-sirte-libya (describing restrictions on resident right to privacy, freedom of religion, freedom of movement, and freedom of expression, and failure to comply with notions of due process, fair trial rights, and the prohibition on cruel, inhuman, and degrading punishments).

## 2. Defendant's Conduct in Material Support of ISIL

For at least 11 months until her arrest in November 2016, Ceasar actively sought to support and assist ISIL and conspired with others to do so. At the hearing during which she pled guilty before the court, she described her conduct:

> From January 2016 to November . . . 2016, I knowingly and intentionally agreed with others to provide material support to foreign terrorist organization, that I know . . . is run by Dawla or Islamic State.
>
> This is the same organization that the U.S. Government calls "ISIS" or "ISIL." At the time, I agreed with others to provide material support to Dawla. I was aware that they're engaged in terrorist activity and that the U.S. government had this (inaudible) as a terrorist organization.
>
> Specifically, I was aware that ISIL had claimed responsibility for the attacks in Paris and in Brussels that happened in 2015 of

November and March 2016. I am aware that these attacks involved the use of firearms and explosives, and that they were intending, and, did endanger the safety of one or more individuals. I worked as an assistant to the other members more than once. I put U.S. based individuals who wanted to make [hijrah] or migration to the Dawla in touch with the other members who were based overseas. I did this by passing the [T]elegram contact information of the other members to these U.S. based individuals, [T]elegram is [an] encrypted messaging application. I put these U.S. based individuals in touch with all the members on [T]elegram[]so they would have contacts in Dawla, who could help them travel overseas to the territory controlled by Dawla.

I believed that if these individuals made it to Dawla, they would join the group and work under its directions and control. I personally spoke on . . . [T]elegram and other social network applications to Dawla members whose contact information I passed to these individuals. When I passed the information on [T]elegram to contact the Dawla members, I was in the United States, Brooklyn, at the time. I also intended to make [hijrah] to Dawla to join the group. First, I was going . . . to move to Sweden to get married to a Dawla supporter, and after that we agreed . . . to go to make [hijrah] to Dawla to control the territory.

Plea Hr'g Tr. 25:19–27:7, No. 17-cr-48, ECF No. 18 (filed under seal).

The record shows that Ceasar used multiple social media accounts to upload images and videos showing support for ISIL and encouraging people to migrate to ISIL-controlled territory, to post quotes and audio recordings of ISIL leaders, and to express her support for acts of violence by ISIL or inspired by ISIL. *See* PSR ¶¶ 7–17. Through her social media presence, she connected with individuals who supported ISIL and were interested in traveling to ISIL-controlled territory. Ceasar attempted to assist at least four people join ISIL abroad by connecting individuals in the United States to ISIL operatives who might facilitate their travel.

### i. Individual 1

In February 2016, Defendant posted on Facebook the following quotation attributed to now-deceased al-Qaeda in the Arabian Peninsula leader Anwar al-Awlaki: "Running away from Jihad will not save you from death, You can die as a coward or you can die as a Martyr!"

PSR ¶ 13. In response, another Facebook user ("Individual 1") commented: "True I would love to die as a shaheed it a big honor." *Id.* A "shaheed" is a person who has achieved martyrdom; among extremists, it is specifically someone who engages in a suicide operation or a violent operation in which the outcome is very likely to be death. Vidino Rep. at 23. Ceasar responded to Individual 1, "Then do hijrah," and provided a screenshot of the user profile of an ISIL operative. PSR ¶ 13. She instructed Individual 1 to "Add him he will guide you." *Id.* Ceasar believed this ISIL operative was an individual in Libya who wanted to help people travel to join ISIL. Gov't Sent. Mem. 9, No. 17-cr-48, ECF No. 101. When he changed his user profile to a new name, Ceasar provided the new name to Individual 1. *Id.* Post-arrest, Defendant admitted that she was attempting to connect Individual 1 to this ISIL operative so that Individual 1 could join ISIL. *Id.* at 8.

### ii. Confidential Source 1

In April 2016, a confidential source working at the direction and under the supervision of the Federal Bureau of Investigation (the "FBI") ("Confidential Source 1") contacted Ceasar posing as a United States-based individual seeking to travel overseas to join ISIL. PSR ¶ 18. She and Confidential Source 1 exchanged text messages discussing the best routes for making hijrah to ISIL-controlled territory. PSR ¶ 19. Defendant then provided Confidential Source 1 with the contact information for Abu Sa'ad al-Sudani, also known as Abu Isa Al Amriki, ("al-Sudani"). *Id.*; Gov't Sent. Mem. 9. Al-Sudani was involved in planning attacks against the United States, Canada, and the United Kingdom; he and his wife were active recruiters of foreign fighters to induce "attacks against Western interests." Department of Defense Press Briefing by Pentagon Press Secretary Peter Cook in the Pentagon Briefing Room (May 5, 2016), https://dod.defense.gov/News/Transcripts/Transcript-View/Article/752789/department-of-defense-press-briefing-by-pentagon-press-secretary-peter-cook-in/.

Ceasar continued to communicate with Confidential Source 1 about how to connect with ISIL operatives after she put him in touch with al-Sudani. She advised Confidential Source 1 about how to respond to operatives' questions and warned him to encrypt his phone. PSR ¶ 20. Several months later, Defendant contacted the username of Confidential Source 1—now operated by an undercover FBI agent—and offered to help him get a visa to migrate to ISIL territory. PSR ¶¶ 25–26. She put him in contact with an ISIL operative who had, with another individual, taken over the recruitment role of al-Sudani and his wife. PSR ¶ 27. Referring to her own role with new ISIL recruiters, Defendant said "they put me as assistant to help them out because all gates are closed except for Afghanistan so we need[] [Muslims]." PSR ¶ 26; Gov't Ex. 7.

### iii. Confidential Source 2

In early 2016, a second confidential source working under the supervision of the FBI ("Confidential Source 2") initiated contact with Ceasar via Facebook. Gov't Sent. Mem. 12. After Confidential Source 2 disclosed that she wanted to travel to ISIL-controlled territory, Defendant provided her with the contact information of al-Sudani's wife and instructed "if u serious about making hijrah then download [the Internet messaging application] and add the head sister committee leader." *Id.* Ceasar later followed up with Confidential Source 2 and informed her that one of the recruiters who had replaced al-Sudani was looking for her, suggesting that Confidential Source 2 reply to him. *Id.* at 13.

### iv. Individual 2

At the end of June 2016, Defendant began communicating via Facebook with a United States-based individual who had been previously convicted in Florida state court of armed robbery and assault on police officers ("Individual 2"). PSR ¶ 28. Defendant and Individual 2 discussed his desire to migrate to ISIL-controlled territory and join ISIL, and she provided him

with the contact information for several ISL facilitators. *See* PSR ¶¶ 29–30. Individual 2 engaged in a series of exchanges with the facilitators about joining ISIL. PSR ¶¶ 30–31. On July 7, 2016, he sent to Ceasar a screenshot of his conversation with the facilitator, in which the facilitator encouraged him to engage in violence in the United States because travel to ISIL-controlled territory would take too long: "Because of ur visa . . . It takes one year . . . That is long . . . So it would be better for u to do work there. Till Then. And scare them." Gov't Ex. 9A; *see* PSR ¶ 31. Two days later, Individual 2 was arrested for violating the terms of his probation by traveling from Florida to New York City, where he met with Ceasar. PSR ¶ 28; Gov't Sent. Mem. 14.

In August 2016, Defendant received $273 from an ISIL facilitator who had been corresponding with Individual 2. *See* PSR ¶¶ 32–33. When she asked "what is this," an ISIL facilitator told her "u did big work." Gov't Ex. 10; *see* PSR ¶ 33.

### 3. Defendant's Plans To Travel to ISIL-Controlled Territory

While Defendant was facilitating individuals' recruitment and travel, she was formulating a plan to migrate to ISIL territory herself. In June 2016, she obtained a 30-day tourist visa for Afghanistan. PSR ¶ 28. In July, Ceasar told the ISIL facilitator who had been corresponding with Individual 2 that she would travel to Afghanistan as soon as she had sufficient money. PSR ¶ 32. She later informed him that she was renewing her visa for Afghanistan (it was set to expire shortly) so that she could travel at a time when flights were less expensive. PSR ¶ 34. In September 2016, a different ISIL contact promised to purchase for Defendant a plane ticket to Turkey where she could secure a visa at the airport. PSR ¶ 36. This contact instructed her to live a normal life and wait to do anything until her email address was requested so a plane ticket

could be sent. PSR ¶ 37. Defendant alerted the contact that she would be putting aside $100 per week to pay for a plane ticket to Turkey. PSR ¶ 38.

