# MANDATE

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 18th day of August, two thousand twenty-one.

Before:     Robert D. Sack,
            Richard J. Sullivan,
            Steven J. Menashi,
                    *Circuit Judges.*

---

United States of America,

        Plaintiff - Appellant,

v.

Sinmyah Amera Ceasar,

        Defendant - Appellee.

---

**JUDGMENT**

Docket Nos. 19-2881(L),
19-2892(CON)

The appeals in the above captioned case from an amended judgment of the United States District Court for the Eastern District of New York were argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED and the case is REMANDED for resentencing consistent with 18 U.S.C. § 3553(a) and this Court's opinion.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 11/16/2021

19-2881(L)
*United States of America v. Sinmyah Amera Ceasar*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2020

(Argued: October 19, 2020      Decided: August 18, 2021)

Docket Nos. 19-2881(L); 19-2892(con)

―――――――――――――――――――

UNITED STATES OF AMERICA,
*Appellant*,

v.

SINMYAH AMERA CEASAR,
*Defendant-Appellee.*

―――――――――――――――――――

Before:        SACK, SULLIVAN, AND MENASHI, *Circuit Judges*.

The government appeals the 48-month sentence imposed in an amended

judgment, entered by the United States District Court for the Eastern District of

New York (Jack B. Weinstein, *J.*), on defendant-appellee Sinmyah Amera Ceasar.

Ceasar pleaded guilty to one count of conspiracy to provide material support to a

foreign terrorist organization—the Islamic State of Iraq and Syria ("ISIS") (also

referred to as the Islamic Sate of Iraq and the Levant or "ISIL")—in violation of 18

U.S.C. § 2339B(a).  While on presentence release, Ceasar violated the conditions

of her release by resuming contact with known supporters of ISIS and other

extremist groups, attempting to conceal these communications from law

enforcement authorities, and then lying to the FBI about her conduct.  Ceasar

was also charged with obstruction of justice, to which she pleaded guilty.  Ceasar

faced a total Sentencing Guidelines range of 360 to 600 months' imprisonment;

the district court imposed a far-below-Guidelines sentence of 48 months.  The

government appeals, arguing that Ceasar's sentence was substantively

unreasonable.  For the reasons set forth below, we agree.  Accordingly, we

VACATE the judgment of the district court and REMAND for resentencing.

> IAN C. RICHARDSON, Assistant United States
> Attorney (David C. James and Joshua G.
> Hafetz, *on the brief*), *for* Jacquelyn M.
> Kasulis, Acting United States Attorney for
> the Eastern District of New York;
>
> COLLEEN P. CASSIDY, Federal Defenders of
> New York, Inc., *for Defendant-Appellee.*

SACK, *Circuit Judge*:

It is undisputed that beginning in or around January 2016, the defendant-

appellee, Sinmyah Amera Ceasar, conspired to provide material support to the

2

Islamic State of Iraq and Syria ("ISIS"),[1] in violation of 18 U.S.C. § 2339B(a) (the "Material Support Offense").  Using social media and the encrypted messaging application Telegram, Ceasar expressed her support for ISIS, encouraged others to join ISIS abroad, and helped individuals in the United States contact ISIS members overseas.  The overseas ISIS members then facilitated U.S.-based ISIS supporters' travel to ISIS-controlled territory.  Ceasar herself intended to travel to ISIS territory by way of Sweden, where she planned to marry another ISIS supporter.  In November 2016, Ceasar was arrested at New York's John F. Kennedy International Airport on her way to Sweden via Turkey.  Following her arrest, Ceasar entered into a cooperation agreement with the government in which she pleaded guilty to one count of conspiracy to provide material support to a foreign terrorist organization.  In April 2018, the United States District Court for the Eastern District of New York granted her presentence release.

While on presentence release, Ceasar reoffended.  Despite the fact that the conditions of her release explicitly prohibited her from contacting individuals or organizations affiliated with foreign terrorist groups, Ceasar obtained a laptop

---

[1] *See United States v. Doe*, 323 F. Supp. 3d 368, 370 (E.D.N.Y. 2018) (Weinstein, J.).  ISIS is also known as the "Islamic State of Iraq and al-Sham," and the "Islamic State of Iraq and the Levant" ("ISIL").  *See United States v. Mumuni*, 946 F.3d 97, 101 n.4 (2d Cir. 2019).  In this opinion, we use the acronyms "ISIS" and "ISIL" interchangeably.  *See id.*

computer, recreated pseudonymous social media accounts, and resumed

contacting or attempting to contact several individuals known to be supporters

of ISIS or other extremist groups.  The FBI, investigating Ceasar's conduct, found

that she had intentionally deleted incriminating communications and had

instructed others with whom she had been in contact to do the same.  The bond

underlying her presentence release was revoked, and she was remanded

pending sentencing.  When the FBI interviewed Ceasar about her conduct while

on presentence release, she made a significant number of false and misleading

statements.

In connection with her conduct while on presentence release, Ceasar

pleaded guilty to an additional charge of obstruction of justice, in violation of 18

U.S.C. § 1512(c)(1) (the "Obstruction Offense").

Mental health professionals who met with and treated Ceasar characterize

her conduct as a misguided search for community stemming from a lifetime of

sexual, physical, and emotional abuse and neglect.  Beginning in her childhood,

Ceasar's father sexually abused her.  At age 13, she entered the foster care system

and was abused or neglected in each home in which she was placed.  While

Ceasar has never been legally married, she entered into three successive so-called

"religious marriages" with older men, beginning when she was 16.  In each of those marriages, her husband physically or emotionally abused her.  Ceasar was diagnosed with complex post-traumatic stress disorder as a result of the abuse and trauma she endured.

Ceasar faced a Sentencing Guidelines range of 360 to 600 months' imprisonment.  Prior to sentencing, the district court ordered the government and Ceasar to provide expert witness testimony or other materials to assist in its sentencing determination.  The district court held a multiday sentencing hearing at which two government and three defense experts testified as to Ceasar's involvement with and support of ISIS and whether she would be likely to reoffend.

The district court concluded that the advisory Guidelines range was "excessively harsh" and varied downward from it dramatically.  The court found that Ceasar was motivated by the abuse and trauma she suffered most of her life, and that she needed educational and mental health support in lieu of a long prison sentence.  On June 26, 2019, despite the Guidelines minimum of 360 months, the court imposed a 46-month sentence on Ceasar for the Material Support Offense, one month for the Obstruction Offense, and one month for

committing an offense while on presentence release, pursuant to 18 U.S.C. § 3147, all to run consecutively for a total term of 48 months' imprisonment.  Because she had been in custody from the time of her arrest in November 2016 until she was granted presentence release in April 2018, and was then remanded to custody on July 19, 2018 (following her violation of the conditions of her presentence release), Ceasar served only 13 additional months from the time of sentencing (June 26, 2019) until she was released from prison on July 28, 2020.

The government appealed on substantive reasonableness grounds, arguing that the district court abused its discretion by considering Ceasar's need for rehabilitation to the exclusion of other sentencing factors, and that this mitigating sentencing factor could not bear the weight assigned to it.  The government further argues that Ceasar's sentence was shockingly low compared with other sentences imposed for similar crimes.

We are not without sympathy for Ceasar, but we are constrained to agree with the government.  We conclude that the district court placed more emphasis on Ceasar's need for rehabilitation than that sentencing factor could bear, and failed adequately to weigh section 3553(a) factors that balance the needs and circumstances of an individual defendant against, among other things, the goals

of protecting the public, deterring criminal behavior, and engendering respect for the law.  We further conclude that in comparison with sentences for similar terrorism crimes, Ceasar's sentence of 48 months' imprisonment was shockingly low and unsupportable as a matter of law.  We therefore vacate the judgment of the district court and remand for resentencing.