### D. Defendant's Arrest and Material Support Guilty Plea

Ceasar never made it to Turkey, or anywhere else outside the United States. In October 2016, she reported to a New York City transit police officer that she had lost her purse, which contained two cell phones. PSR ¶ 40. The purse was turned into the New York City Police Department, after which a magistrate judge issued a warrant allowing the FBI to search both cell phones. *Id.* The search revealed that Defendant had corresponded with several individuals regarding her plans to travel to ISIL territory and to provide ISIL with potential new members. *Id.* She was arrested on November 15, 2016 when she checked into a flight from New York to Sweden, via Turkey, at John F. Kennedy International Airport in Queens, New York. PSR ¶ 40. She claimed she was on her way to Sweden to marry a man she met online. Def.'s Sent. Mem. 6, 18.

Three months later, Defendant pled guilty to conspiring to provide material support and resources, as defined in 18 U.S.C. § 2339A(b), including personnel, including herself, to a foreign terrorist organization, specifically, ISIL. PSR ¶ 1. This organization, during relevant times, has been designated by the Secretary of State as a foreign terrorist organization. *Id.*

### E. Defendant's Obstruction of Official Proceeding

Defendant had been incarcerated for more than a year and was awaiting sentencing when she was released on bond pending sentencing because her health was deteriorating. PSR ¶ 2; Def.'s Sent. Mem. 6. While on presentence release, Ceasar was subject to strict conditions, including that she was barred from using any computer or mobile communication device without prior notification to and consent of Pretrial Services and/or the FBI. Order Setting Conditions of Release and Bond Attachment A ¶ 4, No. 17-cr-48, ECF No. 38-2 (filed under seal). Her

computer usage was limited to educational and vocational research. *Id.* She was also prohibited from knowingly contacting individuals or organizations affiliated with foreign terrorist organizations, or individuals or groups that promote violence for the purpose of effecting political change. *Id.* ¶ 6. Her telephone use was limited to contacting her counsel, treatment providers, sureties, the residential staff of the location where she would be residing, the United States Attorney's Office or the FBI, or to call for assistance in the event of a medical or other grave emergency. *Id.* ¶ 5. To facilitate the monitoring of her communications, Defendant's presentence release terms required that all of her written online communications be in English. *Id.* ¶ 4.

Shortly after her release, Ceasar violated her bond conditions by, among other things, obtaining and using a laptop without the knowledge or consent of Pretrial Services, downloading and using multiple cell phone applications without the knowledge or consent of Pretrial Services, and creating and using multiple Facebook accounts under various pseudonyms to contact and attempt to contact numerous people, including individuals she had previously identified to the FBI as supporters of ISIL or other extremist groups. PSR ¶ 48. Pretrial Services became aware of the unlawful computer usage when Defendant submitted a laptop computer to Pretrial Services to have computer-monitoring software installed. PSR ¶ 43. Following a hearing on the violations, Defendant's bond was revoked and she was remanded to federal custody. PSR ¶ 48.

An investigation into the scope and content of Ceasar's communications and activities while on presentence release turned up widespread violations of her release conditions. In addition to performing online searches for known ISIL affiliates and news of the organization's activities, PSR ¶ 43, Defendant created at least three pseudonymous social media accounts and used them to contact or attempt to contact at least seven people she had previously identified to

the FBI as supporting ISIL or other extremist groups, Gov't Sent. Mem. 17. She also contacted or attempted to contact other individuals about whom she had not previously provided information to the government, but who had expressed support for ISIL or were associated with ISIL supporters. *Id.*

For example, Ceasar searched for and initiated Facebook communications with an individual whom she had previously identified to the FBI as associated with United Kingdom-based ISIL supporters linked to terrorist attacks. *Id.* After this individual posted on Facebook "Be very careful as to who you trust on here especially if they send you any links that maybe incriminating," Defendant responded, "Yea that's true that how I went to prison because some the Muslims were spies." Gov't Ex. 12. Ceasar also engaged in Facebook communications with an individual based in Belgium with whom she had been in contact before her 2016 arrest. Gov't Sent. Mem. 17. On at least one instance, Defendant, this individual, and an ISIL facilitator, to whom Defendant referred people for help in traveling to ISIL-controlled territory, engaged in a multi-user Facebook posting. *Id.* at 18. Following her 2016 arrest, Defendant never disclosed to the government her contact with the individual in Belgium. *Id.* She deleted their messages exchanged while she was out on presentence release, though they were subsequently recovered. *Id.*

Ceasar's messages with ISIL supporters from this time period indicate that she believed that her conduct leading to conviction for conspiring to provide material support to ISIL was not wrong. As noted above, in response to the post "Be very careful as to who you trust on here especially if they send you any links that maybe incriminating," Defendant responded, "Yea that's true that how I went to prison because some the Muslims were spies." Gov't Ex. 12. Two weeks later, she posted on Facebook, "I didn't do anything wrong under Islam but stand up for

my deen and got arrested for what I believe in . . . ." Gov't Ex. 14. "Deen" is an Arabic term for religion which has been interpreted narrowly by jihadists, "to refer explicitly to their in-group, and [they] often use *deen* to express following and adhering to 'the right path' represented by their group's interpretation of Islam." Vidino Rep. at 23 (italics in original).

Ceasar ultimately deleted at least 1,000 Facebook messages and at least 1,000 text messages, as well as emails, audio files, and images. PSR ¶ 44. On the day before she was to meet with Pretrial Services, she used Facebook to tell at least eight people that she intended to delete her Facebook accounts and provided many of these people alternative means of contacting her. Gov't Sent. Mem. 18. Defendant also instructed others with whom she was communicating via Facebook to delete their Facebook messages with her. PSR ¶ 44.

During the government's investigation of Defendant's conduct while out on presentence release, she provided incomplete, inaccurate, and incorrect answers about her behavior. Ceasar lied about reading ISIL-related news sources and propaganda outlets, denying her familiarity with a Facebook account that regularly posted propaganda even though she "friended" the account and "liked" posts by the account. Gov't Sent. Mem. 21. She denied knowledge of a cell phone application offering "full coverage of ISIS news," but acknowledged that she might have viewed the app when confronted by records indicating that she searched for it and attempted to download it. *Id.* at 19, 21. Defendant was unable to explain why extremist imagery was found on her phone. *Id.* at 21–22.

The lies expanded. Ceasar lied about her creation and use of a pseudonymous Facebook account and her creation and use of an email account. *Id.* at 21. She lied about her use of the name "Umm Nutella," the *nom de guerre* she used to identify herself among ISIL supporters throughout 2016; records indicate that she at least twice identified herself with this pseudonym in

messages while on presentence release. *Id.* at 20–21; Gov't Ex. 15; Gov't Ex. 16. She explained that she had not used that name because it would mean she was "back supporting ISIS." Gov't Sent. Mem. 21.

Defendant also lied about her interactions and communications with ISIL supporters. With respect to one Facebook user, Ceasar first denied any knowledge of the account, or the identity of the account's owner. *Id.* When confronted with records indicating that she searched for the account and engaged in a lengthy exchange with the Facebook user, Defendant stated that she remembered the exchange but denied knowing who the owner of the account was even though she had interacted with the account in 2016 and records show a 40-minute voice call between her account and that user's account. *Id.* When asked about writing to that Facebook user the phrase "I used to be with the Islamic State," she admitted to doing so and claimed that she immediately followed up that statement by writing in Arabic that she no longer supported ISIL and was getting her life back together. *Id.* There is no record that Ceasar followed up in the manner that she described. *Id.* When confronted by her statements disavowing responsibility for her crimes, she denied making the statements. *Id.* at 22. When confronted by records showing the comments, Defendant claimed that any denials of accountability she made on Facebook were intended to cover up her cooperation with the government. *Id.*

Ceasar was charged with and pled guilty to "between June 2018 and July 2018 . . . , while released under Title 18, United States Code, Chapter 207, corruptly alter[ing], destroy[ing], mutilat[ing] and conceal[ing] one or more records, documents and other objects, specifically: Facebook messages and text messages, with the intent to impair the objects' integrity and availability for use in one or more official proceedings, specifically (a) bail proceedings in the Eastern District of New York; and (b) sentencing proceedings in the Eastern District of New

York, in violation of 18 U.S.C. § 1512(c)(1)." PSR ¶ 3; *see* Information, No. 19-cr-117, ECF No. 5.

Defendant remained incarcerated before sentencing, dealing with various health problems and concerns about a prospective sentence.

### III. Sentencing Hearing

A sentencing hearing was conducted on June 24, June 25, and June 26, 2019. Guilty pleas in both cases were accepted by the magistrate judge and again by the court.