## BACKGROUND

### I.    The Offense Conduct

Beginning in or around January 2016 and through November 2016, defendant-appellee Sinmyah Amera Ceasar conspired to provide material support to the Islamic State ("ISIS" or "ISIL")[2] in violation of 18 U.S.C. § 2339B(a).  *United States v. Ceasar*, 388 F. Supp. 3d 194, 200 (E.D.N.Y. 2019).  She acted as an ISIS "assistant" by using Telegram, an encrypted messaging application, to put individuals in the United States who were interested in joining ISIS in contact

---

[2] Since 2004, the United States Department of State has designated ISIS as a foreign terrorist organization.  Bureau of Counterterrorism, *Foreign Terrorist Organizations*, U.S. DEP'T OF STATE, https://www.state.gov/foreign-terrorist-organizations/.  As we have previously observed, ISIS is "an organization that has called on members to commit attacks in retaliation for the actions of the United States in Syria and Iraq."  *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 901 F.3d 125, 131 n.7 (2d Cir. 2018) (internal quotation marks omitted); *United States v. Khusanov*, 731 F. App'x 19, 23 (2d Cir. 2018) (summary order) (ISIS, to which the defendant was accused of giving material support, is "committed to surprise, as well as planned, attacks on United States persons inside, as well as outside, this country . . . .").

with ISIS members overseas.  Those ISIS members would then assist U.S.-based

ISIS supporters in traveling to ISIS-controlled territory.  During her plea

allocution, Ceasar stated that she "believed that if these individuals made it to

[ISIS-controlled territory], they would join the group and work under its

directions and control."  Gov't App'x at 19.

Ceasar also used social media to demonstrate her support for ISIS and to

encourage others to join ISIS abroad.  As the district court found, Ceasar

> used multiple social media accounts to upload images and videos
> showing support for ISIL and encouraging people to migrate to ISIL-
> controlled territory, to post quotes and audio recordings of ISIL
> leaders, and to express her support for acts of violence by ISIL or
> inspired by ISIL. . . .  Ceasar attempted to assist at least four people
> join ISIL abroad . . . .

*Ceasar*, 388 F. Supp. 3d at 200-01.

Ceasar herself intended to travel to ISIS-controlled territory by way of

Sweden, where she planned to meet and marry another ISIS supporter.  *Id.* at

202-03.  On November 15, 2016, Ceasar was arrested at New York's John F.

Kennedy International Airport on her way to Sweden via Turkey.

Following her arrest, Ceasar waived her *Miranda* rights and admitted that

she had decided to support ISIS after watching online videos of ISIS members

carrying out beheadings.  She further admitted to putting individuals in the

United States in contact with ISIS members abroad who would assist those U.S.-based individuals in traveling to ISIS-controlled territory.

On February 10, 2017, pursuant to a cooperation agreement, Ceasar pleaded guilty to one count of conspiracy to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a).  The government describes her cooperation as initially "promising[,] and [it] resulted in the collection of some evidence valuable to several national security investigations."  Gov't Br. at 12.  Her cooperation, however, was short-lived.

In April 2018, Ceasar applied for and was granted presentence release on a $50,000 bond with several conditions, including submission to electronic monitoring and a prohibition from contacting individuals or organizations affiliated with foreign terrorist groups.  She was permitted to use a phone or computer for limited purposes only, such as contacting her counsel and conducting educational or vocational research.  *Ceasar*, 388 F. Supp. 3d at 203.

Ceasar soon began to violate these conditions.  She obtained a laptop computer and recreated pseudonymous social media accounts for use in contacting or attempting to contact at least seven people whom she had previously identified to the FBI as ISIS supporters or supporters of other

extremist groups. *Id.* On June 29, 2018, approximately one month after her release, Ceasar submitted the laptop to United States Pretrial Services to have monitoring software installed. *Id.* Inspection of the computer revealed Ceasar's use of these social media accounts to search for and contact individuals known to be supporters of terrorist organizations. *Id.* at 203-04.

FBI agents began to investigate Ceasar's conduct. They discovered that she had intentionally deleted incriminating communications and had instructed others with whom she had been in contact to do the same. She deleted at least 1,000 Facebook messages, approximately 1,000 text messages, and a collection of emails, audio files, and images from her cell phone. *Id.* at 204.

On July 19, 2018, the district court revoked Ceasar's bond and remanded her to custody pending sentencing. In the course of its investigation of Ceasar's presentence release conduct, the FBI interviewed her on January 2, 2019. *Id.* at 204-05. During the interview, Ceasar made many false and misleading statements about, among other things, her creation and use of pseudonymous Facebook and email accounts, her familiarity and interaction with an ISIS-related Facebook page and computer application, and her communications with ISIS supporters. *Id.*

For her conduct while on presentence release, Ceasar waived indictment and was charged by information with the Obstruction Offense.  Gov't App'x at 22.  The information alleged that from June to July 2018, Ceasar "did knowingly, intentionally and corruptly alter, destroy, mutilate and conceal one or more records, documents and other objects, to wit: Facebook messages and text messages, with the intent to impair the objects' integrity and availability for use in one or more official proceedings . . . ."  *Id.*  On March 7, 2019, pursuant to a plea agreement, Ceasar pleaded guilty to the Obstruction Offense.

## II.    Ceasar's Background

It is undisputed that Ceasar has led an extremely difficult life.  Her parents divorced when Ceasar was very young.  Her father began sexually abusing her when she was four years old; the abuse continued until she was 11.  Her mother was ill, suffering from diabetes and kidney failure, eventually going blind as a result of her diabetes.  During Ceasar's childhood, she acted as her mother's primary caregiver.  *Ceasar*, 388 F. Supp. 3d at 196.  When Ceasar was 13 years old, her mother was admitted to a nursing home where she remained until her death from a heart attack at age 49, when Ceasar was 22 years old.

At the time her mother went to live in a nursing home, Ceasar was placed in the foster care system.  She lived in three foster homes over four years and was abused or neglected in each.  She dropped out of high school and signed herself out of foster care at age 17.  *Id.* at 220.

While Ceasar has never been legally married, she entered into three successive "religious marriages" with older men, each of whom physically or emotionally abused her.  *Id.* at 197.  The marriages were arranged by a religious leader at Ceasar's mosque.  She entered the first such marriage at age 16 and was married twice more before the age of 20.  The third marriage ended in 2014 after a miscarriage that resulted in Ceasar's hospitalization for suicidal depression; she had begun experiencing suicidal ideation at age 11.  As a result of the abuse she endured throughout her life, she suffers from complex post-traumatic stress disorder ("PTSD").  *Id.*

### III.    The Sentencing Proceedings—Expert Testimony

Prior to sentencing, the district court ordered both the government and Ceasar "to provide expert witnesses or materials that might permit the court to make a more effective sentencing determination to protect the public and encourage the defendant's rehabilitation."  Gov't App'x at 21.  The district court

then held a three-day hearing at which two government and three defense experts testified as to Ceasar's involvement with and support of ISIS, and whether she would be likely to reoffend.  In its opinion explaining Ceasar's sentence, the district court recounted the experts' testimony in detail.  *Ceasar*, 388 F. Supp. 3d at 205-17.  Their testimony as relevant to this appeal was as follows.