The proceedings were videotaped to record the atmosphere in the courtroom and Ceasar's demeanor. *See In re Sentencing*, 219 F.R.D. 262, 264 (E.D.N.Y. 2004) ("The sentencing hearing normally requires that the defendant be observed for credibility, mental astuteness, physical characteristics, ability to withstand the rigors and dangers of incarceration, and . . . myriad other relevant factors. . . . A judge applies mental impressions of many tangible and intangible factors when imposing a sentence.").

Defendant addressed the court, as did five experts. A letter from her half-brother was accepted in evidence in lieu of his testimony.

#### A. Expert Testimony

##### 1. Dr. Lorenzo Vidino

Dr. Lorenzo Vidino, Director of the Program on Extremism at George Washington University, testified as the government's expert on radicalization, mobilization, disengagement, and deradicalization of jihadist groups, including ISIL. Sent. Hr'g Tr. 17:19–25. The Program on Extremism at George Washington University researches extremism around the world, but centers its research on jihadist extremism in the United States, including advising policy makers and law enforcement. *Id.* 12:5–11, 13:6–10.

For the last 20 years, Dr. Vidino has been researching, studying, and writing about terrorism. *Id.* 12:21–25. He has published several books and articles on the subject. *Id.* Dr. Vidino submitted an expert report and opinion about ISIL's history, radicalization by ISIL, deradicalization, and disengagement, with a focus on Defendant's past and current relationship with ISIL.

Dr. Vidino first placed Ceasar's criminal conduct in the broader context of ISIL recruitment. Online recruitment plays an important role in radicalizing Americans for ISIL, he testified, "from how the individual first encounters ISIS ideology to how he or she embraces that and starts interacting with like-minded individuals online." *Id.* 18:14–20. Online recruitment is a key activity of ISIL in the United States

> because of the lack or almost . . . complete lack of physical recruiters on U.S. ground, meaning that people who are ISIS sympathizers in the Middle East or in Europe will find it fairly easy to make a connection with somebody in a physical space who is an ISIS sympathizer or ISIS recruiter, somebody who can connect them to the organization.
>
> Those individuals in the United States are fairly rare, so the internet is the only safe space -- with a handful of exceptions, where that kind of connection with ISIS can be made.

*Id.* 19:9–21.

Ceasar played two roles in ISIL's online recruitment strategy, Dr. Vidino concluded: (1) as a disseminator of propaganda, and (2) as a connector of ISIL-sympathetic individuals with ISIL recruiters. He explained these roles:

> The disseminator is a fairly common [role]. I would say the vast majority of people who are in this sort of informal online community are disseminators of propaganda. They repost or retweet ISIS propaganda. That, of course, has value in itself because it makes ISIS propaganda more readily available, more accessible. So, that's fairly common.

> What I think is also important is that in some cases [Defendant] is a connector. She makes the connection between people who are on the lower level, people who have no connections whatsoever with ISIS, who have just started this radicalization trajectory, or for one reason or another . . . do not have connections with ISIS, she connects them with people who are ISIS members or who are pa[r]t of some kind of inner circle of this informal community. So, that is not as common as the first one.
>
> Disseminator, as I said, vast majority of people are disseminators. Connector is definitely one step up.

*Id.* 22:14–23:5.

Connectors are important because the online space in which ISIL recruiters operate includes law enforcement agencies and other government entities seeking information. *Id.* 23:13–19. "The value of [a] connector is that th[e] person is trusted by the ISIS recruiter and can point to a lower level person as somebody that should be trusted." *Id.* 23:20–22. In sum, Dr. Vidino's testimony explained the value and importance of Ceasar's conduct to help ISIL.

Dr. Vidino also gave his opinion about extremist individuals' capacity and ability to leave ISIL-associated networks and reintegrate into mainstream society, as well as Ceasar's progress toward these goals. He described two concepts—disengagement and deradicalization. *Id.* 26:14–28:3. Disengagement is a behavioral process and is "marked by a change in role or function that is usually associated with a reduction of violent participation." Vidino Rep. at 20 (internal quotation marks omitted). Deradicalization, by contrast, is "an attitudinal or cognitive process" that is "complete[d] when the commitment to, and involvement in, violent radicalization is reduced to the extent that . . . [the individual] [is] no longer at risk of involvement and engagement in violent activity." *Id.* (internal quotation marks and citation omitted).

Programs aimed to facilitate disengagement and deradicalization are multilayered and bring together mentors, security services, social workers, and psychologists to work with the

radicalized individual according to a specific plan. Sent. Hr'g Tr. 38:7–19. These programs exist in various Western European countries, Dr. Vidino stated, but not in the United States. *Id.* 38:20–39:5. Thus, Defendant, under present conditions, would not have the benefit of such a program of disengagement or deradicalization in or out of prison.

In discussing Defendant's current trajectory toward disengagement and deradicalization, Dr. Vidino relied on several factors identified in academic literature, which are fully explicated in his expert report. *See id.* 28:16–29:23. "[C]ommonly cited signs of disengagement are: [1] Ending personal involvement in terrorism and related activities[;] [2] Distancing oneself from terrorism and extremist activity by acknowledging the shortcomings of their actions[;] [3] Distancing oneself from the group's ideology[;] [4] Breaking contact with individuals associated with the group or supporting its ideology[; and] [5] Accepting the punishment for crimes committed." Vidino Rep. at 21.

"Signs of a deeper level of disengagement include: [1] Providing intelligence and/or serving as a witness in court[;] [2] Meeting victims as part of reconciliation and restorative justice initiatives[; and] [3] Taking part in activities aimed at reducing recruitment and radicalization to extremist groups as well as taking part in activities aimed at encouraging disengagement for those currently involved (e.g., counter-radicalization efforts)." *Id.* at 22 (citation omitted).

Dr. Vidino testified that Ceasar exhibited two "red flags" signaling a danger that she would reengage with ISIL if released from prison: (1) maintenance of extremist views, and (2) engagement with people known by her to be ISIL supporters—in some instances the same people she engaged with during the charged conduct. *See* Sent. Hr'g Tr. 30:10–37:5.

Dr. Vidino's opinion was based on his review of Ceasar's communications with others, both recent and from her time on presentence release. *See id.* 30:19–37:5; Vidino Rep. at 27–28. He testified that the content of her communications suggests that she maintains extremist views. As recently as February 28, 2019, Dr. Vidino explained, Defendant engaged in a recorded telephone call while incarcerated, during which she denied responsibility for her actions and equated her material support for ISIL with the practice of her religious beliefs:

> JA. I know you didn't do anything. I know that you're innocent. I know you didn't understand a lot of things . . .
>
> . . . you were trying to survive, you weren't trying to do anything wrong.
>
> Defendant. Yeah. And I didn't understand . . . when I got arrested and he told me 'oh you gotta enter a plea and plead guilty' and I said why do I have to plead guilty, if I feel like I've not committed a crime, yes, I understood that United States don't like certain religious beliefs and don't allow you to exercise certain beliefs. I did understand that. That was something that was against the law. But I didn't know it was a crime. You know what I mean? I didn't know it was a cyber crime [interrupted] No. They said it was a cyber crime. I don't understand.

Gov't Sent. Mem. 22 (emphasis added); *see also* Vidino Rep. at 27. And just four days before that phone call, Ceasar sent from her Bureau of Prisons email account the following email: "im your friend i did not do anything wrong as a Muslim but a cyber crime in social media which is a violation in USA to support certain shari'ah islaamiya so al maghreb tul horriya." Gov't Ex. 3 (emphasis added); *see* Sent. Hr'g Tr. 35:23–37:5.

Ceasar's frequent explanation that she was prosecuted because of her religion, which is also present in Ceasar's messages while on presentence release, indicates that she retains the mindset of an ISIL supporter, Dr. Vidino explained. *See* Sent. Hr'g Tr. 33:6–35:22; Vidino Rep. at 27–28. The consequence of this behavior, he explained, is that Ceasar has the potential to reoffend. *See* Sent. Hr'g Tr. 33:1–5.

### 2. Dr. Kostas Katsavdakis

Also testifying was the government's expert on threat assessment—Dr. Kostas
Katsavdakis, a clinical and forensic psychologist. *Id.* 84:18–85:4. Whereas clinical
psychologists treat patients on a regular basis, forensic psychologists evaluate and assess
individuals for a forensic or legal purpose, generally upon request by a court or attorneys.
*Id.* 85:9–12. Dr. Katsavdakis was awarded a BA in psychology from Baruch College and a PhD
from California School of Professional Psychology. *Id.* 85:15–18. He is a board certified
forensic psychologist and teaches forensic psychology at John Jay College of Criminal Justice.
*Id.* 85:22–23, 86:22–87:2.