1. *The Government's Experts*

    A.  Dr. Lorenzo Vidino

The government's first expert witness was Dr. Lorenzo Vidino, Director of the Program on Extremism at George Washington University.  *Ceasar*, 388 F. Supp. 3d at 199.  Dr. Vidino is an expert on terrorism; his work focuses on radicalization and recruitment for organizations such as ISIS and al-Qaeda.  Dr. Vidino testified as to the importance of ISIS recruiters and facilitators, as well as the processes of radicalization, mobilization, and deradicalization from jihadist groups.  In preparation for his testimony, Dr. Vidino had reviewed some of Ceasar's social media postings and her post-arrest statements about her social media activity.  He did not meet or speak with her.

Dr. Vidino testified that although ISIS no longer controlled territory, it continued to recruit and engage with supporters over the internet.  He said that

Ceasar had "played two main roles" for ISIS, acting as "a disseminator and a connector." Gov't App'x at 130. According to Dr. Vidino, Ceasar acted as a "disseminator" by posting ISIS propaganda on social media and making it more accessible to the general public. *Id.* As the term suggests, Ceasar acted as a "connector" by "mak[ing] the connection between . . . people who have no connections whatsoever with ISIS, who have just started this radicalization trajectory, . . . with people who are ISIS members or who are [part] of some kind of inner circle of this informal community." *Id.* at 130-31. Dr. Vidino classified "connectors" as "one step up" from "disseminators." *Id.* at 131.

Dr. Vidino identified several factors to assess whether a radicalized individual is disengaging and deradicalizing, such as "ending [one's] personal involvement in terrorism," "[d]istancing [oneself] from extremist activity," Gov't App'x at 186, "[d]istancing oneself from the group's ideology," "[b]reaking contact with individuals associated with the group or supporting its ideology," and "[a]ccepting the punishment for crimes committed," *Ceasar*, 388 F. Supp. 3d at 207 (internal quotation marks and brackets omitted) (alterations added). As to whether Ceasar was progressing toward disengagement and deradicalization, Dr. Vidino testified that based on his review of her communications while she

was on presentence release and after she was remanded to custody, she retained the "worldview [and] the analytical frames of ISIS."  Gov't App'x at 138.  In support of this conclusion, Dr. Vidino noted that Ceasar already had engaged in the same kind of behavior—communicating with ISIS sympathizers—while on presentence release; that she equated Islam with ISIS and framed her prosecution for providing material support to a foreign terrorist organization as persecution for practicing her religion; and that she used the same derogatory language ISIS has used to refer to the American legal system.  *Id.* at 138-45.  As Dr. Vidino summarized: "The way she speaks is the way somebody [who] supports ISIS speaks."  *Id.* at 141.

When asked whether the United States has disengagement or deradicalization programs for people like Ceasar, Dr. Vidino responded in the negative.  He explained that while some other countries, such as Denmark, the Netherlands, and Germany, offer such deradicalization programs, "we are miles away . . . from having programs that are effective, solid, with system[s] behind them. . . .  And we have various initial experimental attempts which I think have not given results so far.  That's the problem."  *Id.* at 145-46.

*19-2881(L); 19-2892(con)*
*United States of America v. Ceasar*

B.  Dr. Kostas Katsavdakis

The government's second expert witness was Dr. Kostas Katsavdakis, a clinical and forensic psychologist.  Dr. Katsavdakis conducted a threat assessment of Ceasar's risk for "targeted violence."  Gov't App'x at 197; *Ceasar*, 388 F. Supp. 3d at 208.  Dr. Katsavdakis explained: "Targeted violence generally implies that a person engages in that kind of violence under a certain pathway," Gov't App'x at 196, and, as the name suggests, "targets" a "particular group . . . or a particular individual," *id.* at 207.

Dr. Katsavdakis reviewed Ceasar's medical records and interviewed her over the course of five sessions, between 2017 and 2019, for approximately ten hours in total.  *Ceasar*, 388 F. Supp. 3d at 208.  He concluded that "she poses a moderate risk for targeted violence based upon nine factors."  Gov't App'x at 203. The first of these is "pathway warning behaviors," which are "behaviors that the person is engaging in to indicate that they are accelerating or on the pathway to a potential attack."  *Id.* at 221.  This is a spectrum of conduct that begins with "grievance," progresses to violent ideation and planning, and ends with an attack.  *Id.* at 222.  Dr. Katsavdakis concluded, based on Ceasar's communications about traveling to marry another ISIS supporter, going to ISIS-controlled

16

territory, and engaging in jihad, that Ceasar fell within the "planning and preparing" stage. *Id.* The second factor is "fixation," a "pathological preoccupation with an idea." *Id.* at 223. Dr. Katsavdakis concluded that, although Ceasar stated that she was no longer interested in ISIS, her behavior indicated otherwise: While on presentence release, she obtained a computer and resumed searching for ISIS-related content and communicating with ISIS supporters online. The third factor, identification, is "an attempt to become a warrior or pseudocommando . . . , and usually it's a sign that you're affiliating with or interested in a particular group or individual." *Id.* at 225. As examples of Ceasar's "identification," Dr. Katsavdakis testified that Ceasar had created a video "espousing not only travel overseas for Islamic purposes but also jihad," and he cited her social media posts supportive of ISIS. *Id.* at 226. The fourth factor, "leakage," means "conveying to a third party, not the direct source, of your intent to engage in some kind of harmful act." *Id.* Here, Ceasar's internet posts and re-posts of videos were indicative of leakage. The fifth factor is presence of mental illness. Dr. Katsavdakis testified that Ceasar told him about her history of anxiety and depression, the abuse she suffered as a child, her religious marriages, and failures at school and work. Dr. Katsavdakis was also aware of

Ceasar's prior suicidal ideation, which was exacerbated by her miscarriage and abuse by her then-husband.

The sixth factor is reliance on virtual community. This allows an individual engaged in activities supporting terrorism or terrorist groups to further isolate themselves and reinforce their extremist beliefs. Dr. Katsavdakis found this factor "evident" in Ceasar. *Id.* at 229. The seventh factor, failed relationships, was also obvious in Ceasar's history of, from a young age, successive, abusive marriages to older men. The eighth factor is thwarting occupational and academic goals. Ceasar dropped out of high school, and she subsequently "held very few jobs for any sustained period of time." *Id.* at 230. The ninth and final factor, presence of deception, manifested in Ceasar's obtaining a computer and returning to her ISIS-supporting community online while on presentence release, her false and misleading statements to the FBI about this conduct, and her statements to Dr. Katsavdakis that her awareness of the FBI's possible surveillance of her motivated her to move more quickly toward her end goals.

Based on these factors, Dr. Katsavdakis concluded that Ceasar posed a moderate risk and "that it would be difficult and a long-term process to case manage [Ceasar] . . . on probation." *Id.* at 234.

2. *The Defense's Experts*

A. Daisy Khan

Daisy Khan is the founder and executive director of Women's Islamic Initiative for Spirituality and Equality ("WISE").  Ms. Khan was offered as an expert on counter-extremism and women in Islam.  *Ceasar*, 388 F. Supp. 3d at 212. Ms. Khan met with Ceasar approximately six times while Ceasar was incarcerated and testified about what drew Ceasar to supporting ISIS.  Ms. Khan stated that, in her opinion, Ceasar's motivations were personal, not ideological, and that Ceasar was no longer committed to an extremist cause.