Dr. Katsavdakis conducted a threat assessment of Defendant. *Id.* 98:7–10. He met with
and interviewed her for about ten hours in five sessions in 2017, 2018, and 2019. Gov't Ex. 2
("Katsavdakis Rep."), at 1–2. He also reviewed her medical, educational, and other records.
Sent. Hr'g Tr. 100:7–8; *see generally* Katsavdakis Rep. Based on his professional judgment and
review of academic literature, he identified nine factors bearing on Defendant's conduct and her
likelihood of reoffending: (1) pathway warning behaviors, (2) fixation, (3) identification,
(4) leakage, (5) presence of mental illness, (6) reliance on virtual community, (7) failed
relationships, (8) thwarting of occupational/academic goals, and (9) presence of deception—
violation of supervisory conditions. Katsavdakis Rep. at 15. Dr. Katsavdakis testified in detail
about his evaluation of Ceasar vis-à-vis the factors:

> Q So, starting with the first factor of the nine factors, walk us
> through that. That's pathway warning behaviors.
>
> A Yes, it's called pathway warning behaviors, originally written
> about in the mid 1990s, and it's essentially the behaviors that the
> person is engaging in to indicate that they are accelerating or on the
> pathway to a potential attack.

The bottom of the pathway warning behavior generally starts with a grievance . . . ; it's followed by moving to violent ideation, which is the way to solve the grievance . . . through violence, either through oneself or affiliating with a group; from there, it goes to what we call pre-attack planning behaviors, and this could vary from contacting persons with extremist views, securing weaponry, securing travel documents; and it goes from research to more planning, probing, which can be . . . going to [a] facility to see if you could enter it or going to the airport; and then the attack is the end.

And you want to know where are they on the pathway . . . .

Q Where did the Defendant fall for you within that pathway?

A Planning and preparing.

Q What's that . . . based on?

A Her messages through different forums to different persons indicating that she was preparing to secure travel documents to go overseas to marry. Some of the messages that she posted on line regarding doing jihad or engaging in jihad or wanting to die as well.

. . .

Q Can you talk about what[, the next factor,] fixation is and how it relates to your assessment?

A Generally, fixation means . . . a pathological preoccupation with an idea -- doesn't have to be an extremist idea but any idea -- to such an extent that it interferes with functioning, can get the person into problems socially, occupationally, interpersonally, or with the law.

And that data was collected via some of the posts . . . , interest in ISIS material, connecting people. And, again, the posts from 2016 until the time she was arrested. And then subsequent to that, her interest in ISIS individuals when she was released on bail and under supervision.

Q As part of your examination of the Defendant this time around, this year, did she tell you whether she was or was not still interested in ISIS?

A I think what she said was she was not interested and there were several factors of why she got involved. Generally, it fell into one of four categories.

First category was that she was brainwashed.

Second category was that she was living a life that was quite hopeless and wanted to find an alternative lifestyle to kind of get away from everything she had been going through, some of her past.

Third was curiosity.

And the fourth major category was knowledge. In particular, of 2018 when she was released, indicating that she just wanted to [know] what people were doing in their other cases who had been arrested for terroristic-like behavior. So, it fell in one of those four categories.

Q Doctor, if she tells you in 2019 that she doesn't have any interest in ISIS anymore, why are you counting fixation as one of the factors in your analysis?

A Because one of the things in a threat assessment we're trained to do is to look at the consistency or inconsistency between what they say verbally and what they do behaviorally.

So, . . . someone can tell me or anybody that they're not interested in a particular subject or a particular person they're stalking, but if their behavior indicates otherwise then that generally indicates there's some interest at least in that area.

Q What, if anything, about the Defendant's behavior indicated contrary to what she was saying?

A Well, around June 2018, she was able to get a computer, I think from a friend at a mosque, and started browsing the internet for -- not all of it was ISIS-related material but some of it was ISIS-related. And that was also found on her phone . . . .

Q And doctor, the next factor, identification.

A Yes.

Q Can you explain why that is or how that is relevant to your analysis?

A Identification is an attempt to become a warrior or pseudocommando or someone with a military or could be a police-like background, and usually it's a sign that you're affiliating with or interested in a particular group or individual.

[Defendant] had a video she created in February 2016, espousing not only travel overseas for Islamic purposes but also jihad. That's one. She had also posted different kinds of emoticons with

weapons, guns, bombs. She had also reposted messages from ISIS leaders . . . . She had also referenced Omar Mateen, who . . . killed 49 people on June 12, 2016, in reference to some of the acts subsequent to that.

So, those are all examples of identification that we're looking for in a threat case.

Q What about[, the next factor,] "leakage," what is that?

A Leakage is conveying to a third party . . . your intent to engage in some kind of harmful act. It's not a direct threat to the target, not a direct threat to the individual, but, again, leaking it. Generally, nowadays, it's online . . .

But you are telling someone somewhere that you are thinking of doing these things, acting this way, engaging in violence, doing jihad, or hurting people or killing people.

Q In this case, what action or actions of the Defendant indicated leakage?

A That would be her online post or reposts and . . . the video that she made that I saw.

. . .

Q What about the presence of mental illness, was that a factor?

A It is. We do assess for the presence of mental illness; not per se a diagnosis.

One of the common misconceptions in threat assessment/risk assessment is the belief that if you have a mental illness it could be a buffer to a threat. As a threat assessment professional, we pay less attention to the diagnosis but more attention to the symptoms.

Based upon what [Defendant] told me, that she has been suffering from some kind of anxiety and depression probably on or around age eleven . . . with regard to her past reported victimization by various family members, marriages, failures at school, failures at work that she experienced up until the time she was arrested in November 2016.

Q Are you aware of any diagnosed mental illness?

A No. The diagnosis that was referenced in the available records from Temple University, on September 14, 2015 . . . is the suicidal

ideation diagnosis. At around that time, she was hospitalized in the emergency room for complications related to a miscarriage about three days earlier and reported victimization by one of the spouses. And at that time, she had reported suicidal ideation via overdose to the practitioner at the hospital, who then referred her case management. I don't think they followed up but I know they referred to case management. Again, that was around September 14 of 2015. There was no documentation of psychiatric distress or symptoms in the school records from 2004 all the way up until about 2014. Philadelphia. The primary diagnosis that [Ceasar] had was what we called a specific learning disability, and that diagnosis was for what we call expressive and receptive language problems. And she was under an IEP -- the name has changed over the last 40 years, but generally stands for individualized education plan. . . .

Q To be clear, doctor, you reviewed her IQ records?

A I did.

Q Was there anything abnormal about them?

A [Her] full scale IQ is 98. Her verbal and performance IQ are within 96 to 98, which fall in the average [range].

The two below average ranges for [Ceasar] are in what we call achievement testing, using the [Wechsler Individual Achievement Test] . . . [,] she has below average functioning on reading comprehension and mathematics computations; not significantly below average, but I believe below average.

That was the main testing that was done with [Defendant] while she was in school at the four, five schools she attended.

Q Doctor, the next factor on your list, reliance on virtual community, can you explain what that factor means and why it's relevant to your assessment?

A One of the things that we see with terrorist[] cases in particular is that the person isolates and begins to rely on a monitor in front of them or a computer screen, like a phone, and that becomes their primary method of interacting with the social wor[l]d, which was evident in my opinion with [Ceasar], especially from late 2015 until she was arrested in November 2016.

You can again further harden your beliefs or have further extremist beliefs by relying on just communicating with people online. Sometimes a person thinks they know who they're interacting with when, if fact, they really don't know who they're interacting with.

. . .

Q Failed relationship, I think, is the next factor. Can you [ex]plain to the Court and how it relates?

A In part, kind of a thwarting of relationships.

[Defendant] has had successive or sequential relationships that have been destructive and at times abusive with three separate men. . . . She was married at a very young [age], 18, and she was married again on or around 2014 to 2015. These are short-lived marriages with men typically 25 to 30 years older than [her].

Q Doctor, the next, which is the second to last [factor], the thwarting of occupational and academic goals, can you explain what that means and how it relates to your assessment?

A This goes, again, to trying to establish some kind of pattern for her to succeed professionally or otherwise.

She struggled academically. I would say she did okay up until the eleventh grade and when she moved to Philadelphia all things kind of fell apart. Her grade point [average] decreased and then she dropped out of school. Her last full grade was the eleventh grade. And then subsequent to that, she's held very few jobs for any sustained period of time.

. . .

Q Doctor, the last factor is presence of deception.

Can you explain what that means and why it's important to your assessment?

A Yes, you essentially want to see the cooperation or the level of involvement the person has in whatever probation or parole or supervisory conditions you have.