Ms. Khan further testified that based on Ceasar's history of abuse, Ceasar needed reeducation, healing from years of trauma, and membership in a healthy and productive community:  "In addition to the psychiatric help that she's been getting, she needs to be in a community which is going to welcome her as if she's a family member. . . .  I have taken the time to find such a community for her and she needs a life coach and a life mentor, which I am willing to do for her."  Gov't

App'x at 281.  Ms. Khan recommended the creation of a pilot program specific to Ceasar to manage her rehabilitation.  *Ceasar*, 388 F. Supp. 3d at 213.  Ms. Khan acknowledged, however, that she had not yet created or tested the type of program she was suggesting for Ceasar's rehabilitation, nor could she identify any facility that could adequately provide for Ceasar's rehabilitation.  *Id.*

### B.  Dr. Marc Sageman

The defense's second expert witness was Dr. Marc Sageman, a forensic psychiatrist and expert on terrorism.  *Id.*  Dr. Sageman met with Ceasar for several hours on April 19, 2019, while she was detained after violating the conditions of her presentence release.  Dr. Sageman also reviewed some discovery materials and Ceasar's medical records.

Dr. Sageman testified that Dr. Katsavdakis's method of evaluating Ceasar was not validated or commonly used in the field of terrorism.  He stated that the factors Dr. Katsavdakis relied upon apparently were taken from an article outside the terrorism literature and misapplied to Ceasar.  The district court found this testimony unpersuasive because there was no evidence that Dr. Katsavdakis actually relied on that article.  *Id*.

20

Dr. Sageman then offered his opinion on whether Ceasar would likely reoffend and, relatedly, on Ceasar's reasons for providing material support to ISIS.  As to the continued risk Ceasar posed, Dr. Sageman testified that Ceasar was unlikely to reoffend with repeated conduct—connecting people to ISIS—because ISIS no longer controls physical territory, and its online presence has dwindled.  Dr. Sageman further testified that, based on his interview of Ceasar, her affiliation with ISIS was "emotional" rather than radical.  Gov't App'x at 318. He stated that Ceasar "was attracted to [ISIS] because it was . . . a caring community that [would] take care of her because she was basically looking for some people to take care of her."  *Id.* at 320.  Ceasar had experienced a lifetime of abuse that left her "alienated," and she was looking for a community; she found one, however violent and destructive, in the "idealized" online community of ISIS supporters.  *Id.*; *Ceasar*, 388 F. Supp. 3d at 213-14.

In evaluating her conduct while on presentence release, Dr. Sageman testified that Ceasar's communications did not necessarily indicate an ongoing commitment to ISIS.  She did not, in Dr. Sageman's view, pose a risk of violence, nor was she dangerous, but she could rejoin a destructive community if she were "abandoned" as she was while on bail.  Gov't App'x at 321-22.  Dr. Sageman

testified that "[t]he best way to mitigate [this risk] is to introduce her to a community that will take care of her . . . and I think she will do well." *Id.* at 322. Dr. Sageman did not believe that Ceasar would again lend support to a foreign terrorist organization. *Ceasar*, 388 F. Supp. 3d at 214.

### C.  Dr. Katherine Porterfield

The defense's third and final expert witness was Dr. Katherine Porterfield, a clinical psychologist and expert in trauma and extremism. As of the time of sentencing, Dr. Porterfield had met with Ceasar for a total of approximately 130 hours over the course of two years. She also had reviewed Ceasar's medical records and case-related materials.

Dr. Porterfield described Ceasar's lifetime of abuse and trauma as "quite astonishing," Gov't App'x at 347, and testified that it left Ceasar with ongoing "severe impairments," *id.* at 349. Dr. Porterfield diagnosed Ceasar with complex PTSD, coupled with a serious condition of dissociation. Dr. Porterfield testified: "[M]y opinion is that [Ceasar's] clinical problems are very much the root of her very misguided and destructive and dysfunctional actions. She was a person who did not know how to handle her feelings of pain, shame and fear." *Id.* at 351; *Ceasar*, 388 F. Supp. 3d at 214. As to why Ceasar sought out a violent

community online despite enduring years of abuse, Dr. Porterfield explained that

Ceasar suffers from "betrayal trauma" from her father sexually abusing her and

that, as a result, she developed a defense mechanism of self-destructive behavior.

Gov't App'x at 352-54.  The abuse Ceasar suffered impaired her "radar" for

dangerous and delinquent people and situations; she "stayed in her cultural

community, and, unfortunately, with her bad radar, went towards the worst

forces in that community because of her very poor judgment and very poor

emotional functioning."  *Id.* at 354-55.

Dr. Porterfield explained Ceasar's conduct while on presentence release as

a form of relapse.  She analogized Ceasar's return to the ISIS-supporting online

community to a domestic violence victim returning to an abuser.  *Ceasar*, 388 F.

Supp. 3d at 215-16.  Dr. Porterfield testified that Ceasar "was released without

enough planning and without enough support," and that she thought Ceasar

"went back []to . . . some very familiar dysfunctional people" because "she could

not handle the stress at that point of being out, not having enough treatment, and

not having enough of a community."  Gov't App'x at 356; *Ceasar*, 388 F. Supp. 3d

at 215-16.

23

Dr. Porterfield further testified that Ceasar did not maintain any commitment to ISIS and that she no longer "yearn[ed] for this fantasied absurd thing that she back then thought was going to give her a new life." Gov't App'x at 361. As to whether Ceasar should be incarcerated, Dr. Porterfield testified that prison would do further harm to Ceasar; her mental health issues would not be addressed, nor would she get the trauma-focused treatment that she needed. *Ceasar*, 388 F. Supp. 3d at 216-17. Dr. Porterfield testified that in addition to ongoing trauma treatment, Ceasar needed support and structure "to process her relationship to her community, to Islam, and to who she is [as] a young woman going forward." Gov't App'x at 365. At the conclusion of her testimony, Dr. Porterfield stated that she believed, "with ongoing support and treatment this young person is committed to rebuilding her life and would do so in a healthy way. She needs help." *Id*. at 401.

## IV.    The District Court's Sentence and Written Opinion

At the conclusion of the three-day hearing, the defense asked the district court to impose a sentence of time served with a lifetime term of supervised release. The defense argued, based on the expert testimony, that Ceasar's conduct was the product of chronic abuse and that intensive treatment, not

24

prison, was the answer.  The government disagreed.  It asked the district court to

impose a Guidelines sentence, arguing that Ceasar's serious offense—providing

material support to ISIS—coupled with her conduct while on presentence

release, and her ensuing lies about it to law enforcement authorities,

demonstrated her dangerousness and risk of recidivism.  The government

argued, as it does on appeal, that a significant term of incarceration was

necessary to incapacitate Ceasar and to deter those who may otherwise engage in

similar conduct in the future.

Before the court imposed its sentence, Ceasar spoke on her own behalf.

She acknowledged the wrongfulness of her conduct and that she "mistook a

terroristic organization, who used [her] religion, to be a sort of guidance in [her]

life." *Id*. at 447.  She further stated that she no longer supports or associates with

any terrorist organizations and that she aimed to focus on bettering her health,

education, and future.  The district court also read into the record a letter of

support it had received from Ceasar's brother.

Based on Ceasar's total offense level of 40 and her criminal history

category of VI due to applicable terrorism enhancements under section 3A1.4(b)

of the Sentencing Guidelines, Ceasar faced a Guidelines range of 360 to 600

months' imprisonment.  The district court concluded that this range was

"excessively harsh," and varied downward from it considerably.  *Id.* at 456.

The court found that Ceasar "has moved substantially towards rejection of

ISIL and now abjures the terrorist ideology."  *Id.* at 458.  It went on to discuss the

factors it weighed in imposing the sentence:

> Under federal penal jurisprudence, the [c]ourt will consider general
> and specific deterrence; that is, what will indicate to the population
> generally what they should and should not do.  And they should not
> do what this Defendant has done; that is, betray, in a sense, her
> citizens, the United States citizens, and its law enforcement by
> giving information to ISIL members or those who sought ISIL
> membership who are in this country.  I believe that general and
> specific deterrence will result from the sentence I am imposing.
>
> I also must consider incapacitation.  In case she slips back into this
> role, will the people of the country be sufficiently protected by her
> being in prison?
>
> We will also consider rehabilitation, although rehabilitation in
> prison, as we all know, is very difficult, and the question of
> punishment for doing bad acts; in this case, the aiding of ISIL.
>
> . . .
>
> It's apparent that this young woman is in need of intensive educational,
> emotional, and economic support to address the trauma she has
> experienced and which has, in part, motivated her actions.