Subsequent to the time that she was released on bail, she was able to, within 50 days, at least get a computer from someone and then return to some of her online activities, including ISIS interests . . . . In addition, when she was asked [about] some of her behavior by the FBI, I think it was the beginning of January 2019, she had indicated that she was not engaged in some of this activity; later, she pled guilty to some of the same activity.

When I interviewed her, I asked her about some of the techniques or some of the methodologies she may have used in 2016, when she

was aware that the FBI was perhaps surveilling her. Part of what she said is that, in, part, motivated her to move sooner, to move quicker, which is not uncommon in these cases.

Often in a threat case, once the individual realizes that they're monitored by law enforcement or the workplace, they tend to actually increase the pathway to get to the end result faster. It's actually a factor that we look for a lot, what is the organization or the people around her doing to make the situation worse? We don't really look at that too much in regular violence assessment.

So, those are some examples of deception that are relevant.

Sent. Hr'g Tr. 113:19–124:21.

These factors demonstrate, Dr. Katsavdakis concluded, that Ceasar poses a moderate risk for violent/extremist beliefs, further radicalization, and possible acts. *Id.* 95:12–14, 124:22–125:2; *see also* Katsavdakis Rep. at 15.

### 3. Daisy Khan

Defendant's first expert to testify was Daisy Khan, an expert in counter-extremism and women in Islam. Sent. Hr'g Tr. 158:25–159:3. Khan is the founder and executive director of the Women's Islamic Initiative in Spirituality and Equality, a global network of Muslim women working on issues of peacebuilding, gender equality, and human dignity. Def. Ex. II. She is the editor of *WISE UP: Knowledge Ends Extremism*, a book representing "a community-led effort to address the issue of the rise of extremism, wherever it might be, but, also, to prevent the rise of Islamophobia in this country." Sent. Hr'g Tr. 162:16–19. The book has three sections; the first section discusses Islam in the United States, *see id.* 163:24–164:19; the second section provides information about the websites and periodicals of ISIL and how propaganda is used to manipulate individuals' views on various topics, *see id.* 164:20–165:6; the third section concerns prevention of recruitment, *see id.* 165:7–166:3. Khan's goal with respect to the book was to

"help . . . to revive and to rehabilitate and reform people that may fallen into this trap."

*Id.* 166:22–24.

Khan testified about Defendant's previous and current relationship with ISIL, as well as Khan's own potential role in Defendant's rehabilitation. She testified that Ceasar's attraction to ISIL was personal, not ideological. *Id.* 170:19–21. Ceasar was motivated, Khan says, by the social isolation and trauma in her life, as well as her desire for purpose in life:

> [Ceasar] said social isolation and the trauma in her life had isolated her from others. She felt abandoned, but also she was feeling socially isolated as a citizen in this country because somebody pulled her hijab. Then she said love, marriage and sex. She craved family. She wants to be loved. She has los[t] her mother and had an abusive childhood and she really wanted to be part of that. She also said that . . . the Muslim imam was dishonored. That Muslims are dishonored all over the world and she wanted to lift up Muslims. It gave her an important role to play to make Islam great again, like make America great again.
>
> So it's that kind of thinking. So I knew that a lot of her issues were deeply personal. The motivation was personal. It was not ideological. I didn't find any religious zeal in her. She doesn't know that much about her religion in my assessment of her religiosity. She craves it and wants to be accepted, but after seeing the push and pulls I came to the conclusion that her reasons for going [to ISIL territory] were primarily personal and she also mentioned that she would be assured a job the day she landed there because she was skilled and . . . she could provide for herself because she has been a solo provider for herself. She's . . . been working since she was very young girl and so this would also make her feel like she was independent. So that was the push and pull factor.

*Id.* 170:8–171:7. Khan believes that Ceasar is no longer committed to ISIL and that she is regretful of her conduct. *Id.* 171:8–24.

Khan went on to testify that Defendant would benefit from access to a supportive and understanding community, as well as from continued psychiatric treatment. *See id.* 172:3–173:16. She suggested piloting a rehabilitation program in which Defendant would be placed in a residential program, provided financial assistance, and given intensive mentoring and support

31

in a Muslim community. *Id.* 173:18–174:10. Khan volunteered to act as her mentor. *Id.* 173:7–9. The details of the suggested program were not specified and Khan has never designed or used such a program. *Id.* 184:18–21.

### 4. Dr. Marc Sageman

Dr. Marc Sageman testified as Defendant's expert on terrorism and forensic psychiatry. *Id.* 197:16–18. Dr. Sageman is a Senior Fellow at the Foreign Policy Research Institute's Center for the Study of Terrorism and a forensic psychiatrist. *See* Def. Ex. SS, at 1. His scholarship focuses on terrorism, the process of radicalization, and political violence. *Id.* Dr. Sageman previously served as the Special Adviser to the Deputy Chief of Staff of the Army and to the Deputy Chief of Staff of the International Security Assistance Forces (Intelligence) on the Insider Threat in Afghanistan, and he was a scholar-in-residence at the New York City Police Department. *Id.* He testified before the 9/11 Commission, and has consulted for United States government agencies, local law enforcement agencies, and more than 20 foreign governments. *Id.* Dr. Sageman is also the author of books and articles about terrorism. *Id.* He holds a PhD in sociology and an MD from New York University, and an AB from Harvard College. *Id.*

Dr. Sageman first opined on Dr. Katsavdakis's evaluation of Ceasar, specifically his use of various factors to evaluate Ceasar's threat risk. *See* Sent. Hr'g Tr. 197:20–205:18. Dr. Sageman contends that these factors were taken from a specific piece of unreliable academic literature, then inappropriately used and misapplied. *Id.* The court did not find Dr. Sageman's testimony on this topic persuasive, since Dr. Katsavdakis did not testify that he relied upon the article in question. *Id.*

Dr. Sageman then testified about Ceasar's past and current relationship with ISIL and her risk of recidivism. In addition to meeting with her, he reviewed materials relating to the instant offenses. *Id.* 196:16–17, 212:20–25.

Dr. Sageman testified that Defendant's connection with ISIL was "more of an emotional affiliation":

> A . . . [T]his kind of very strong bond of loyalty and identification with this community, this is why she was attracted to ISIS, because she felt she idealized this community, this caliphate, and so that it would be a fair and just community in the Middle East unlike all of the other tyrannies that exist [in the] Middle East. And she felt that this community, she was attracted to it because it was online a caring community that will take care of her because she was basically looking for some people to take care of her.
>
> Q And how did her personal history contribute to her desire for that community?
>
> A Well, she was very disappointed and alienated from people around her because they abused her, they exploited her, they . . . since she was . . . five or six, all the way to . . . the three husbands who abused her, and, so, she was looking -- so, she felt very alienated. And no Muslim was coming to her aid. No Muslim was coming to her help. So, she was very alienated, not only by the people who would not take care of her, but also the ambient community here in the United States. So, she basically looked up to this community as an ideal community for her and [was] willing to overlook a lot of the horror that goes along with this community. So that's how she became attracted to this idealized community, online community.

*Id.* 211:21–212:19.

He further explained that the language Defendant used in her communications while on presentence release was not indicative of a continued commitment to ISIL because of the passage of time and the patterns people assume in friendships. *Id.* 213:6–16. "There is no risk of violence" by Defendant, said Dr. Sageman, because there is no evidence that she has been or is violent. *Id.* 205:20–206:3. He noted that the risk of Defendant engaging in the conduct that led to her convictions was low because ISIL no longer controls any territory:

> One is connecting people to ISIS. And this is now very unlikely because there's no people to connect to ISIS; it's no longer around, as even Dr. Vidino mentioned, in terms of territory. And ISIS online

> is now very, very small and they don't really respond to people.
>
> . . .
>
> Second . . . , her body going to Iraq or Syria. Again, there's no
> territory to go to, so I see that as very, very unlikely.

*Id.* 206:10–25.

Dr. Sageman also testified about a recent study of recidivism among those convicted of terrorism offenses in the United States, which indicates that risk of recidivism among convicted terrorists is low. *See id.* 209:25–210:15. The study by Dr. Omi Hodwitz—Assistant Professor in the Department of Sociology and Anthropology at the University of Idaho and a Research Affiliate of the National Consortium for the Study of Terrorism and Responses to Terrorism at the University of Maryland—collected data for terrorist offenders and analyzed their postrelease criminal histories. Def. Ex. UU, at 56. Only 1.6% of terrorist offenders released between 2001 and 2018 recidivated, and none of the crimes which they committed postrelease were clearly politically motivated. *Id.* at 59–61.