*Id.* at 459-60.  The district court further noted that the United States lacks the type

of "intensive disengagement and deradicalization programs" that some European

countries have implemented to rehabilitate those who commit terrorism-related

crimes. *Id.* at 461. The court also announced that it would issue a full written

opinion.

The court sentenced Ceasar to 46 months' imprisonment for the Material

Support Offense, one month for the Obstruction Offense, and one month for

committing an offense while on presentence release, pursuant to 18 U.S.C. § 3147.

These sentences were to run consecutively, for a total term of imprisonment of 48

months. The court also imposed eight years of supervised release. The

government objected and requested that the court more fully explain its

reasoning for the sentence imposed. The court replied that while it would lay

out its reasoning in a written opinion, "a major factor is that[,] based on [the

court's] repeated observations of [Ceasar]," along with the extensive record and

expert testimony, "she is well on her way towards rehabilitation. And she

presents or will present when this sentence has been served almost no danger to

the country and that this sentence will also save her as a human being." *Id.* at

469.

Approximately one month after the sentencing hearing, the district court

issued its written opinion. *See Ceasar*, 388 F. Supp. 3d at 194. The court

recounted at length Ceasar's background, the offense conduct, and the experts'

and Ceasar's testimony at the sentencing hearing. *Id.* at 194-218. The court stated

that it "carefully considered" the sentencing factors set forth in 18 U.S.C.

§ 3553(a), and while recognizing the seriousness of Ceasar's crimes, "the

importance of specific deterrence, as well as general deterrence, to protect the

public," it concluded that "[i]n this instance, rehabilitation and specific

deterrence . . . go hand in hand." *Id.* at 219-20.

The district court acknowledged that in its view, the ideal sentence—

Ceasar's placement in an intensive deradicalization or disengagement program—

would not be possible because no such program exists in the United States. *Id*. at

220. Other countries, the court pointed out, have created such rehabilitative

programs, and it recommended that the Bureau of Prisons follow suit. *Id.* at 221.

Without an "adequate program of rehabilitation . . . , the court seriously

considered whether a further term of incarceration was appropriate" and

concluded that the seriousness of Ceasar's offenses "compelled . . . some

incarceration as punishment and for control . . . ." *Id.*

The court was mindful of the likely negative impacts of a long prison

sentence on Ceasar's physical and mental health, however, and concluded that "a

lengthy term of incarceration during which her medical needs are not fully met

would be extremely harmful to Ceasar's development as a productive member of society." *Id*. at 222.  The district court reiterated Ceasar's sentence of 48 total months of incarceration and the conditions of her supervised release.  *Id*. at 223-25.

The government appealed.

## DISCUSSION

The government argues that Ceasar's well-below-Guidelines sentence was substantively unreasonable.  We agree.  Despite our admiration for the district court's meticulous inquiry and analysis, and its care and compassion for Ceasar, we conclude that it placed more emphasis on Ceasar's need for rehabilitation than that sentencing factor could bear.  It failed adequately to weigh section 3553(a) factors that, *inter alia*, balance the needs and circumstances of an individual defendant against the goals of protecting the public, deterring criminal behavior, and engendering respect for the law.  We further conclude that in comparison with sentences of others for similar terrorism crimes, Ceasar's sentence of 48 months' imprisonment was shockingly low and unsupportable as a matter of law.

## I.   Applicable Law

District courts "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. § 3553(a)(2).  18 U.S.C. § 3553(a).  In calculating a sentence, courts must consider and weigh the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

(5) any pertinent policy statement . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*Id.*

We are "constrained to review sentences for reasonableness," *United States v. Richardson*, 521 F.3d 149, 156 (2d Cir. 2008), and do so "under an abuse-of-discretion standard," *Gall v. United States*, 552 U.S. 38, 51 (2007); *see also United States v. Verkhoglyad*, 516 F.3d 122, 127 (2d Cir. 2008) ("reasonableness" review "applies both to the sentence itself and to the procedures employed in arriving at the sentence" (internal quotation marks omitted)).  Review for "substantive reasonableness . . . requires that we consider only whether the length of the sentence is reasonable in light of the § 3553(a) factors." *Richardson*, 521 F.3d at 156.

In reviewing the substantive reasonableness of a sentence, we "consider whether [a sentencing] factor, as explained by the district court, can bear the weight assigned it under the totality of circumstances in the case." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc).  We do not consider how we might have weighed particular factors, *id.*, but instead, "[o]ur role is no more than to patrol the boundaries of reasonableness," *United States v. Stewart*, 590 F.3d 93, 135 (2d Cir. 2009) (internal quotation marks omitted).  A sentence is substantively unreasonable if "affirming it would damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or

otherwise unsupportable as a matter of law." *United States v. Park*, 758 F.3d 193, 200 (2d Cir. 2014) (internal quotation marks omitted).

Reviewing a sentence for substantive reasonableness requires us to "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S. at 51.  While a sentence outside the Guidelines range is not presumptively unreasonable, the district court's justification for a non-Guidelines sentence must be "sufficiently compelling to support the degree of the variance." *Id.* at 50.  And "a major departure should be supported by a more significant justification than a minor one." *Id.*

## II.    Analysis

"Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." *United States v. Mumuni*, 946 F.3d 97, 112-13 (2d Cir. 2019) (internal quotation marks and alteration omitted); *see also United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat . . . , and thus that terrorists and their supporters should be incapacitated for a

longer period of time.")  But we have recognized in terrorism cases, too, that "sentencing is one of the most difficult—and important—responsibilities of a trial judge." *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014).  We will not lightly set aside such exercises of judicial discretion.  As with sentencing appeals in other contexts, we do so only in "exceptional cases." *Cavera*, 550 F.3d at 189. For the reasons that follow, we conclude that this is one such case.

### A.    Ceasar's Need for Rehabilitation

It is not unusual for criminal conduct to arise from tragic circumstances affecting the defendant.  In Ceasar's case, those circumstances were particularly pronounced.  She suffered terrible sexual, physical, and emotional abuse for much of her life.  That this traumatic history may have played a role in Ceasar's search for acceptance in a community—no matter how destructive or violent— does not, however, cancel out the seriousness of her offenses.  When weighing Ceasar's personal history, the district court appears to have considered her background and ensuing needs for mental healthcare and rehabilitation nearly to the exclusion of countervailing sentencing factors.  We conclude that this was an abuse of discretion.

In articulating its "ideal sentence"—which it recognized was unavailable—the district court nonetheless stressed that Ceasar would have benefited from rehabilitation programs that did not then exist, nor, to our knowledge, have since been developed.  *Ceasar*, 388 F. Supp. 3d at 220-22.  As both the government and defense experts testified at the sentencing proceeding, any such rehabilitation program and its efficacy remain untested in this country.  In particular, Daisy Khan testified that Ceasar would benefit from the creation of a rehabilitation program but acknowledged that she had neither a facility nor a tested methodology or existing program to manage Ceasar's rehabilitation.