The court's impression from Dr. Sageman's testimony is that he believes Defendant does not pose a risk of reoffending because of changed political circumstances, her own personal growth, and her lack of a history of violence.

### 5. Dr. Katherine Porterfield

Defendant's final expert to testify was psychiatric expert Dr. Katherine Porterfield. Her background is discussed *supra*, in Section II.B. During the sentencing hearing, she testified at length about Defendant's PTSD, as well as how her offenses directly relate to her clinical problems:

> A So my opinion is that Ms. [Ceasar's] clinical problems are very
> much the root of her very misguided and destructive and
> dysfunctional actions. She was a person who did not know how to
> handle her feelings of pain, shame and fear.

Those are pretty much the feelings she walks around with every day and especially in her younger sort of late adolescence. She did not have the tools with which to handle those feelings and, therefore, she managed them by . . . disassociating, not connecting to those feelings.

She did not have the tools to manage her self-loathing and self-attack. So she repetitively found herself in relationships with hurtful people who would again misuse her. These three men we've heard about, . . . these informal marriages, and then ultimately the people online who were exploiting her.

And she did not know how to handle what I call radar. You know, radar is like the thing you develop as a person when you get taken care of as a little kid. You get radar that says, oh, this person's bad news. They're going to hurt me. They're going to scare me. And then you get radar that says, hey, this person's kind, and gentle, and they're taking care of me. That's a good feeling.

When you get abused by your caregivers, especially sexual abuse at the level she had from her father, your radar, your ability to perceive who's dangerous, who's safe, becomes incredibly distorted.

Ms. [Ceasar's] perceptions of other people have been so severely harmed by this abuse and abandonment that she didn't have good radar. And we have worked on that an awful lot in two years, she and I, because it's one of the most critical things you need as a person. You better know who's safe and who's good, and you have to know who's harmful and dangerous.

Q And it doesn't really make sense to me. If she was abused, why is she seeking out a violent community?

A It's one of the most painful, difficult things about child abuse, especially what we call betrayal trauma.

So Ms. [Ceasar] had betrayal trauma. That is the overwhelming experiences coming at her of fear of hurt of her body, of sexual abuse; were coming from the person who's supposed to protect her. So now you have a double whammy. You have fear and overwhelmed feelings of sexual abuse, and it's coming at you from the person who's supposed to be your protector.

So what happens is that children, unfortunately, in those moments, often have to develop a defense mechanism. They have to make sense of what's happening to them. I must be worthless. I must have brought this on. I must be bad.

35

And children internalize that and then, tragically, if they have really severe abuse and nobody helps them and nobody takes care of them, they repeat it. And that repetition is really the core of what Ms. [Ceasar] has struggled with and continues to work on and really show more insight in, which is the repeated violence and hurt against herself over and over again.

She went towards danger instead of going towards health and protection and that's a very tragic thing, as we see sitting here today.

Sent. Hr'g Tr. 243:5–245:11.

Dr. Porterfield explained that Ceasar's behavior while on presentence release was typical

of the behavior survivors of trauma exhibit during recovery:

Q Based on your training and experience, do you have an opinion about what caused this behavior on bail?

A I do. I think that when you work with people who are troubled and especially very severely traumatized and abused, their trajectory is not a straight line. They, not unlike drug addiction, and not unlike domestic violence sufferers, meaning people who are abused and then return to abusive partners, the trajectory goes like this: It is a wavy line. There is relapse. There is mistake.

I believe that's what this was. I believe she was released without enough planning and without enough support, frankly. I wish I had been, myself, more available during that period. I feel badly about that.

And I think that she could not handle the stress at that point of being out, not having enough treatment, and not having enough of a community. And I think she went back into, you know, sort of dipping her toe in the water of some very familiar dysfunctional people. That's what I think happened.

I was just going to say, it was not a good thing legally, but frankly, clinically, it gave us a lot to work with, because I was quite shocked and I was really, really -- I was shocked and I was disappointed, and I was able to talk very intensely with Ms. [Ceasar] about these choices and about where her life is going.

And, you know, in clinical work, that's actually the kind of meat that really helps, is if you have some stuff to work with. And I'm

not glad it happened for all kinds of reasons, but we worked with it
and we continue to work with it.

*Id.* 248:1–249:4.

Despite the "wavy line" of Defendant's recovery from trauma, Dr. Porterfield does not

believe Defendant has a continuing commitment to ISIL:

> Q And do you have an opinion about her current level of
> commitment to ISIS based both on your conversations with her,
> your review of discovery, but also your experience working with
> extremists?
>
> A She does not have a commitment to ISIS. She is very saddened
> that she did that and embarrassed.
>
> I think she's struggling more now with her relationship to her faith
> and to Islam, which is why I think it is an incredible benefit to have
> someone like Ms. Khan, who is a spiritual guide in the field, a
> spiritual guide in Islam. But Ms. [Ceasar] does not yearn for this
> fantasied absurd thing that she back then thought was going to give
> her a new life. She does not.

*Id.* 253:2–14.

Dr. Porterfield testified that continuing incarceration would be more harmful to Ceasar

than it would be beneficial, given her PTSD:

> Q And shifting to her current state, do you have an opinion about
> how incarceration affects her complex PTSD?
>
> A I think that prison is not an easy place for anyone. It's not an easy
> place to be.
>
> I think that it has been harmful to her in that she hasn't had a
> community around her of healthy people. She's had other women
> who are under terrible stress and who also have terrible judgment
> issues, frankly. She has medical problems that do not get addressed,
> which leads her then into a very anxious state because she has so
> many medical problems.
>
> By the way, if you remember the ACE model I talked about . . . ,
> one of the biggest predictors is the higher ACE also the higher
> medical difficulties. And she has very serious medical difficulties
> for her age, I believe not unrelated to the traumatic stress she
> endured as a child.

> Prison is not a great environment for her. It has, I think, been a place where she has had to deal with her behaviors and face consequences, and I don't think that's actually a bad thing to face consequences when we make mistakes. But I think that prison itself is not helpful to her condition and it's not helpful to her mental health issues.
>
> She needs now trauma-focused treatment, which is not what I've done.

*Id.* 253:15–254:13 (emphasis added). Trauma-focused treatment, Dr. Porterfield testified, cannot be accomplished while Defendant is incarcerated because of her vulnerability. *See id.* 254:14–255:16. Trauma-focused treatment is intensive and would require Ceasar to discuss in detail her past experiences, including sexual and physical abuse, so that she and a professional could "integrate" those experiences into emotional management strategies. *Id.* 254:15–255:3. The emotional difficulty of doing this while emotionally isolated during incarceration, Dr. Porterfield explained, might lead to Ceasar's further deterioration and potentially suicide. *Id.* 255:4–16.

### B. Defendant's Testimony

Appearing calm and sincere, Ceasar spoke briefly on her own behalf. Defendant explained how she sought out ISIL as a way to improve her own situation and how incarceration has allowed her to learn how to discipline herself and avoid negative influences. *See id.* 339:1–18. She testified that she no longer supports or associates with terrorist organizations. *See id.* 339:19–24. Ceasar also spoke with insight about her improvements in judgment and mental health, both in the past and going forward:

> A year ago out on bail, I trusted my own judgment. The difference is now that I understand that I have terrible judgment and I can't trust what I think are good decisions. I now know the difference, which is that I know to seek proper help and advice only from the people like Dr. Porterfield, my attorneys and their team, and Daisy Khan.
>
> . . . What I want everyone to know is I was foolish and ignorant. I understand the actions I took were wrong, and I will never do it

again. I'm not . . . going to engage with any terrorists or radical groups.

What I want to focus on is getting my mental, my education, and my physical health, and to become a productive citizen. I know I can be. What I have mentally accomplished about my mental health with Dr. Porterfield, she has taught me boundaries, self-esteem, and cleansing myself away from trauma. Also, Ms. Daisy Khan helped me understand the confusion I had in my beliefs. I am more aware of my emotions and communicate better with my peers.

*Id.* 341:4–22.

### C. Letter of Defendant's Half-Brother

In lieu of speaking during the sentencing hearing, Defendant's half-brother submitted to

the court a letter describing his support of her and his commitment to assisting in her

rehabilitation:

> Dear Judge Weinstein,
>
> I am writing on behalf of my sister, Sinmyah Amera Ceasar. I know that my sister has made many mistakes and has plead guilty to supporting ISIS.
>
> I am writing you today, with a heavy heart, and of my own free will, to share my support for my sister. As you know, she has faced a lifetime of hardship, abuse, neglect, and pain. I believe this contributed to her crimes and caused her to be involved with those whom she was involved with.
>
> My sister and I fell out of touch when she went to live with her mother. I didn't reconnect with her until college via telephone and found out she was in foster care. She's been in and out of the system ever since. Her mother dying was heartbreaking as well, as her mother was my stepmother for some time.
>
> I didn't have the means to take Sinmyah in then and I don't now. She doesn't have support from her aunts, uncles, or cousins the way she does from me. I care about her and I keep in touch with her.
>
> I believe with proper care, support, and rehabilitation, my sister can live life as a healthy American citizen, and I'm aware that this will be no easy feat.