The court's apparent acceptance of the experts' agreement that "no such satisfactory general [deradicalization or disengagement] program exists in the United States" is in considerable tension with its emphasis on Ceasar's need for rehabilitation as the factor that most influenced its sentencing decision.  *See id*. at 220-21.  The district court stated that "Ceasar's counsel and the Probation Department are developing a program of intensive treatment and support for the term of her supervision after her incarceration" and instructed that "the treatment should begin in prison and connect seamlessly with control and assistance by Probation."  *Id*. at 196.  This reasoning suggests that Ceasar could get the

rehabilitative care she requires after—or even during—a term of incarceration,

and therefore seems to render less persuasive the court's reliance on

rehabilitation as a factor weighing against a longer prison sentence.  Moreover, if

at the time of sentencing, Ceasar's treatment program still required development

and could not have been implemented until some future time, it is difficult to see

how a longer sentence would have been detrimental to Ceasar's ultimate

rehabilitation; she would have been awaiting the availability of such a program

in any event.  Gov't App'x at 389.  We think the district court was mistaken in

imposing a sentence so heavily based on the prospective creation of one or more

such programs.

### B.    Our Relevant Jurisprudence

When we view Ceasar's sentence in the context of the crimes she

committed, other defendants who have committed similar terrorism crimes, and

our treatment of them, we conclude that the 48-month sentence imposed in the

case at bar was shockingly low and therefore substantively unreasonable.

In *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ("*Stewart I*"), the

defendant-appellant Lynne Stewart had been a "dedicated public servant who

had, throughout her career [as an attorney], represented the poor, the

disadvantaged and the unpopular," often as court-appointed counsel.  *Id.* at 147

(internal quotation marks omitted).  She represented Sheikh Omar Ahmad Ali

Abdel Rahman, who "was convicted of a variety of terrorism-related crimes,"

including "soliciting the murder of Egyptian President Hosni Mubarak,"

"attacking American military installations," "conspiring to bomb the World Trade

Center in 1993, which succeeded," and "conspiring subsequently to bomb various

structures in New York City, including bridges, tunnels," and the FBI's New York

office, which did not succeed.  *Id.* at 101.  While imprisoned, Abdel Rahman was

subject to Special Administrative Measures ("SAMs"), which, among other

things, "prohibited him from having contact with others . . . that could

foreseeably result in his communicating . . . terrorist information."  *Id.* at 102

(internal quotation marks and alterations omitted).  Abdel Rahman was

permitted to remain in contact with his lawyers, including Stewart, and Stewart

executed documents in which she agreed to abide by the SAMs.  *Id.*  During

visits with Abdel Rahman, however, Stewart violated the SAMs by "pass[ing]

messages between third parties . . . and Abdel Rahman," and from Abdel

Rahman to others.  *Id.* at 103 (internal quotation marks omitted); *see also United

States v. Stewart*, 686 F.3d 156, 161-62 (2d Cir. 2012) ("*Stewart II*").

Although Stewart faced a Sentencing Guidelines range of 360 months' imprisonment, the district court imposed a 28-month sentence. *Stewart I*, 590 F.3d at 144. The government appealed the sentence as "unreasonable and unduly lenient." *Id.* at 134. Although we were "impressed by the factors that figured in Stewart's modest sentence—particularly her admirable history of providing, at no little personal cost to herself, proficient legal services in difficult cases to those who could not otherwise afford them," we found Stewart's sentence to be "strikingly low" in light of her criminal conduct and her use of "her privileged status as a lawyer to facilitate her serious violation of the law." *Id.* at 147-48. Together with her possible commission of perjury at trial—a fact on which the district court had not made an explicit finding—we concluded that remand was required for the district court to make such a finding and then to resentence Stewart. *Id.* at 151.

On remand, the district court imposed a below-Guidelines, but greatly increased, sentence of 120 months' imprisonment. We affirmed despite Stewart's claim that the new sentence was substantively unreasonable. *Stewart II*, 686 F.3d at 179-80. In light of her "severe criminal conduct in aid of a terrorism conspiracy," and the facts that she "abus[ed] the trust that the government had

placed in her as a member of the bar" and had "lied repeatedly under oath," we

rejected her contention that the 120-month sentence was "shockingly high." *Id.* at

181.

As in our *Stewart* decisions, so too here there are mitigating factors that

may render a Guidelines sentence unduly harsh and that may merit

consideration and weight when determining the appropriate sentence.  But also

as in *Stewart*, the sentence imposed is "strikingly low" in light of the seriousness

of the defendant's conduct.  *Stewart I*, 590 F.3d at 148.

In *United States v. Mumuni*, 946 F.3d 97 (2d Cir. 2019), we held that the

district court had abused its discretion by imposing a sentence well below the

applicable Guidelines range where that sentence was based on, *inter alia*,

assigning mitigating factors weight that they could not bear.  *Id.* at 112.  There,

the defendant pleaded guilty to multiple terrorism counts, including conspiracy

and attempt to provide material support to ISIS, conspiracy to assault federal

officers, attempted murder of federal officers, and assault of a federal officer with

a deadly or dangerous weapon.  *Id.* at 101.  Mumuni faced a Guidelines sentence

of 85 years' imprisonment.  *Id.* at 104.  The district court imposed a 17-year

sentence, and the government appealed on substantive reasonableness grounds.

*Id.* at 101, 105-06.  One of the three bases on which we concluded that Mumuni's

sentence (albeit more than four times that imposed in Ceasar's case) was

"shockingly low and unsupportable as a matter of law" was that the district court

placed improper weight on mitigating factors, including Mumuni's youth at the

time of his offense, his lack of criminal record, and his good behavior while

incarcerated pretrial and presentence.  *Id.* at 108, 112.  To the extent that such

mitigating factors accounted for an 80% downward variance from the

Guidelines, we concluded that in a "case involving terrorism and such serious

offense conduct, . . . reliance on these mitigating factors produced a sentence that

shocks the conscience and cannot be located within a permissible range of

decisions."  *Id.*  The same is true with respect to the sentence before us here.

Ceasar's attempts to distinguish the instant case from *Mumuni* are

unavailing.  She argues that our decision there should have "no bearing on this

case" and that it is best understood as a reflection of our disapproval of the

district court's discounting the violent nature of Mumuni's crimes.  Def. Br. at 55-

57.  But there, "we identif[ied] three errors that render[ed] Mumuni's sentence

substantively unreasonable," including the district court's (1) reliance "on a

sterilized account" of Mumuni's attack on a federal agent and its second-guessing

of the record that conflicted with its own acceptance of Mumuni's guilty plea; (2)

unsupported and contradictory explanations of the sentencing disparity between

Mumuni and his co-conspirator; and (3) reliance on mitigating factors that could

not bear the weight assigned to them. *Mumuni*, 946 F.3d at 107-08. None of these

errors was determinative. To the contrary, we concluded that "[j]ointly and

severally, these errors caused the [d]istrict [c]ourt to render a sentence that is

shockingly low and unsupportable as a matter of law." *Id.* at 108.

Ceasar further argues that the mitigating factors present here—her lifetime

of abuse and neglect and need for rehabilitation—are more serious than those

considered in *Mumuni* and, according to Ceasar, merit the weight assigned to

them. In an appeal we decided before *United States v. Booker*, 543 U.S. 220 (2005),

at a time when the Guidelines were thus understood to be mandatory, we

nonetheless "conclude[d] that in extraordinary circumstances . . . district courts

may properly grant a downward departure [from a Guidelines sentence] on the

ground that extreme childhood abuse caused mental and emotional conditions

that contributed to the defendant's commission of the offense." *United States v.