Again, she and I re-connected once she was in prison after many years apart. I came to visit her in person, and was heartbroken by all that she'd went through. She and I talked each week afterwards by phone for the past couple of years, and she's spoken to me of the harsh realities of prison and her hopes for the future. My sister has always been driven and optimistic.

I don't know what the outcome of these hearings will be, but I will support my sister as best I can and love her.

Thank you for your time and consideration,

Brother of Sinmyah Amera Ceasar

Def. Ex. XX.

## IV. Offense Level, Criminal History Category, and Sentencing Guidelines Range

The base offense level for Defendant's conspiracy to provide material support offense is 26. U.S.S.G. §§ 2X1.1(a), 2M5.3(a). Two levels are added because the crime "involved the provision of . . . funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." *Id.* § 2M5.3(b)(1)(E). Another twelve levels are added because the offense is a felony involving terrorism. *Id.* § 3A1.4(a). The adjusted offense level is 40.

The base offense level for Defendant's obstruction of an official proceeding offense is 14. *Id.* § 2J1.2(a). Eight levels are added: Three because Ceasar's false statements and concealment of evidence substantially interfered with the administration of justice, *id.* § 2J1.2(b)(2); two because the offense involved the destruction of a substantial number of records, documents, or tangible objects, *id.* § 2J1.2(b)(3)(A); and three more because Ceasar committed the offense while on bail release for the conspiracy to provide material support offense, *id.* § 3C1.3. Three levels are deducted for acceptance of responsibility. *Id.* §§ 3E1.1(a), (b). The adjusted offense level is 19.

Adjusting for the multiple counts, the total offense level is 40. *Id.* § 3D1.4(c).

Although she has no prior criminal record, because the instant case is a felony involving "the federal crime of terrorism," Defendant's criminal history category is automatically category VI. *Id.* § 3A1.4(b).

The guideline imprisonment range for a total offense level of 40 and a criminal history category of VI is 360 months to life. Because of the statutory maximum terms of imprisonment, the restricted guideline term of imprisonment is 360 months to 480 months. Since Ceasar committed the obstruction offense while on bail release for the conspiracy to provide material support offense, a term of imprisonment of not more than 120 months must also be imposed consecutive to any term of incarceration for the obstruction of an official proceeding offense. 18 U.S.C. § 3147.

A lifetime of supervised release may be imposed for the conspiracy to provide material support offense. *Id.* § 3583(j). Up to three years of supervised release may be imposed for the obstruction of an official proceeding offense if a term of imprisonment is imposed. *Id.* §§ 3583(a), (b)(2).

**V. Law**

The United States Sentencing Guidelines ("Guidelines") are advisory and allow the court to exercise its discretion in sentencing. *United States v. Booker*, 543 U.S. 220, 245–46 (2005). "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The district court may depart from the Guidelines range when it "consider[s] all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49–50 (2007).

The court must impose a sentence sufficient, but not greater than necessary, after considering the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--
>
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
>
> (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>
> (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
>
> (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
>
> (5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## VI. 18 U.S.C. § 3553(a) Considerations

The court carefully considered the above factors in fashioning Defendant's sentence.

### A. Rehabilitation, Punishment, and Deterrence

Defendant is a 24-year-old United States citizen. Her traumatic childhood has already been described in detail. *See* Section II.A. Raised by an ill, single mother, Ceasar was sexually abused by her father and placed in foster care after her mother became too ill to care for her. She dropped out of high school and lived with friends and romantic partners, and in homeless shelters, after signing herself out of foster care. Employment of Ceasar was temporary. A series of marriages with older men ended after physical and emotional abuse. Defendant lacks stable relationships with friends and family, with the exception of her half-brother. She also suffers from serious health conditions, including complex PTSD. *See* Section II.B.

Defendant's testimony was supported by her experts: She sought ISIL as a way to deal with her harsh circumstances and because of clinical issues affecting her judgment. *See* Section III.A.3 (describing Khan's testimony); Section III.A.4 (describing Dr. Sageman's testimony); Section III.A.5 (describing Dr. Porterfield's testimony); Section III.B (describing Defendant's

43

testimony); *see also* Richard L. Abel, *Law's Trials: The Performance of Legal Institutions in the US "War on Terror"* 72 (2018) (describing how many terrorism defendants, "[s]eeking a sense of meaning through identification with a larger group and cause, . . . were easily manipulated").

Whatever her motivations, there is no question that Defendant's criminal offenses were serious. Dr. Vidino's testimony helpfully placed Defendant's conduct—connecting individuals in the United States with ISIL-affiliated individuals—in context. *See* Section III.A.1. Defendant was not simply an individual who posted propaganda; she intentionally and knowingly connected individuals in the United States with those abroad who would do the United States harm. An objective observer can only conclude that Ceasar's deletion of her communications with others while on presentence release impeded the government's ability to investigate the extent of her bail violations.

The sentence must reflect the importance of specific deterrence, as well as general deterrence, to protect the public. The experts disagreed about the risk of reoffending posed by Defendant, but seemed to agree that deradicalization of Defendant (whether or not that has already occurred in whole or part) would reduce the likelihood of reoffending. In this instance, rehabilitation and specific deterrence of Defendant seem to go hand in hand.

The ideal sentence, in the court's estimation following the hearing, would be Defendant's placement in a deradicalization or disengagement program with provision for intensive educational, emotional, and economic support to address her childhood trauma and its attendant results. This treatment might begin while Defendant is incarcerated, or while she was supervised under strict conditions by the Probation Department. As disclosed during the hearing, no such satisfactory general program exists in the United States.

For many years, countries in Western Europe and the Middle East have incorporated

deradicalization and disengagement programs into their regular practice when confronted with

individuals assessed as having been radicalized or individuals that have been charged or

convicted of a terrorism-related crime. *See, e.g.*, United Nations Office on Drugs and Crime,

*Handbook on the Management of Violent Extremist Prisoners and the Prevention of*

*Radicalization to Violence in Prisons* 122–23 (2016) ("The [Danish] Back on Track . . .

programme was designed to help prisoners who have been charged or convicted of terrorism-

related offences, or who have been assessed as vulnerable to radicalization."); Kelly A. Berkell,

*Off-Ramp Opportunities in Material Support Cases*, 8 Harv. J. Nat'l Security 1, 28–32 (2017)

(describing the deradicalization program used by Saudi Arabia).

Such intensive programs may be integrated into terms of incarceration. *See, e.g.*,

Liesbeth van der Heide & Bart Schuurman, *Reintegrating Terrorists in the Netherlands:*

*Evaluating the Dutch Approach*, 17 J. Deradicalization 196, 204–07 (2018) (describing the

Dutch Terrorism, Extremism and Radicalization team, which was designed to "a) improve efforts

made to reintegrate terrorist prisoners while still in detention, b) provide better aftercare upon

their release, and c) create a central and coordinated approach for dealing with this offender class

in the future"). The efficacy of such programs is under study; their existence is evidence of a

commitment to dealing with the problem of radicalization by focusing on rehabilitation.

The United States lacks adequate rehabilitation programs. The absence is of particular

concern because the kind of incarceration presently utilized in federal prisons can make

radicalization more likely to persist. *See* United Nations Office on Drugs and Crime, *supra* at

109 ("prison radicalization to violence is an issue of considerable importance and recruitment

attempts, successful or otherwise, do occur"). Apparently only the United States District Court

for the District of Minnesota has made an effort to incorporate deradicalization programming into terrorism-related sentences, and this appears to have been limited to one criminal prosecution. Berkell, *supra* at 45–51.

The federal Bureau of Prisons would be well-served by incorporating a formal deradicalization and disengagement program into its offerings. This program might build on those programs in effect abroad and with demonstrated records of success. Such a program should also account for differences on the basis of sex and gender. *See generally* Sofia Patel & Jacqueline Westermann, *Women and Islamic-State Terrorism: An Assessment of How Gender Perspectives Are Integrated in Countering Violent Extremism Policy and Practices*, 14 Security Challenges 53, 56 (2018) ("Gender perspectives are rarely holistically integrated into definitions and processes of radicalisation. This has resulted in incomplete understanding of female pathways into and out of violent extremism, as well as the ways in which women develop resilience to resist radicalisation . . . ."); Nur Irfani Binte Saripi, *Female Members of ISIS: A Greater Need for Rehabilitation*, 7 Counter Terrorist Trends & Analysis 26 (2015) (describing women's roles in ISIL and noting the importance of tailoring rehabilitation to address their specific experiences with ISIL).