Rivera*, 192 F.3d 81, 85 (2d Cir. 1999). While *Booker* has since rendered the

Guidelines non-mandatory and variances—as distinct from "departures"—from

them are therefore permissible, *Stewart I*, 590 F.3d at 137 n.32 (distinguishing

between departures and variances), variances must still be reasonable.  We

conclude that the district court's very substantial downward variance from the

Guidelines sentence here was unreasonable; it was not "within the range of

permissible decisions."  *Park*, 758 F.3d at 200 (internal quotation marks omitted).

It was, as we have noted, based on the potential creation of then-untested

rehabilitation programs—which may never come into existence—and failed to

weigh competing sentencing considerations.  Obviously, as Dr. Porterfield

acknowledged, not every person who suffers such extreme abuse and trauma

seizes the opportunity to provide material support to ISIS or commit obstruction.

Gov't App'x at 367.  To the extent Ceasar invites us to decide the threshold at

which the gravity of a defendant's personal circumstances merits a sentencing

variance of this magnitude, we decline to do so.

In sum, the district court's approximately 87% downward variance from

the bottom of the 360- to 600-month Guidelines range was based on Ceasar's

need for rehabilitation and the potential detrimental effects of a long prison

sentence on her physical and mental wellbeing.  *Ceasar*, 388 F. Supp. 3d at 221-22.

Under the facts and circumstances of this case, in which the lives and safety of

innocents were ultimately at risk, this factor could not bear the weight assigned

to it.  The court did not adequately balance the need for rehabilitation against the

competing punitive goals of sentencing recognized by section 3553(a), including

the needs for the sentence "to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense;" "to afford

adequate deterrence to criminal conduct;" and "to protect the public from further

crimes of the defendant."  18 U.S.C. § 3553(a)(2).  We now turn to these

considerations.

## C.     The Section 3553(a) Factors

In its discussion of the length of Ceasar's term of imprisonment, the district

court aimed to "minimize the amount of time [Ceasar] would go without

effective medical and social supports."  *Ceasar*, 388 F. Supp. 3d at 222.  It did not

meaningfully balance that concern against the seriousness of Ceasar's offenses,

the goals of general and specific deterrence, the need to protect the public from

future crimes Ceasar could commit, and the need to avoid unwarranted

sentencing disparities among defendants with similar records who have been

found guilty of similar conduct.  18 U.S.C. § 3553(a)(2), (a)(6).

The district court recognized that Ceasar's crimes were "serious" and that she "was not simply an individual who posted propaganda; she intentionally and knowingly connected individuals in the United States with those abroad who would do the United States harm." *Ceasar*, 388 F. Supp. 3d at 220. We cannot reconcile that with the 48-month sentence imposed.

Strikingly—yet nearly absent from the district court's discussion—Ceasar had already exhibited recidivist behavior while on release awaiting sentencing. To be sure, the district court acknowledged that "Ceasar's deletion of her communications with others while on presentence release impeded the government's ability to investigate the extent of her bail violations." *Id.* at 220. But that captures only a small part of her conduct underlying the post-release Obstruction Offense: recreating pseudonymous social media accounts to reconnect with ISIS supporters; deleting incriminating communications to evade punishment and encouraging others to do the same; and then making false and misleading statements to law enforcement when questioned about this conduct. The district court recognized the experts' disagreement as to Ceasar's "risk of reoffending," but did not address the remarkable fact that, independent of the experts' opinions, Ceasar had indeed already reoffended. *Id.*

43

The district court's conclusion that "rehabilitation and specific deterrence of [Ceasar] seem to go hand in hand" is further subject to question in light of the fact that Ceasar was already being treated by Dr. Porterfield when she reoffended while on presentence release.  *Id.*  Indeed, Dr. Porterfield testified that she was unaware that Ceasar was reoffending even though, to the best of her recollection, she had met with Ceasar during that time.  The district court did not address the tension between connecting Ceasar's rehabilitation to specific deterrence and the fact that Ceasar was receiving therapy to correct her problematic decision-making while she had resumed her criminal conduct—and then attempted to conceal it from law enforcement authorities (and presumably from Dr. Porterfield).

Ceasar mischaracterizes her behavior while on presentence release as "contact[ing] former friends, some of whom she had cooperated against."  Def. Br. at 46.  This conduct, according to Ceasar, "did not amount to new criminal conduct or 'recidivism' on [its] own."  *Id.*  But the context in which Ceasar engaged in such conduct is crucial.  She went beyond reaching out to old friends. She violated the express terms of her presentence release by obtaining and using a laptop to resume her operation of pseudonymous social media accounts in

order to contact or attempt to contact several people she knew to be supporters

of ISIS or other extremist groups.  She deleted incriminating social media and

text messages, emails, audio files, and images and instructed others with whom

she had been in contact to do the same.  She then lied to the FBI about it.  While

Ceasar may have been searching for a community and a sense of belonging in

her course of recovery from a lifetime of abuse and neglect, that can only go so

far in determining—in light of her remarkably dangerous and unlawful

conduct—a just and adequate punishment.

Indeed, despite recognizing Ceasar's violations of the conditions of her

presentence release to some extent, the district court's sentencing of Ceasar for

these additional offenses was remarkably low.  Of the total 48-month sentence

imposed, the court sentenced Ceasar to 46 months for the Material Support

Offense, one month for the Obstruction Offense, and only one month for

committing an offense while on bail, pursuant to 18 U.S.C. § 3147.  Gov't App'x at

467-68; *Ceasar*, 388 F. Supp. 3d at 223.  We conclude that the district court abused

its discretion as a matter of law by failing to give adequate weight to the gravity

of Ceasar's reoffending conduct while on presentence release, her conduct taken

to obstruct justice, and the demonstrated threat she posed to the public when at

liberty.

Finally, it does not appear that the district court considered whether

Ceasar's sentence would be "shockingly low" compared with the sentences

imposed on other defendants with similar records who committed similar

terrorism crimes. *Mumuni*, 946 F.3d at 107 (internal quotation marks omitted); *see*

18 U.S.C. § 3553(a)(6). To be sure, "[u]ltimately, what shocks the conscience

depends on the informed intuition of the appellate panel. It is a highly

contextual standard that involves some degree of subjectivity in its application . .

. ." *Mumuni*, 946 F.3d at 107 (internal quotation marks and footnotes omitted).

But the sentences imposed in a handful of recent material support cases illustrate

the unwarranted disparity reflected by the 48-month sentence imposed here.[3]

In *United States v. Naji*, No. 16-cr-653 (FB) (E.D.N.Y. June 11, 2019), for

example, defendant Mohamed Naji pleaded guilty to one count of attempting to

---

[3] We do not require district courts to "discuss every § 3553(a) factor individually," nor do we "require robotic incantations by district judges." *United States v. Villafuerte*, 502 F.3d 204, 210 (2d Cir. 2007) (internal quotation marks omitted). Indeed, "this Court presumes that the sentencing judge has considered all relevant § 3553(a) factors and arguments unless the record suggests otherwise." *United States v. Rosa*, 957 F.3d 113, 118 (2d Cir. 2020). In this case, though, the record suggests that the district court failed to consider some relevant sentencing factors, including the need to avoid unwarranted sentence disparities.

provide material support to ISIS, in violation of 18 U.S.C. § 2339B.  Gov't

Sentencing Mem. at 9, *Naji*, No. 16-cr-653 (FB) (E.D.N.Y. June 11, 2019), ECF No.

21.  Naji, like Ceasar, posted violent, pro-ISIS content on social media, but went a

step further:  He in fact traveled to Yemen to join ISIS, whereas Ceasar was

intercepted at JFK on her way to ISIS-controlled territory.  *Id*. at 1-9.  Naji, like

Ceasar, attempted to conceal his activities and obstruct justice by instructing

those with whom he was communicating to delete their messages, but Naji's plea

agreement protected him from an obstruction charge.  *Id.* at 9 n.2.  The district

court sentenced Naji to the statutory-maximum 240 months' imprisonment.