With no adequate program of rehabilitation available to Defendant, the court seriously considered whether a further term of incarceration was appropriate. The seriousness of the offenses ultimately compelled the conclusion that some incarceration as punishment and for control was necessary.

## B. Potential Harm of Long Incarceration

The manner in which Defendant's physical and emotional health will be impacted by a lengthy term of incarceration was seriously considered by the court. *See United States v. Rosado*, 254 F. Supp. 2d 316, 321 (S.D.N.Y. 2003) ("Since rehabilitation may not be a basis for incarceration but must be considered as a basis for sentencing, Congress must have anticipated that sentencing judges would use their authority, in appropriate cases, to reduce a defendant's sentence to permit him to continue his rehabilitation in the most effective manner." (citing *United States v. Maier*, 975 F.2d 944, 947 (2d Cir. 1992)).

Both Defendant and her experts testified that further incarceration would run the risk of being detrimental to Defendant's physical and psychiatric conditions. *See, e.g.*, Section III.A.5 (describing Dr. Porterfield's testimony); Section III.B (describing Defendant's testimony). Ceasar's brief presentence release was because of her physical conditions, which have not yet been fully addressed in prison. And Ceasar cannot benefit from the trauma-focused treatment that she requires while she is incarcerated.

The court's conclusion is that a lengthy term of incarceration during which her medical needs are not fully met would be extremely harmful to Ceasar's development as a productive member of society.

Continued separation of Defendant from a supportive, non-incarcerated community will also be detrimental to the goal of rehabilitation.

Ceasar's connection to a supportive community in view of her crimes is essential. The expert testimony, as well as academic literature, is clear that an individual in Defendant's position must have stable and supportive relationships for rehabilitation. *See* Daniel Koehler, *Family Counselling, De-radicalization and Counter-Terrorism: The Danish and German programs in context*, *in* Countering Violent Extremism: Developing an Evidence-base for Policy

and Practice 129, 129 (Sara Zeiger & Anne Aly eds., 2015) ("social bonds and relationships are considered to be essential for desistance focussed probation and reintegration work . . . , effective treatment of PTSD . . . , as well as the success of terrorist de-radicalization programs . . . " (internal citations omitted)); United Nations Office on Drugs and Crime, *supra* at 72 ("Relationships are one of the primary vehicles for disengagement from violent extremism and, further, appear to be what most optimally enables subsequent engagement of a former violent extremist elsewhere in society."). And, in light of Defendant's testimony that she sought ISIL in part to find a supportive community, her rehabilitation will be aided by her connections to her half-brother and experts such as Daisy Khan.

These considerations compel the conclusion that any term of incarceration should be tailored to minimize the amount of time Defendant would go without effective medical and social supports.

### C. First Amendment Issues

Not raised by either Defendant or the government was whether the First Amendment to the United States Constitution protected any of Defendant's speech or her speaking activities in support of ISIL. The court, in assessing Defendant's behavior, did consider the free speech issue, namely the extent to which Defendant's behavior amounted only to engaging in protected, unpopular speech.

This country's consideration of constitutional protection of unpopular speech goes back to its founding. The Sedition Act of 1798 criminalized "false" speech critical of the government subject to the defense of truth. *See* Sedition Act of 1798, 1 Stat. 596. Condemned by some at the time as unconstitutional, "the attack upon its validity has carried the day in the court of history." *New York Times Co. v. Sullivan*, 376 U.S. 254, 273–76 (1964). "The general proposition that freedom of expression upon public questions is secured by the First Amendment

has long been settled by [Supreme Court] decisions." *Id.* at 269; *see also Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., dissenting) ("Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, selfreliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom. Such, in my opinion, is the command of the Constitution.").

Upon consideration of the underlying constitutional free speech issue, the court concluded that Defendant acted physically to help ISIL. She had adequate actus reus and mens rea under constitutional criminal law. She did not act by speech alone, merely praising that terrorist organization. Rather, her activity went far beyond speech in physically supporting the cause of ISIL.

## VII. Sentence

Defendant is sentenced to 48 months total incarceration. This compares to the 360 to 600 months' imprisonment requested by the government.

Ceasar is given 46 months in prison for the material support offense, and one month in prison for the obstruction offense, with an additional one month to be served pursuant to 18 U.S.C. § 3147; the terms of incarceration are to be served consecutively. The court recommends that Defendant be incarcerated at a prison medical facility such as that in Danbury,

Connecticut, where she can be treated by appropriate programming and where she can be visited by her half-brother.

Ceasar is sentenced to eight years of supervised release on the material support offense and three years of supervised release on the obstruction offense, to run concurrently. Supervision will be subject to the following special conditions, among others, intended to aid her disengagement and deradicalization, as well as her general rehabilitation:

1.    Defendant shall participate in an educational or vocational training program as approved by the court's Probation Department.

2.    Defendant shall participate in a mental health treatment program approved by the Probation Department. She shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree she is reasonably able to do so, and shall cooperate in securing any applicable third-party payment. She shall disclose all relevant financial information and documents to the Probation Department to assess her ability to pay.

3.    Defendant shall not associate in person, through mail, electronic mail, the Internet, social media, telephone, or any other means with any individual known by her to be affiliated with any terrorism-related groups, organized crime groups, gangs or any other criminal enterprise; nor shall she frequent any establishment, or other locale where these groups may meet, pursuant, but not limited to, a prohibition list provided by the Probation Department.

4.    Defendant shall participate in polygraph examinations required by Probation to obtain information necessary for risk management and correctional treatment.

5.    Defendant shall cooperate with the Probation Department's Computer and Internet Monitoring program. Cooperation shall include, but not be limited to, identifying computer systems, Internet capable devices, and/or similar electronic devices she has access to,

and allowing the installation of monitoring software/hardware on said devices, at her expense to the extent she can reasonably pay. Defendant may be limited to possessing only one personal Internet capable device, to facilitate the Probation Department's ability to effectively monitor her Internet related activities.

6. Defendant shall permit random examinations of said computer systems, Internet capable devices, and similar electronic devices, and related computer peripherals, such as CD's, under her control.

7. Defendant shall report to the Probation Department any and all electronic communications service accounts (as defined in 18 U.S.C. § 2510(15)) used for communications, dissemination and/or storage of digital media files (i.e., audio, video, images). This includes, but is not limited to, email accounts, social media accounts, and cloud storage accounts.

8. Defendant shall provide the Probation Department with account identifiers and passwords for each account, and shall report the creation of new accounts, changes in identifiers and/or passwords, transfer, suspension and/or deletion of any account within five days of such action. Failure to provide accurate account information may be grounds for revocation of release.

9. Defendant shall permit the Probation Department to access and search any account using her credentials when reasonable suspicion exists that she has violated a condition of supervision and that the account to be searched contains evidence of this violation. Failure to submit to such a search may be grounds for revocation of release.

10. Defendant agrees that the Probation Department may, in its discretion, share information obtained during its monitoring of her phone, electronic, Internet capable, and/or computer systems, communications accounts, and devices with the FBI in order for the FBI to

assist the Probation Department in evaluating such information as part of assessing Defendant's compliance with the terms of her supervision.

11.    Defendant agrees to monitoring by the Probation Department by location monitoring and/or global positioning systems ("GPS") for a period of six months. Such monitoring may include home detention and/or a curfew. Defendant agrees to abide by all technology requirements and all location monitoring and/or GPS policies and procedures. Defendant must pay the costs of monitoring to the degree she is reasonably able. Defendant must disclose all financial information and documents to the Probation Department to assess her ability to pay.

12.    Defendant shall submit her person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a female United States Probation officer. Failure to submit to a search may be grounds for revocation of release. Defendant shall warn any other occupants of her home that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that Defendant has violated a condition of her supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

Probation shall issue monthly reports to the court on the progress of Defendant so that the judge in charge of the case can consider shortening or lightening post-incarceration monitoring. Any supervision problems shall be promptly reported to the court. Both Probation and Defendant may move by letter for court intervention, limiting or expanding supervision.

A special assessment of $200, $100 on each count, is imposed.

No fine is imposed because it is unlikely that Defendant will be able to pay a fine. A forfeiture order has been entered separately.

## VIII. Conclusion

All relevant issues have been considered, with special attention given to the Guidelines, to ensure the appropriate sentence. The sentence imposed is sufficient, but not greater than necessary.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated:  July 31, 2019
         Brooklyn, New York