Judgment at 2, *Naji*, 16-cr-653 (FB) (E.D.N.Y. June 27, 2019), ECF No. 25.

In *United States v. Saidakhmetov*, No. 15-cr-95 (WFK), 2018 WL 461516

(E.D.N.Y. Jan. 18, 2018), the district court sentenced the defendant to the

statutory maximum of 15 years where the defendant pleaded guilty to one count

of conspiring to provide material support to a terrorist organization, in violation

of 18 U.S.C. § 2339B(a)(1).  *Id.* at *1.  Like Ceasar, Saidakhmetov was "in contact

with ISIL operatives and supporters."  *Id.* at *2.  Saidakhmetov and his co-

conspirator took steps to join ISIL, including planning travel to ISIL-controlled

territory.  *Id.*  Also like Ceasar, he was arrested at JFK when attempting to travel

to Turkey.  *Id.*  Saidakhmetov faced a Guidelines range of 360 months' to life

imprisonment; the statutory maximum was 180 months (15 years), which the

district court imposed.  *Id.* at *3-4.  Saidakhmetov's co-conspirator, Juraboev, also

received a sentence of 180 months' imprisonment.  *United States v. Juraboev*, No.

15-cr-95 (WFK), 2017 WL 5125523, at *1, 2017 U.S. Dist. LEXIS 181402, at *2

(E.D.N.Y. Nov. 1, 2017).  Juraboev, like Saidakhmetov, pleaded guilty to one

count of conspiracy to provide material support to a terrorist organization.

Juraboev had, *inter alia*, expressed support for ISIL online, and, like

Saidakhmetov, purchased a plane ticket to travel to Turkey and planned to

continue on to Syria.  He was arrested at his apartment in Brooklyn.  *Id.*, 2017 WL

5125523, at *2, 2017 U.S. Dist. LEXIS 181402, at *7-8.

Perhaps the most obvious difference between these cases and Ceasar's is

that Ceasar was not going to take up arms to fight on behalf of ISIS.  Ceasar was

an intermediary who connected U.S.-based individuals to others overseas who

could assist them in traveling to ISIS-controlled areas.  Ceasar did, however, plan

to travel to ISIS-controlled territory and marry another ISIS supporter on the

way.  Like Saidakhmetov, she was arrested while attempting to leave the United

States to travel to ISIS territory.  While Ceasar's conduct may not have risen to

the level of criminality engaged in by some of these other defendants, the difference in the length of the sentences seems significantly out of proportion to the difference in the seriousness of their not-so-dissimilar crimes.[4]

Ceasar argues that the cases to which the government cites are inapposite because the mitigating circumstances present here render the instant case distinguishable.  For the reasons discussed above, however, we conclude that the mitigating factors—the abuse Ceasar has suffered and her ensuing needs for mental healthcare and rehabilitation—may merit significant consideration but cannot bear the apparently decisive weight assigned to them by the district court.  That such mitigating circumstances were not present in these other cases,

---

[4] An opinion from the Fourth Circuit, albeit a "summary opinion" and therefore deemed by that court to be non-precedential, is similarly instructive.  In *United States v. Young*, 818 F. App'x 185 (4th Cir. 2020), the Fourth Circuit affirmed a 15-year sentence imposed on Young, who was charged with attempting to provide material support to ISIL and attempting to obstruct justice.  *Id.* at 188-89.  Unbeknownst to Young, he was in communication with an FBI informant, he "advised [the informant] on how to travel abroad without being flagged by authorities," and, as prompted by the informant, transmitted Google gift cards to be used to buy encrypted messaging accounts, ostensibly in order to recruit more ISIL fighters.  *Id.* at 189.  Like Ceasar, Young does not himself seem to have planned to become an ISIL fighter.  The court focused instead on Young's recruiting others, examined comparable material support sentences in the Fourth Circuit, and emphasized the district court's conclusion that it was "important for people to understand that if they intend to provide material support for a terrorist organization . . . there's a very harsh penalty to be paid."  *Id.* at 194 & n.10 (internal quotation marks omitted).

therefore, does not so drastically distinguish them in Ceasar's favor as to warrant

a 48-month sentence.

Ceasar invokes this Court's decision in *Thavaraja*—in which we upheld a

below-Guidelines sentence of 108 months—as a relevant comparator.  *See*

*Thavaraja*, 740 F.3d at 260.  While the defendant's conduct in that case was

undoubtedly serious, we noted the district court's finding that his procuring of

weapons for a foreign terrorist organization "was motivated solely to assist the

Tamil minority in Sri Lanka who were engaged in an ongoing civil war."  *Id.* at

262 (internal quotation marks omitted).  By contrast, Ceasar did not assist

"people who certainly pose no direct threat to the United States," *id.* at 261

(internal quotation marks omitted).  She aided an organization that intentionally

targets the United States and its citizens.  Moreover, the defendant in *Thavaraja*

was described as "a very model, positive inmate," *id.* at 257 (internal quotation

marks omitted), who "had accepted full responsibility for his crimes," *id.* at 260.

By contrast, Ceasar, as she explained, acted out of anxiety "to find a way out of

[her] situation," such that she failed to "realize the severity of what people could

convince [her] into believing."  Gov't App'x at 447.  She also did not consistently

accept responsibility for her criminal conduct.  Her offense conduct while out on

*19-2881(L); 19-2892(con)*
*United States of America v. Ceasar*

presence release reflected an extraordinary breach of trust and evidenced her

likelihood of reoffending.  When the FBI interviewed her about this conduct, she

lied.  She also had attempted to conceal her offending conduct while on

presence release by intentionally deleting incriminating communications and

by instructing others with whom she had been in contact to do the same.  These

facts alone render *Thavaraja* distinguishable from the instant case.

Although every case is unique and no two defendants are ever exactly

alike, the significant differences between the sentences imposed on Naji,

Saidakhmetov, Juraboev, and Young, on the one hand, and Ceasar on the other,

reflect a troubling and unwarranted disparity "among defendants with similar

records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

That disparity, coupled with the seriousness of Ceasar's Material Support and

Obstruction Offenses, her demonstrated recidivist tendencies while on

presence release, and her attempts to cover up her conduct by deleting

incriminating material and lying to law enforcement authorities, lead us to

conclude that the 48-month sentence imposed on Ceasar "shocks the conscience."

*Mumuni,* 946 F.3d at 107 (internal quotation marks omitted).

## CONCLUSION

Our jurisprudence in this area is built on the understanding that district courts are generally better positioned than appellate courts to make sentencing determinations. *See United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). It is the role of this Court, however, "to patrol the boundaries of reasonableness" of those decisions. *Stewart I*, 590 F.3d at 135 (internal quotation marks omitted). For the reasons stated at some length above, we conclude that Ceasar's far-below-Guidelines sentence was outside the bounds of what was reasonable in light of the facts and circumstances of this case. While Ceasar's need for rehabilitation from years of trauma and abuse was one factor that the district court could have properly taken into consideration at sentencing—perhaps it may indeed merit, in the court's discretion, a below-Guidelines sentence—the district court's assigning it overwhelming weight while failing to give adequate consideration to the competing goals of sentencing—including the need for the sentence to protect the public, deter criminal conduct of the defendant specifically and others generally, promote respect for the law, and reflect the seriousness of the offense committed—was an abuse of discretion. For the

foregoing reasons, we VACATE the judgment of the district court and REMAND

for resentencing consistent with 18 U.S.C. § 3553(a) and this opinion.